Mountain Valley Pipeline, LLC

v.

Easements to Construct, etc., et al.


# Exhibit 1 to Complaint

Certificate Order from FERC

171 FERC ¶ 61,232
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
                       Richard Glick, Bernard L. McNamee,
                       and James P. Danly.

Mountain Valley Pipeline, LLC                    Docket No.  CP19-14-000

ORDER ISSUING CERTIFICATE

(Issued June 18, 2020)

1.     On November 6, 2018, Mountain Valley Pipeline, LLC (Mountain Valley) filed an application pursuant to section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] for authorization to construct and operate approximately 75.1 miles of natural gas pipeline and associated aboveground facilities in Pittsylvania County, Virginia, and Rockingham and Alamance Counties, North Carolina (Southgate Project).  The Southgate Project is designed to provide up to 375,000 dekatherms (Dth) per day of firm transportation service.

2.     For the reasons discussed below, we will grant the requested authorizations, subject to the conditions described herein.

I.     **Background**

3.     Mountain Valley,[3] a Delaware limited liability company, does not currently provide any services subject to the Commission's jurisdiction.  On October 13, 2017, the Commission issued a certificate of public convenience and necessity authorizing Mountain Valley to construct and operate a new 303.5-mile-long, 42-inch-diameter interstate pipeline system to provide up to 2,000,000 Dth per day of firm natural gas transportation service from Wetzel County, West Virginia, to an interconnection with Transcontinental Gas Pipe

_____

[1] 15 U.S.C. § 717f(c) (2018).

[2] 18 C.F.R. pt. 157 (2019).

[3] Five companies own Mountain Valley:  (1) EQM Midstream Partners, LP (45.5%); (2) NextEra Energy (31%); (3) Con Edison Transmission, Inc. (12.5%); (4) WGL Midstream (10%); and (5) RGC Midstream, LLC (1%).

Line, LLC's (Transco) Compressor Station 165 in Pittsylvania County, Virginia (Mainline System).[4]

4.      In early 2018, Commission staff authorized Mountain Valley to commence construction of the Mainline System, and, in February 2018, Mountain Valley commenced construction.[5]  On July 27, 2018, the U.S. Court of Appeals for the Fourth Circuit issued an order vacating authorizations issued by the Department of the Interior's Bureau of Land Management (BLM) and the Department of Agriculture's Forest Service (Forest Service) for the Mainline System.[6]  Thereafter, on August 3, 2018, Commission staff issued a Notification of Stop Work Order for the Mainline System.[7]  Subsequently, on August 29, 2018, Commission staff authorized partial construction to resume based on staff's assessment that completing construction and restoration as quickly as possible would best protect the environment.[8]

5.      On October 3, 2018, Mountain Valley informed the Commission that the U.S. Court of Appeals for the Fourth Circuit had issued an order vacating the U.S. Army Corps of Engineers (Army Corps) Huntington District's Nationwide Permit 12 for the project, and that it was suspending construction in waters of the United States in the

---

[4] *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (2017), *order on reh'g*, 163 FERC ¶ 61,197 (2018) (*Mountain Valley*), *aff'd sub nom.*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019).

[5] *See* Mountain Valley's Weekly Status Report Nos. 14 and 15 (filed February 7 and 15, 2018, respectively, in Docket No. CP16-10-000) (construction did not commence until after February 2, 2018).

[6] *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018) (vacating the permit for the pipeline to cross 3.6 miles of the Jefferson National Forest in West Virginia and Virginia).

[7] *Mountain Valley Pipeline, LLC*, Notification of Stop Work Order, Docket No. CP16-10-000 (August 3, 2018) (delegated order).

[8] *Mountain Valley Pipeline, LLC*, Partial Authorization to Resume Construction, Docket No. CP16-10-000 (August 29, 2018) (delegated order) (allowing construction except for the area containing the 3.5 miles of pipeline route across the Jefferson National Forest, in Monroe County, West Virginia and Giles County, Virginia, between milepost 196.0 and milepost 221.0).

Army Corps' Huntington District.[9]  Subsequently, Mountain Valley notified the Commission that the Army Corps' Norfolk and Pittsburgh Districts had suspended their nationwide permits issued for the Mainline System, and that, consequently, Mountain Valley was suspending construction in waters of the United States in those Army Corps districts as well.[10]

6.      On August 15, 2019, Mountain Valley voluntarily suspended new construction activities in certain watersheds to avoid potential impacts on listed threatened and endangered aquatic species.[11]  On August 28, 2019, the Commission requested that the U.S. Fish and Wildlife Service (FWS) reinitiate consultation under section 7 of the Endangered Species Act (ESA) with respect to the Mainline System project.

7.      On October 11, 2019, the United States Court of Appeals for the Fourth Circuit issued an order granting a stay of the FWS's 2017 Biological Opinion and Incidental Take Statement (Biological Opinion) issued for the Mainline System and granting the Department of the Interior's motion to hold the litigation in abeyance until completion of reinitiated ESA consultation.[12]  In response to the court's stay of the 2017 Biological Opinion, the Director of the Office of Energy Projects notified Mountain Valley that it

---

[9] Mountain Valley's October 3, 2018 Letter, Docket No. CP16-10-000 (providing opinion of the U.S. Court of Appeals for the Fourth Circuit, *Sierra Club v. U.S. Army Corps of Eng'rs*, 905 F.3d 285 (4th Cir. 2018)).

[10] Mountain Valley's October 9 and 22, 2018 Letters, Docket No. CP16-10-000 (providing the Army Corps' Norfolk and Pittsburg Districts' notices suspending authorization, respectively).

[11] Mountain Valley's August 15, 2019 Voluntary Suspension Letter, Docket No. CP16-10-000 (suspending work within mileposts 107.5-122.5, 196.3-201.8, and 218.6-293.3).  The FWS issued a Biological Opinion for the Mainline System on November 21, 2017.  Since issuance of the Biological Opinion, the candy darter, which is known to inhabit streams in the project area, was listed as endangered by the FWS. New information on the possible effects of the Mainline System on certain species covered by the Biological Opinion (i.e., Roanoke logperch, Indiana bat, and Northern long-eared bat) has also been identified in the interim (e.g., new information regarding impacts from sedimentation and slips).

[12] *Wild Virginia v. Department of the Interior*, Order, 4th Cir. No. 19-1866 (Oct. 11, 2019) (order granting stay and holding case in abeyance).  On September 11, 2019, the FWS accepted the Commission's August 28, 2019 request to reinitiate consultation pursuant to section 7 of the ESA regarding impacts to certain species covered in the 2017 Biological Opinion (i.e., the candy darter, Roanoke logperch, Indiana bat, and Northern long-eared bat).

must cease all construction activity along the entirety of the Mainline System and in all work areas except for restoration and stabilization activities.[13] At that time, Mountain Valley had completed construction (trenched, installed, and backfilled the pipeline) on about 78% of the Mainline System right-of-way and final restoration on about 51% of the Mainline System.

8.      Currently, Mountain Valley is not authorized to recommence construction of the Mainline System, as reinitiated ESA consultation is ongoing.  In addition, Mountain Valley cannot construct the portion of the Mainline System that crosses the Jefferson National Forest in West Virginia and Virginia, or that is in waters of the United States subject to the Army Corps' Nationwide Permit 12.

9.      While we are authorizing the Southgate Project with this order, we are directing the Office of Energy Projects to not issue any notice to proceed with construction[14] of the Southgate Project until Mountain Valley receives the necessary federal permits for the Mainline System, and the Director of the Office of Energy Projects, or the Director's designee, lifts the stop-work order and authorizes Mountain Valley to continue constructing the Mainline System.

10.     Upon commencing operations on its Mainline System, Mountain Valley will become a natural gas company within the meaning of section 2(6) of the NGA.[15]

## II.     Southgate Project Proposal

11.     Mountain Valley proposes to construct and operate the Southgate Project to provide up to 375,000 Dth per day of firm transportation service from an interconnect approximately 0.1 mile upstream of the terminus of the Mainline System in Pittsylvania County, Virginia, to Dominion Energy North Carolina's (Dominion)[16] local distribution

---

[13] *Mountain Valley Pipeline LLC*, Cessation of Certain Activities, Docket No. CP16-10-000 ( October 15, 2019) (delegated order).

[14] Construction activities include tree-clearing.  *See, e.g.*, *PennEast Pipeline Co., LLC*, 164 FERC ¶ 61,098, n.136 (2018) ("PennEast is prohibited from commencing construction, including any tree clearing activities . . . .").

[15] 15 U.S.C. § 717(a)(6) ("a 'natural gas company' means a person engaged in the transportation of natural gas in interstate commerce . . . .").

[16] Dominion is a local distribution company primarily engaged in the purchase, transportation, distribution, and sale of natural gas to customers in North Carolina. Following a January 2, 2019 merger, Dominion Energy, Inc. acquired the Public Service Company of North Carolina and changed the company name to Dominion Energy North

facilities, via the Dan River Interconnect and the Haw River Interconnect in Rockingham and Alamance Counties, North Carolina, respectively. The proposed project will provide Dominion access to natural gas produced in the Marcellus and Utica shale regions, and a connection to East Tennessee Natural Gas, LLC's (East Tennessee) pipeline system.[17] Specifically, Mountain Valley proposes to construct:

- approximately 0.5 mile of 24-inch-diameter natural gas pipeline in Pittsylvania County, Virginia;

- approximately 30.7 miles of new 24-inch-diameter natural gas pipeline in Pittsylvania County, Virginia, and Rockingham County, North Carolina;

- approximately 43.9 miles of new 16-inch-diameter natural gas pipeline in Rockingham and Alamance Counties, North Carolina;

- one new 28,915-horsepower compressor station, including two natural gas-fired turbine-driven compressor units, in Pittsylvania County, Virginia (Lambert Compressor Station);

- four new interconnects and associated meter stations, enabling the Southgate Project to receive natural gas from Mountain Valley's Mainline System (Mainline Interconnect) and East Tennessee's LN 3600 (East Tennessee Interconnect),[18] and to deliver natural gas to Dominion's T-15 Dan River facilities (Dan River Interconnect) and T-21 Haw River facilities (Haw River Interconnect); and

---

Carolina. For ease of reference, we will refer to the project shipper as Dominion throughout.

[17] Currently, Dominion accesses gas it stores in Spectra Energy Partner's Saltville Storage facility, which is located on East Tennessee's pipeline system, through secondary firm backhaul transportation on Transco's pipeline system to Dominion's local distribution system. The Southgate Project would provide Dominion with a primary receipt and delivery forward haul transportation path between East Tennessee's system and Dominion's local distribution system.

[18] The project will provide for the receipt of 250,000 Dth per day of natural gas from the Mainline System and 50,000 Dth per day of natural gas from the East Tennessee Interconnect.

- ancillary facilities including pig launchers and receivers,[19] mainline block valves, and cathodic protection beds.

Mountain Valley estimates that the Southgate Project will cost approximately $468 million.[20]

12.     Mountain Valley conducted a binding open season for firm transportation service from April 11 through May 11, 2018.  As a result, Mountain Valley executed a binding precedent agreement with Dominion for 300,000 Dth per day of firm transportation on the project.  The precedent agreement requires Dominion to execute a 20-year term firm transportation service agreement.  Dominion has elected to pay negotiated rates.

13.     Mountain Valley proposes to provide Firm (Rate Schedule FTS), Interruptible (Rate Schedule ITS), and Interruptible Parking and Lending (Rate Schedule ILPS) transportation services under a separate rate zone called the Southgate System.

## III.     Procedural

### A.     Notice, Interventions, Protests, and Comments

14.     Notice of Mountain Valley's application was published in the *Federal Register* on November 26, 2018.[21]  A number of timely motions to intervene were filed.[22]  Robert McNutt, Mark Ruffin, Renee Womack, the Sappony Tribe, and the Monacan Indian Nation filed late motions to intervene, which were granted by notice issued on April 23, 2019.  On January 31, 2020, Transco filed a late motion to intervene, which was denied by notice issued on April 6, 2020.[23]

---

[19] A "pig" is a device used to clean or inspect the interior of a pipeline.

[20] Mountain Valley's November 6, 2018 Application, Exhibit K at 1 (Application).

[21] 83 Fed. Reg. 60,420 ( Nov. 26,2018).

[22] Timely, unopposed motions to intervene and notices of intervention are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure. 18 C.F.R. § 385.214(c)(1) and 385.214(a)(2) (2019).  Timely motions to intervene include those filed dealing with environmental issues during the comment period for the draft environmental impact statement (EIS).  *See id*. § 380.10(a)(1)(i).  Because Bobby Pulliam, Eleanor Amidon, Food and Water Watch, and the City of Burlington filed motions to intervene during the comment period for the draft EIS, their motions are deemed timely.

[23] Mountain Valley filed an answer in opposition to Transco's request to intervene out-of-time on February 14, 2020.  On February 28, 2020, Transco filed an answer to Mountain Valley's answer.  Because Transco's motion to intervene late was denied, we

15.     The North Carolina Utilities Commission (North Carolina Commission) protests Mountain Valley's proposed recourse rates for the Southgate Project because it contends that the two largest components of the proposed rates – the return on equity (ROE) and the depreciation rate – are not adequately supported.[24]  The Appalachian Mountain Advocates, Appalachian Voices, the Center for Biological Diversity, the Chesapeake Climate Action Network, the Haw River Assembly, and the Sierra Club (collectively, Appalachian Mountain Advocates) jointly filed a protest in opposition to the project in its entirety, asserting that the project is not needed and is likely to adversely impact a range of environmental resources.[25]  We will discuss the merits of these protests below.[26]

16.     Numerous entities, including landowners and individuals, filed comments raising concerns over the environmental impacts of the project.  These comments are addressed in the final Environmental Impact Statement (EIS) and, as appropriate, below.  In addition, the North Carolina Economic Development Association and the North Carolina Chamber filed comments in support of the Southgate Project based on the project's job creation benefits; the final EIS addressed these comments.

## B.     **Answers**

17.     Mountain Valley and Dominion filed answers to the North Carolina Commission's and the Appalachian Mountain Advocates' protests.[27]  Although the Commission's Rules of Practice and Procedure do not permit answers to protests or answers to answers, we find good cause to waive our rules and accept the answers because they provide information that has assisted in our decision-making process.[28]

---

consider Transco's filings as comments and Mountain Valley's response as an answer to them; accordingly, concerns raised in the filings are addressed below in the environmental analysis section.

[24] North Carolina Commission's December 10, 2018 Notice of Intervention and Protest at 4 (North Carolina Commission Protest).

[25] Appalachian Mountain Advocates' December 10, 2018 Motion to Intervene and Protest at 7-8 (AMA Protest).

[26] *See infra* PP 29-51 (project need) and 53-64 (recourse rates).

[27] Dominion's December 28, 2018 Answer (Dominion Answer); Mountain Valley's January 8, 2019 Answer (Mountain Valley Answer).

[28] *See* 18 C.F.R. § 385.213(a)(2).

### C.     **Requests for Formal Hearing**

18.    The North Carolina Commission and Appalachian Mountain Advocates request a formal hearing on Mountain Valley's Southgate Project application that would address, respectively, whether Mountain Valley's proposed recourse rates comply with Commission policy,[29] and whether the project is needed.[30]

19.    An evidentiary, trial-type hearing is necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[31]  Neither the North Carolina Commission nor Appalachian Mountain Advocates have raised a material issue of fact that the Commission cannot resolve on the basis of the written record.  As demonstrated by the discussion below, the existing written record provides a sufficient basis to resolve the issues relevant to this proceeding.  The Commission has satisfied the hearing requirement by giving all interested parties a full opportunity to participate through evidentiary submission in written form.[32]  Therefore, we will deny the North Carolina Commission's and the Appalachian Mountain Advocates' requests for a formal hearing.

### D.     **Request for Technical Conference**

20.    In comments filed March 27, 2020, Transco requests a technical conference to allow it to explain "its safety, integrity, and operational concerns" regarding the portion of the proposed Southgate Project that would be collocated with Transco's existing pipeline right-of-way.[33]  In a response filed May 8, 2020, Mountain Valley asserts that a technical conference is not necessary where, as is the case here, the questions raised can be resolved through the written record.[34]  Mountain Valley responds to Transco's general concerns regarding construction practices in the collocated segments, and maintains it is more appropriate for Mountain Valley and Transco to work together to discuss and

---

[29] *See* North Carolina Commission Protest at 16-17.

[30] *See* AMA Protest at 15-16.

[31] *See, e.g., Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988); *Dominion Transmission, Inc.,* 141 FERC ¶ 61,183, at P 15 (2012).

[32] *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993).

[33] *See* Transco's March 27, 2020 Comments at 3.

[34] *See* Mountain Valley's May 8, 2020 Comments at 1-2.

resolve engineering and technical issues related to construction and operation of their collocated pipelines than to hold a conference.[35]

21.     Because the merits of this matter can be adequately addressed based on the information in the record in this proceeding, we find no need to convene a technical conference.  Transco's concerns regarding collocation of the Southgate Project pipeline with Transco's existing right-of-way are discussed further in the environmental section of this order.[36]

## IV.     Discussion

22.     Because the proposed facilities will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction and operation of the facilities are subject to subsections (c) and (e) of the NGA.

### A.     Application of the Certificate Policy Statement

23.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[37]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

24.     Under this policy, the threshold requirement for existing pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the proposed route

---

[35] *See id.* at 2.

[36] *See infra* PP 127-133.

[37] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227; *corrected,* 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128; *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

or location of the new pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

### 1.    Subsidization and Impacts on Existing Customers

25.    As discussed above, the threshold requirement is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  Mountain Valley proposes to establish a separate rate zone for service on the Southgate Project.  The design of the Southgate Project allows only for the physical flow of gas from the Mainline System to the Southgate Project facilities. [38] Thus, the Southgate System rates will apply to all facilities downstream of the Mainline System (i.e., the Lambert Compressor Station, the Mainline Interconnect, the East Tennessee Interconnect, the Haw River Interconnect, and the Dan River Interconnect).  Mountain Valley has designed the initial recourse rates for the Southgate System as a separate rate zone to ensure that the cost of the project, and the risks inherent in it, are borne by Mountain Valley and the Southgate Project customers, and not its Mainline System customers.  Therefore, once operation of the Mainline System commences, there would be no risk that existing Mainline System customers would be subsidizing service on the Southgate Project, and no degradation of service to those customers.

### 2.    Existing Pipelines and Their Customers

26.    We find that there will be no adverse impact on other pipelines in the region or their captive customers.  The Southgate Project will provide up to 375,000 Dth per day of incremental firm transportation service in North Carolina and southern Virginia.  No transportation service provider or captive customer has protested this project.[39] Therefore, we find that the Southgate Project will have no adverse impact on existing pipelines or their captive customers.

### 3.    Landowners and Communities

27.    We are satisfied that Mountain Valley has taken appropriate steps to minimize adverse impacts on landowners.  As discussed in greater detail in the final EIS and below, Mountain Valley's proposed project will disturb approximately 1,466 acres of land

---

[38] Application at 15.

[39] In PP 128–133 below, we address Transco's comments regarding the collocation of the Southgate pipeline with Transco's mainline.

during construction, and approximately 450 acres of land during operation.[40]  Mountain Valley participated in the Commission's pre-filing process and has actively worked with local stakeholders, including homeowners and landowners, as well as with federal and state agencies, to develop the proposed pipeline route, culminating in more than 190 route adjustments and the elimination of a second compressor station that had originally been proposed in pre-filing to be located near milepost 26 in North Carolina.[41] Mountain Valley obtained permission to survey, and completed field surveys of, approximately 96% of the route[42] and has committed to minimizing the use of eminent domain to the greatest extent possible by negotiating easement agreements for the permanent and temporary easements necessary to construct and operate the project.[43] Approximately 49% (i.e., 36.8 miles) of the proposed pipeline route would be collocated with existing utility corridors and rights-of-way.[44]

28.    Several commenters question the appropriateness of granting private pipeline companies the power of eminent domain, and request that the Commission not grant Mountain Valley that authority.  The Commission itself does not confer the right of eminent domain.  Under NGA section 7, the Commission has jurisdiction to determine if the construction and operation of proposed interstate pipeline facilities are in the public convenience and necessity.  Once the Commission makes that determination, NGA section 7(h) authorizes a certificate holder to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain if it cannot

---

[40] Final EIS at 4-114 (Table 4.8-1).

[41] Application at 12.

[42] Final EIS at 1-3.

[43] Application at 11.

[44] Final EIS at 2-3.

acquire the easement by an agreement with the landowner.[45] Thus, the NGA, not the Commission, grants certificate holders the right to take property by eminent domain.[46]

### 4.     Need for the Project

29.     Mountain Valley has entered into a long-term, firm precedent agreement with Dominion for 300,000 Dth per day of firm transportation service, 80% of the project capacity.

30.     Appalachian Mountain Advocates, the North Carolina Department of Environmental Quality (North Carolina DEQ), Friends of the Central Shenandoah, and various commenters challenge the need for the Southgate Project on several grounds. These parties and commenters maintain that existing infrastructure is available to meet the demand for natural gas in North Carolina, a demand which they believe Mountain Valley overstates, and ask the Commission to evaluate new pipeline infrastructure projects on a regional basis.  They also seek heightened scrutiny of Mountain Valley's precedent agreement with the project shipper, Dominion, due to Dominion's former affiliate status.[47]

### a.     Ability of Existing Infrastructure to Meet Demand

31.     Appalachian Mountain Advocates assert that a surplus of pipeline capacity exists when existing pipelines, projects under construction, and applications in the regulatory

---

[45] 15 U.S.C. § 717f(h) ("When *any holder of a certificate of public convenience and necessity* cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way . . . it may acquire the same by the exercise of the right of eminent domain . . . .") (emphasis added); *see also Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000) (holding that the Commission does not have the discretion to deny a certificate holder the power of eminent domain); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at *2 (noting that eminent domain power is conferred to the certificate holder under section 7(h) of the NGA).

[46] *Islander East Pipeline Co.*, 102 FERC ¶ 61,054, at PP 124-31 (2003).

[47] *Compare* Application at 4 (explaining that on November 6, 2018, Dominion's predecessor owned a 30% interest in the Southgate Project's Series B ownership structure) *and* Mountain Valley's December 20, 2018 Change in Ownership Notification (notifying the Commission that Dominion "no longer has any equity interest in the Southgate Project").

queue are considered as a whole.[48]  As in previous Commission proceedings,[49] commenters, including Appalachian Mountain Advocates, Friends of the Central Shenandoah, Blue Ridge Environmental Defense League, and Katie Whitehead, cite to a study by Synapse Energy Economics, Inc. (Synapse Study) that Southern Environmental Law Center and Appalachian Mountain Advocates commissioned, which asserts that existing gas pipeline capacity, existing storage in Virginia and the Carolinas, and the future operation of Transco's Atlantic Sunrise Project and Columbia's WB Xpress Project can satisfy the growing peak demand in that region.[50]  The Synapse Study concludes that the natural gas infrastructure capacity of the Virginia and the Carolinas region is more than sufficient to meet expected future peak demand.  Appalachian Mountain Advocates and Katie Whitehead also cite to a study by the Institute for Energy Economics and Financial Analysis (IEEFA), which argues, in part, that interstate pipeline infrastructure constructed to ship natural gas from the Marcellus and Utica region is overbuilt.[51]  Finally, Appalachian Mountain Advocates cites a Department of Energy

---

[48] AMA Protest at 11.

[49] *See Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042, at P 30 (2017), *order on reh'g*, 164 FERC ¶ 61,100, at PP 53-44 (2018); *Mountain Valley*, 161 FERC ¶ 61,043 at P 37, *order on reh'g*, 163 FERC ¶ 61,197 at PP 45-47.

[50] Synapse Energy Economics, Inc., *Are the Atlantic Coast Pipeline and the Mountain Valley Pipeline Necessary*?  An examination of the need for additional pipeline capacity into Virginia and Carolinas, (2016) (filed as Exhibit A of AMA Protest) (Synapse Study).  The Commission previously considered the findings of the Synapse Study and found that the study makes an unlikely assumption that all gas is flowed by primary customers along their contracted paths, and fails to consider the use of regional pipeline capacity by shippers outside of Virginia and the Carolinas through interruptible service or capacity release.  *Mountain Valley*, 161 FERC ¶ 61,043 at P 41 n.47, *order on reh'g*, 163 FERC ¶ 61,197 at P 47.

[51] Institute for Energy Economics and Financial Analysis, *Risks Associated With Natural Gas Expansion in Appalachia*, *Proposed  Atlantic Coast and Mountain Valley Pipelines Need Greater Scrutiny* (Apr. 2016) (filed as Exhibit E of AMA Protest) (IEEFA Study).  The Commission previously considered the findings of the IEEFA Study and determined that the study "speaks in generalities" and suggests that pipelines like the proposed project may serve to aid in the delivery of lower-priced natural gas to higher-priced markets – a result which would serve the public interest.  *Mountain Valley*, 163 FERC ¶ 61,197 at P 47.

study in support of its argument that, through 2022, pipeline capacity will exceed by over 50% production capacity in the Appalachian Basin.[52]

32.     North Carolina DEQ and Appalachian Mountain Advocates argue that, even if capacity needs increase alongside projected population growth, Dominion's capacity needs can be met through its existing contracted capacity.[53]  In support of its claim that natural gas demand will only experience a nominal increase in the future, Appalachian Mountain Advocates point to Energy Information Administration (EIA) forecasts that residential use of natural gas will decline by 0.6% per year over the next two decades, while commercial and industrial uses will respectively increase 0.4% and 0.6% per year.[54]

33.     Mountain Valley filed its own market demand study (Wood Mackenzie Study),[55] estimating that demand growth for natural gas capacity in the Southeast will reach 8.3 billion cubic feet (Bcf) per day[56] by 2030.[57]  The study also posits that much of the gas needed to meet this demand would be from the Marcellus and Utica shale regions, thus requiring additional pipeline capacity.[58]  Appalachian Mountain Advocates, Friends

---

[52] AMA Protest at 12 n.4 (quoting U.S. Dep't of Energy, Natural Gas Infrastructure Implications of Increased Demand from the Electric Power Sector (Feb. 2015), http://energy.gov/epsa/downloads/report-natural-gas-infrastructure-implications-increased-demand-electric-power-sector) (DOE Study).  The Commission previously considered the findings of the DOE Study and concluded that although the study notes that natural gas companies are increasingly using underutilized capacity on existing pipelines, re-routing natural gas flows, and expanding existing pipeline capacity, the study does not contend that this supplants the need to build new infrastructure.  *Mountain Valley*, 161 FERC ¶ 61,043 at P 40 n.47, *order on reh'g*, 163 FERC ¶ 61,197 at P 47.

[53] AMA Protest at 13-14; North Carolina DEQ's November 5, 2018 Comments in Docket PF18-4-000 at 4-5 (North Carolina DEQ's November 5, 2018 Comments).

[54] AMA Protest at 13-14.

[55] Wood Mackenzie, Inc., Southeast U.S. Natural Gas Market Demand in Support of the Mountain Valley Pipeline Project (Jan. 2016) (filed as Exhibit I of Mountain Valley's Application) (Wood Mackenzie Study).

[56] A volumetric capacity of 8.3 Bcf per day is equivalent to 8,300,000,000 Dth per day.

[57] Wood Mackenzie Study at 6.

[58] *See id.* at 20-21.

of the Central Shenandoah, and other commenters question the usefulness of the Wood Mackenzie Study because it covers a seven-state region in the Southeast, while the Southgate Project will only serve a portion of central North Carolina.

34.     Appalachian Mountain Advocates submitted an analysis performed by the Applied Economics Clinic (AEC Report)[59] to counter Mountain Valley's projections showing increasing natural gas demand in the future.  As Mountain Valley has not indicated that gas delivered by the project will be used for electric generation,[60] Appalachian Mountain Advocates explains that the AEC Report focuses on gas demand for residential, commercial, and industrial end-use customers.[61]  Specifically, the AEC Report takes issue with Mountain Valley's (i) reliance on a nationwide, rather than regional, projection of gas demand;[62] (ii) failure to exclude gas consumption for electric generation from North Carolina's expected annual growth in gas demand;[63] and (iii) use of a purportedly inflated projection of future population growth in North Carolina and failure to consider the steady downward trend in per capita gas consumption attributed to increased energy efficiency and other advances.[64]

35.     Commenters contend that the Commission must conduct an independent evaluation of actual market demand.[65]  As part of this independent evaluation of whether expected gas demand can be met by existing pipeline capacity, Appalachian Mountain Advocates asserts that the Commission should evaluate the potential for production

---

[59] Elizabeth A. Stanton, PhD and Eliandro Tavares, *Analysis of the Mountain Valley Pipeline Southgate Project* (Jul. 2019) (filed as Exhibit A of Appalachian Mountain Advocates' September 16, 2019 Comments on Draft EIS) (AEC Report).

[60] Mountain Valley states that the natural gas transported by the Southgate Project will be used to make bundled gas sales primarily to residential and small- and medium-sized commercial customers for heating, cooking, and other end-uses typical of natural gas local distribution company customers.  Mountain Valley's March 15, 2019 Data Request Response at 3.

[61] Appalachian Mountain Advocates' September 16, 2019 Comments on Draft EIS at 6 (AMA's September 16, 2019 Comments).

[62] AEC Report at 8.

[63] *Id.* at 9-11.

[64] *Id.* at 9.

[65] *See, e.g.*, North Carolina DEQ's November 5, 2018 Comments at 5; AMA Protest at 15; Friends of the Central Shenandoah's April 1, 2019 Comments at 9.

decline in the Marcellus and Utica shale formations.[66]  Commenters further suggest that the Commission should assess the ability of renewable energy sources and energy efficiency to meet electric demand over the life of the proposed pipelines.[67]  Noting that market forces indicate that LNG exports will increase in future years, Blue Ridge Environmental Defense League argues that the Mountain Valley's statements that it has no plans to export natural gas and the draft EIS's observation that there is no direct connection from the Southgate Project's terminus to Cove Point LNG – the nearest export terminal located approximately 190 miles away in Calvert County, Maryland – are an insufficient guarantee that LNG exports are not necessary to financially sustain the project.[68]

36.      Finally, Appalachian Mountain Advocates and Friends of the Central Shenandoah recommend that the Commission evaluate the need for new pipeline infrastructure on a regional basis because failure to do so will lead to the development of unnecessary pipelines.[69]

37.      In its January 8, 2019 answer, Mountain Valley asserts that Dominion's binding, 20-year precedent agreement for 80% of the Southgate Project's capacity is "significant evidence of demand for [a] project."[70]  Mountain Valley notes that the Commission previously evaluated the Synapse and U.S. Department of Energy studies submitted by Appalachian Mountain Advocates and observed that commenter depictions of the

---

[66] AMA's September 16, 2019 Comments at 4.

[67] *See, e.g.*, AMA's September 16, 2019 Comments at 4; Friends of the Central Shenandoah's April 1, 2019 Comments at 5; Southern Environmental Law Center's September 16, 2019 Comments on the Draft EIS at 2-3 (SELC's September 16, 2019 Comments).

[68] Blue Ridge Environmental Defense League's September 16, 2019 Comments on the Draft EIS at 12-13 (Defense League's September 16, 2019 Comments).

[69] AMA's September 16, 2019 Comments at 3-4; Friends of the Central Shenandoah's April 1, 2019 Comments at 22.  In addition, the Synapse Study asserts that considering each new pipeline proposal in isolation ignores important alternatives, such as upgrades to existing pipelines and storage facilities, which would increase regional natural gas supply capacity and avoid the adverse impacts on communities or the environment. Synapse Study at 4.  Similarly, the IEEFA Study argues that the Commission should evaluate regional requirements for additional pipeline capacity similar to other infrastructure programs such as electric transmission and highways.  IEEFA Study at 6-7.

[70] Mountain Valley Answer at 10 (quoting Certificate Policy Statement, 88 FERC at 61,744).

findings of the studies were overstated.[71]  Mountain Valley counters that the Wood Mackenzie Study forecasts that local distribution company and other non-electric generation gas usage in the Southeast will expand at a 1.6% annual growth rate[72] and further contends that Dominion needs the project's additional pipeline capacity to meet its design-day requirements, which are expected to increase 11% as a result of population growth in North Carolina.[73]

38.    Mountain Valley argues that the Southgate Project will:  (i) provide North Carolina and southern Virginia access to new natural gas supplies in the Marcellus and Utica shale regions; (ii) provide the opportunity to serve commercial and industrial load in Virginia and North Carolina not currently served by natural gas; (iii) provide new interconnects that improve the interstate grid and increase reliability and resiliency of North Carolina's gas infrastructure; (iv) eliminate a bottleneck by allowing Dominion to transport gas received from East Tennessee on a firm forward haul basis, rather than relying on backhauls on Transco's system; and (v) introduce a new entrant into the North Carolina interstate pipeline market, which may foster competition and lower consumer costs.[74]  The company states that the North Carolina Commission has recognized the public benefits of the Southgate Project and has authorized payment under Dominion's precedent agreement with Mountain Valley.[75]  Mountain Valley argues that the North Carolina Commission's approval warrants deference and "boosts the [precedent agreement's] probative value."[76]

39.    It is well established that precedent agreements are significant evidence of demand for a project.[77]  As the court stated in *Minisink Residents for Environmental Preservation*

---

[71] *Id.* at 12 (citing *Mountain Valley*, 161 FERC ¶ 61,043 at P 41 n.47, *order on reh'g*, 163 FERC ¶ 61,197 at P 47).

[72] *Id.* at 12-13.

[73] *Id.* at 13.

[74] Mountain Valley Answer at 13-14 (citing Application at 13-14).

[75] *Id.* at 14-15; *see infra* note 94.

[76] *Id.* at 15 (citing *NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022 (2017), *order on reh'g*, 164 FERC ¶ 61,054, at P 39 n.102 (2018) (*NEXUS*), *aff'd in relevant part*, *City of Oberlin v. FERC*, 937 F.3d 599 (D.C. Cir. 2019)).

[77] Certificate Policy Statement, 88 FERC at 61,748 (precedent agreements, though no longer required, "constitute significant evidence of demand for the project"); *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017) (*Sabal Trail*) (affirming Commission reliance on preconstruction contracts for 93% of project capacity to demonstrate market

& *Safety v. FERC* (*Minisink Residents*), and again in *Myersville Citizens for a Rural Community, Inc., v. FERC*, nothing in the Certificate Policy Statement or in any precedent construing it suggest that the policy statement requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's precedent agreements with shippers.[78]  Given the substantial financial commitment required under these agreements by project shippers, we confirm that precedent agreements are the best evidence that the service to be provided by the project is needed in the markets to be served.[79]  Moreover, it is current Commission policy to not look beyond precedent or service agreements to make judgments about the needs of individual shippers.[80]

---

need); *Twp. of Bordentown v. FERC*, 903 F.3d 234, 263 (3d Cir. 2018) ("As numerous courts have reiterated, FERC need not 'look[] beyond the market need reflected by the applicant's existing contracts with shippers.'") (quoting *Myersville Citizens for a Rural Cmty., Inc., v. FERC*, 783 F.3d 1291, 1301, 1311 (D.C. Cir. 2015)); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at *1 (precedent agreements are substantial evidence of market need); *see also Midship Pipeline Co., LLC*, 164 FERC ¶ 61,103, at P 22 (2018) (long-term precedent agreements for 64% of the system's capacity is substantial demonstration of market demand); *PennEast Pipeline Co., LLC*, 164 FERC ¶ 61,098 at P 16 (affirming that the Commission is not required to look behind precedent agreements to evaluate project need); *NEXUS*, 160 FERC ¶ 61,022 at P 41, *order on reh'g*, 164 FERC ¶ 61,054, *aff'd in relevant part*, *City of Oberlin*, 937 F.3d at 605 (finding need for a new pipeline system that was 59% subscribed).

[78] *Minisink Residents*, 762 F.3d 97, 110 n.10 (D.C. Cir. 2014); *see also Myersville Citizens*, 783 F.3d at 1311.  Further, Ordering Paragraph (C)(4) of this order requires that Mountain Valley file a written statement affirming that it has executed contracts for service at the levels provided for in their precedent agreements prior to commencing construction.

[79] *See, e.g., Adelphia Gateway, LLC*, 169 FERC ¶ 61,220, at P 35 (2019), *order denying reh'g*, 171 FERC ¶ 61,049, at P 12 (2020); *Tenn. Gas Pipeline Co., L.L.C.*, 169 FERC ¶ 61,230, at P 19 (2019), *order denying reh'g*, 170 FERC ¶ 61,142, at P 10 (2020).  In addition to precedent agreements, applicants may rely on a variety of relevant factors to demonstrate need.  Certificate Policy Statement, 88 FERC at 61,747.  These factors might include, but are not limited to, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market.  *Id.* at 61,747.

[80] *Id.* at 61,744 (citing *Transcon. Gas Pipe Line Corp.*, 82 FERC ¶ 61,084, at 61,316 (1998)).

40.     Here, Mountain Valley has entered into a long-term, firm precedent agreement with Dominion for 300,000 Dth per day of firm transportation service – 80% of the project's design capacity.[81]  To further confirm this showing of need, Ordering Paragraph (C)(4) of this order requires that Mountain Valley file a written statement affirming that it has executed contracts for service at the levels provided for in its precedent agreements prior to commencing construction.  Dominion, the sole project shipper, is a local distribution company that has determined, based on its assessment of the long-term needs of its customers and market, that there is a market for the natural gas to be transported and that the Southgate Project is the preferred means for delivering or receiving that gas.  In addition, the project's interconnect with East Tennessee will allow Dominion to access gas it stores in the Saltville Storage facility on a more reliable firm forward haul basis.  We find that Mountain Valley has sufficiently demonstrated that there is market demand for its project.

41.     We disagree with commenters' assertion that the Commission should examine the need for pipeline infrastructure on a region-wide basis.  Commission policy is to examine the merits of individual projects and assess whether each project meets the specific need demonstrated.  While the Certificate Policy Statement permits the applicant to show need in a variety of ways, it does not suggest that the Commission should examine a group of projects together and pick which project(s) best serve an estimated future regional demand.  Projections regarding future demand often change and are influenced by a variety of factors, including economic growth, the cost of natural gas, environmental regulations, and legislative and regulatory decisions by the federal government and individual states.  Given the uncertainty associated with long-term demand projections, including those presented in the studies noted by commenters and applicant above, where an applicant has precedent agreements for long-term firm service, the Commission deems the precedent agreements to be the better evidence of demand.[82]  The Commission evaluates individual projects based on the evidence of need presented in each proceeding.  Where, as here, it is demonstrated that specific shippers have entered into precedent agreements for project service, the Commission places substantial reliance on those agreements to find that the project is needed.

42.     Nor are we persuaded by commenters' contention that there is insufficient supply in the Appalachian Basin to support the pipeline.  Although Mountain Valley has stated that the intended source of supply for the Southgate Project will be production in the

---

[81] Prior to the Certificate Policy Statement, the Commission required a new pipeline project to have contractual commitments for at least 25% of the proposed project's capacity.  *See* Certificate Policy Statement, 88 FERC at 61,743.  Mountain Valley would have satisfied this prior, more stringent, requirement.

[82] *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at P 56; *Mountain Valley*, 161 FERC ¶ 61,043 at P 42, *order on reh'g*, 163 FERC ¶ 61,197 at PP 46-47.

Appalachian Basin, the Southgate Project is also connected to other interstate pipelines, such as East Tennessee and – by virtue of its connection with the Mainline System – Equitrans, which could potentially supply gas to the project from other areas of supply. Additionally, because the amount of gas that will be produced from the region is reflective of, among other things, the price of natural gas, projections regarding the amount of gas available for the Southgate Project are speculative.

43.     Allegations that the project is not needed because gas that is transported by it may be exported through an LNG terminal are not persuasive.  There is no evidence in the record that indicates that the project will be used to transport natural gas for export.  The project shipper is a local distribution company, which will locally distribute gas to residential, commercial, and industrial end-use customers.  Thus, even if there was evidence that some of the gas would be exported, that fact would not undercut our finding here that the project is necessary for the transportation of natural gas in interstate commerce.[83]

44.     We also disagree with commenters' claim that the project is not needed because of the availability of existing capacity on other pipelines or due to the Commission's approval of the Atlantic Coast Pipeline Project (ACP Project).  The EIS analyzed whether existing natural gas transmission pipelines in the project area, including the authorized ACP Project, could possibly be used as system alternatives for the Southgate Project.[84] The EIS concluded that these existing pipeline systems are fully subscribed and cannot provide firm transportation of the required volumes of gas to the area that Mountain Valley is proposing to serve.[85]  Thus, contrary to commenters' assertions, we are not persuaded that authorization of the Southgate Project would lead to the overbuilding of pipeline infrastructure.  The EIS further found that expansion of these systems would likely result in environmental impacts similar to the Southgate Project's anticipated impacts.[86]  Therefore, the EIS concluded that utilization of existing pipeline systems would not offer a significant environmental advantage.[87]

---

[83] Moreover, no gas can be exported from the United States without a finding by the Secretary of Energy that such export is not inconsistent with the public interest. *Sierra Club v. FERC*, 827 F.3d 36, 40 (D.C. Cir. 2016) (*Freeport LNG*) (citing 15 U.S.C. § 717b(a)).

[84] Final EIS at 3-3 to 3-6.

[85] *Id*. at 5-14.

[86] *Id*.

[87] *See id*. at 3-3 to 3-6.

45.     Additionally, renewable energy sources would not accomplish the project purpose of providing natural gas transportation service.[88]  The Commission cannot require individual energy users to use different or specific energy resources.[89]

### b.     Precedent Agreement with Affiliated Shipper

46.     Appalachian Mountain Advocates and North Carolina DEQ argue that because Dominion is affiliated with Mountain Valley, the Commission should exercise heightened scrutiny in reviewing whether there is actual market demand for the project. Appalachian Mountain Advocates assert that Mountain Valley's precedent agreement with Dominion should be viewed with skepticism, and afforded less weight, because Dominion had acquired a 30% ownership interest in Mountain Valley after executing the precedent agreement.[90]

47.     In response, Mountain Valley points to its December 2018 filing, notifying the Commission that Dominion "no longer has any equity interest in the Southgate Project," and is "no longer an affiliate of Mountain Valley."[91]  Thus, Mountain Valley contends, any concerns regarding Dominion's affiliate status are moot.

48.     In its December 28, 2018 answer, Dominion confirmed that it is no longer affiliated with Mountain Valley.[92]  Additionally, Dominion put into the record testimony

---

[88] *See id.* at 3-2 (concluding that generation of electricity from renewable energy sources or the gains realized from increased energy efficiency and conservation are not transportation alternatives and cannot function as a substitute for the proposed project); *see also Columbia Gas Transmission, LLC*, 164 FERC ¶ 61,036, at P 65 and n.147 (2018), *order denying reh'g*, 170 FERC ¶ 61,247 (2020) ("As we have concluded with respect to other natural gas transportation infrastructure projects, we do not find that the potential for energy conservation and renewable energy sources to be practical alternatives."); *Mountain Valley*, 161 FERC ¶ 61,043 at P 43 (recognizing that "renewable energy is not a comparable replacement for the transportation of natural gas").

[89] *RH energytrans, LLC*, 165 FERC ¶ 61,218, at P 21 (2018).

[90] AMA Protest at 14-15; North Carolina DEQ's December 10, 2018 Intervention at 3.

[91] Mountain Valley Answer at 11 (citing Mountain Valley's December 20, 2018 Change in Ownership Notification).

[92] Dominion Answer at 3.

and pleadings from two proceedings before the North Carolina Commission,[93] which Dominion offers as evidence that the North Carolina Commission has authorized Dominion's payment of compensation to Mountain Valley under a service agreement for the Southgate Project.[94]  Dominion explains that the 2018 North Carolina Commission testimony states that "[Dominion] projects that by the winter of 2019-20 it will need additional interstate capacity to serve expected peak-day requirements," and includes a table showing the forecasted peak-day demand requirements for winter seasons from 2017-18 through 2022-23.[95]  Dominion further explains that the table shows a deficit of 7,710 Dth per day beginning in 2019-20, increasing to 62,111 Dth per day by 2022-23.[96]  Additionally, Dominion notes, a significant amount of the subscribed capacity reflected in the table is for secondary firm service as backhaul,[97] which has a lower scheduling priority than the capacity that would be provided by the Southgate Project.[98]  According to Dominion, the secondary nature of this capacity "takes on greater significance as flows become increasingly bidirectional on the pipelines that [Dominion] uses."[99]

49.     As Dominion "no longer has an equity interest in the Southgate Project,"[100] we agree with Mountain Valley that the affiliate concerns are moot.  In any event, the fact that a project shipper is affiliated with a project sponsor does not require the Commission to look behind the precedent agreements to evaluate project need.[101]  As the court

---

[93] *Id.* (Exhibits A-D).

[94] *Id.* at Exhibit D (*Order Accepting Affiliated Agreements for Filing and Permitting Operation Thereunder Pursuant to N.C. Gen. Stat. §62-153*, Docket No. G-5, SUB 593 (N.C. Util. Comm'n Oct. 9, 2018)) (also filed as Exhibit Z-1 of Mountain Valley's Application).

[95] *Id.* at 3-4.

[96] *Id.* at 4.

[97] Backhaul refers to transportation service where a shipper's delivery point is upstream of the receipt point.

[98] Dominion Answer at 4.

[99] *Id.* at 4.

[100] Mountain Valley's December 20, 2018 Change in Ownership Notification.

[101] *Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277, at P 57 (2002) ("as long as the precedent agreements are long-term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing the market need for a proposed project"); *see also* Certificate Policy Statement,

affirmed in *Minisink Residents*, the Commission may reasonably accept the market need reflected by the applicant's existing contracts with shippers and not look behind those contracts to establish need.[102]   And in *Appalachian Voices v. FERC*, the court affirmed the Commission's determination that "[a]n affiliated shipper's need for new capacity and its obligation to pay for such service under a binding contract are not lessened just because it is affiliated with the project sponsor."[103]   When considering applications for new certificates, the Commission's primary concern regarding affiliates of the pipeline as shippers is whether there may have been undue discrimination against a non-affiliate shipper.[104]   Here, no such allegations have been made, nor have we found that the project sponsor engaged in any anticompetitive behavior.  As discussed above, Mountain Valley held a binding open season for capacity on the project and all potential shippers had the opportunity to contract for service.

50.      Finally, commenters question the probative value of the contract between Mountain Valley and Dominion, arguing that, as a regulated utility, Dominion will seek recovery of its Southgate Project-related costs from "captive ratepayers," resulting in guaranteed rates, and the ability to reallocate the financial risk of the Southgate Project from the project owner to captive ratepayers.[105]   However, this argument glosses over the important role of the North Carolina Commission, which is responsible for setting retail rates for Dominion.  The North Carolina Commission will disallow costs that are not justified according to North Carolina state law after considering, in the judgment of the

---

88 FERC at 61,748 (explaining that the Commission's policy is less focused on whether the contracts are with affiliated or unaffiliated shippers and more focused on whether existing ratepayers would subsidize the project) and at 61,744 (the Commission does not look behind precedent agreements to question the individual shippers' business decisions to enter into contracts) (citing *Transcon.*, 82 FERC ¶ at 61,316).

[102] *Minisink Residents* ,762 F.3d at 110 n.10; *see also Sabal Trail*, 867 F.3d at 1379 (finding that pipeline project proponent satisfied Commission's "market need" where 93% of the pipeline project's capacity has already been contracted for).

[103] *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *1 (quoting *Mountain Valley*, 161 FERC ¶ 61,043 at P 45).

[104] *See* 18 C.F.R. § 284.7(b) (2019) (requiring transportation service to be provided on a non-discriminatory basis).

[105] *See, e.g.*, AMA Protest at 14-15; Friends of the Central Shenandoah's April 1, 2019 Comments at 22-23.  As we previously noted, Dominion is no longer affiliated with Mountain Valley; however, commenters warn that Dominion could purchase a portion of the Southgate Project following certificate issuance.

North Carolina Commission, the interests of North Carolina ratepayers.[106]  Matters relating to Dominion's retail rates are for the North Carolina Commission and are not within the Commission's jurisdiction.[107]  Therefore, it is reasonable for the Commission to rely on the contract between Mountain Valley and Dominion as evidence of need to conclude that the project is in the public interest.[108]

51.     In conclusion, we find that the precedent agreement signed by Dominion for approximately 80% of the Southgate Project's capacity adequately demonstrates that the project in needed.

### 5.       **Certificate Policy Statement Conclusion**

52.     The proposed project will enable Mountain Valley to provide 375,000 Dth per day of incremental firm transportation service, of which 80% is subscribed.  We find that Mountain Valley has demonstrated a need for the Southgate Project and further, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[109]

---

[106] The North Carolina Commission has the jurisdiction to regulate the sale and transportation of natural gas within North Carolina, including regulating Dominion, the sole entity that has contracted to take service on the Southgate Project.  *See* North Carolina Commission Protest at 2-3.

[107] *NEXUS,* 164 FERC ¶ 61,054 at P 39.

[108] The North Carolina Commission's approval of the contract boosts its probative value.  *See Guardian Pipeline, L.L.C,* 91 FERC ¶ 61,285, at 61,966-67 (2000) ("It is also the Commission's preference not to second guess the business decisions of end users or challenge the business decision of an end user on whether it is economic to undertake direct service from a pipeline supplier, *particularly when that decision has been approved by the appropriate state regulatory body.*") (emphasis added) (citing *Southern Natural Gas Co.*, 76 FERC ¶ 61,122, at 61,635 (1996)).

[109] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

B.    **Rates**

1.    **Initial Recourse Rates**

53.    Mountain Valley proposes to provide firm (Rate Schedule FTS), interruptible (Rate Schedule ITS), and interruptible lending and parking (Rate Schedule ILPS) transportation services under a separate rate zone called the Southgate System.  Mountain Valley developed its proposed cost of service utilizing a capital structure of 50% debt and 50% equity, a proposed cost of debt of 6%, an ROE of 14%, and a 5% depreciation rate based on the 20-year contract life of the executed agreement with Dominion.  Mountain Valley utilizes a straight fixed-variable rate design to derive its rates based on the full project design capacity of 375,000 Dth per day and a first-year cost of service of $84,889,100.[110]  In its revised Exhibit P, Mountain Valley calculates a maximum monthly firm reservation recourse charge of $18.7651 per Dth and a firm usage charge of $0.0033 per Dth.[111]  Mountain Valley proposes a maximum daily interruptible and interruptible lending and parking recourse charge of $0.6202 per Dth based on the maximum daily Rate Schedule FTS reservation charge plus the Rate Schedule FTS usage charge.

54.    We have reviewed Mountain Valley's proposed cost of service and rates and find that they reasonably reflect current Commission policy, as modified below.

a.    **Return on Equity**

55.    On December 10, 2018, the North Carolina Commission filed a protest stating that Mountain Valley failed to provide substantial evidence to justify its proposed 14% ROE.  The North Carolina Commission notes that Mountain Valley's only support are the facts that the Commission approved a 14% ROE for the Mountain Valley Mainline System and that a 14% ROE is consistent with the Commission's policy with respect to greenfield pipelines.[112]  The North Carolina Commission states that simply citing cases where the Commission has allowed the use of a 14% ROE is inadequate and conflicts with the statutory requirement that an applicant demonstrate that its recourse rates are in the public convenience and necessity.[113]  The North Carolina Commission states that

---

[110] In its August 22, 2019 Data Request Response, Mountain Valley submitted a revised Exhibit P with a corrected operating and maintenance expense calculation.

[111] In its revised Exhibit P, Schedule 2, Mountain Valley breaks down the total cost of service into $84,443,026 for fixed costs and $446,074 for variable costs.

[112] North Carolina Commission Protest at 8.

[113] *Id*. at 9.

Mountain Valley has failed to provide any analysis of current financial markets or current investor expectations, nor has Mountain Valley provided an analysis of the specific risks the pipeline faces.  In addition, the North Carolina Commission questions whether the proposed rates, based on an ROE not supported by current market data, provided the necessary check on the potential exercise of market power at the time Mountain Valley entered into the negotiated rate agreement with Dominion, as required by the Commission's Alternative Rates Policy Statement.[114]

56.    In its January 8, 2019 answer, Mountain Valley states that because the Mountain Valley Mainline System is not yet in service and Mountain Valley is not yet an established pipeline company with an existing revenue base, the Southgate Project is more akin to a new greenfield project than to the expansion of an existing system, given the business risks associated with the project.[115]  Mountain Valley states that a 14% ROE for a new pipeline project is not only consistent with Commission precedent, but has also been upheld by the U.S. Court of Appeals for the District of Columbia Circuit in *Sierra Club vs. FERC*.[116]  In addition, Mountain Valley states that its proposed ROE is consistent with Commission precedent, citing *Rockies Express Pipeline, LLC*, where the Commission allowed the company to use the same 13% ROE approved as part of its greenfield certificate application for two expansion projects.[117]  Mountain Valley argues that it did not exercise any alleged market power when signing an agreement with Dominion at a negotiated rate and that the parties negotiated based on an estimated recourse rate dependent on numerous factors and Dominion's independent research of marketplace rates for similar capacity.[118]

---

[114] *Id.* at 11-12 (citing *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement)).

[115] Mountain Valley Answer at 5.

[116] *Id.* (citing *Sabal Trail*, 867 F.3d 1357).

[117] *Id.* (citing *Rockies Express Pipeline LLC,* 116 FERC ¶ 61,272, at P 44 (2006) (addressing preliminary non-environmental issues for REX-West expansion); *Rockies Express Pipeline LLC,* 119 FERC ¶ 61,069 (2007) (certificating REX-West expansion)*; Rockies Express Pipeline LLC,* 123 FERC ¶ 61,234, at P 55 (2008) (certificating REX-East expansion)).

[118] Mountain Valley Answer at 9.

57.     We will approve Mountain Valley's proposed 14 ROE.  Though the Southgate Project is an extension from the previously certificated Mountain Valley Mainline System, the Mainline System is not in service.  Thus, just as was the case when it proposed its initial Mainline System, Mountain Valley is not an established pipeline company and has no existing revenue base.  Without cash flows from existing operations and a proven track record, we find that, with respect to the Southgate Project, Mountain Valley faces a capital funding outlook similar to other companies constructing new pipeline systems.  The reasoning the Commission has relied upon in other instances for authorizing lower ROEs for extension of existing pipeline systems is not applicable under this fact pattern, as those pipelines obtained revenues for service on their existing systems.  Therefore, for purposes of establishing initial rates, we believe it is appropriate to treat Mountain Valley, whose Mainline System is not in service, in the same manner as we would an applicant proposing its initial greenfield system, because there are no established operations or revenue streams that would reduce the risk to the level experienced by natural gas companies whose existing systems are in service.

### b.     Depreciation

58.     The North Carolina Commission protests Mountain Valley's proposed five percent depreciation rate for the Southgate Project, which is based on the 20-year term of Mountain Valley's contract with Dominion.  The North Carolina Commission recognizes that there have been instances where the Commission has found it appropriate to base the depreciation rate for new, incremental projects on contract life but explains that those instances involve delivery laterals built on behalf of specific customers.[119]  Noting that Dominion has only contracted for 300,000 of the 375,000 Dth per day of capacity to be created by the Southgate Project and that Mountain Valley anticipates executing agreements with other potential shippers for additional capacity in the future, the North Carolina Commission asserts "there is no basis to presume that the useful life of the facilities will end when the primary contract term ends."[120]  Mountain Valley responds that the five percent depreciation rate is appropriately based on a 20-year life of the project because, while it continues to market unsubscribed capacity, a primary purpose of the Southgate Project is to serve Dominion's needs.[121]  According to Mountain Valley, the North Carolina Commission overstates Commission precedent by suggesting the Commission only approves contract life depreciation rates for delivery laterals, but rather that the Commission has approved contract life depreciation rates for incrementally-

---

[119] North Carolina Commission Protest at 14.

[120] Id.

[121] Mountain Valley Answer at 7.

priced projects like the Southgate Project.[122]  Specifically, Mountain Valley notes that in *Equitrans, L.P.* (*Equitrans*),[123] the Commission approved depreciation rates based on the life of the contract for an expansion project that was integrated with the rest of Equitrans's mainline system.

59.     The Commission's general policy with respect to depreciation for pipeline expansions is to use the pipeline's last approved depreciation rate.[124]  Although the Commission has deviated from this general policy and allowed the depreciation rate to be based on the life of the contract with respect to delivery laterals built on behalf of specific customers,[125] we do not find Mountain Valley's use of a five percent depreciation rate based on its 20-year contract term with Dominion appropriate.  In addition to serving the needs of Dominion, Mountain Valley states that the purpose of the Southgate Project is to "provide North Carolina and southern Virginia with direct pipeline access to the Marcellus and Utica gas regions in West Virginia, Ohio and southwestern Pennsylvania," and to "meet the growing needs of natural gas users in the southeastern U.S."[126]  Mountain Valley designed the Southgate Project so that it will have the ability to provide additional capacity to other potential shippers at or prior to the Dan River Interconnect[127] and states that it has engaged in discussions with additional potential shippers and anticipates that it will execute agreements for the additional 75,000 Dth per day of available capacity in the future.[128]  Thus, this mainline expansion will not function merely as a delivery lateral to serve Dominion, but instead will have the potential to meet increased demand and serve other customers.

---

[122] *Id.*

[123] *Id.* at 7-8 (citing *Equitrans, L.P.*, 153 FERC ¶ 61,381, at P 17 (2015), *reh'g denied*, 155 FERC ¶ 61,194 (2016)).

[124] *See, e.g.*, *Cheyenne Connector,* 168 FERC ¶ 61,180 at PP 50-54 (approving an expansion project depreciation rate equivalent to the rate approved in the initial certificate where no NGA section 4 rate filing had been made in the interim); *see also Gulf South*, 163 FERC ¶ 61,124 at P 22, *order on reh'g,* 166 FERC ¶ 61,089 at P 30, *aff'd in part*, *Gulf South Pipeline Co., LP v. FERC*, No. 19-1074, slip op. at 22-24 (D.C. Cir. Apr. 10, 2020); *Wyoming Interstate Co., Ltd.,* 119 FERC ¶ 61,251, at P 22 (2007).

[125] *See, e.g., Transcon. Gas Pipe Line Co.*, 147 FERC ¶ 61,102 (2014); *Gas Transmission NW, LLC,* 142 FERC ¶ 61,186 (2013).

[126] Application at 2.

[127] *Id.* at 9.

[128] *Id.* at 2.

60.     We acknowledge that in *Equitrans* the Commission authorized Equitrans to extend its mainline system and approved the pipeline's proposed depreciation rate based on the life of the shipper's 20-year contract term.[129]  However, the Commission did so without explanation, and that case is inconsistent with our general policy, discussed above.  We note that in *Tennessee Gas Pipeline Co., L.L.C.*,[130] the Commission recently reaffirmed its policy to use the last stated and approved depreciation rate for incremental expansion projects.

61.     In sum, we find that Mountain Valley has not shown that its 20-year contract term with Dominion is determinative of the useful life of the Southgate Project facilities.  Accordingly, we direct Mountain Valley to revise its rates for the Southgate System using the 2.5% depreciation rate underlying its currently-approved Mainline System rates.

### c.      Section 7 Recourse Rate Review

62.     In its protest, the North Carolina Commission argues that the Commission has repeatedly erred in relying on *Atlantic Refining Co. v. Pub. Serv. Comm'n of N.Y.*[131] a case regarding the Commission's discretion in NGA section 7 proceedings to approve initial rates that will "hold the line" until just and reasonable rates are adjudicated under sections 4 or 5 of the NGA.[132]  The North Carolina Commission claims that, by declining to do a more thorough review of proposed recourse rates in a section 7 proceeding and deferring to a section 4 proceeding to ensure that the rates are just and reasonable, the Commission fails to ensure that the recourse rates available to Dominion when it negotiated its precedent agreement provided the necessary check on the exercise of market power by the pipeline at the time those negotiations occurred.[133]  The North Carolina Commission also argues that the "hold the line" approach affirmed in *CATCO* was only found to be warranted because the Commission had ensured that the consuming public would be protected while awaiting adjudication of just and reasonable rates.  The North Carolina Commission asserts that in the instant project proposal, given that the two

---

[129] *See Equitrans L.P.,* 153 FERC ¶ 61,381, at P 17 n.18.

[130] 169 FERC ¶ 61,230, at PP 33-34 (2019).

[131] 360 U.S. 378 (1959) (*CATCO*).

[132] North Carolina Commission Protest at 15.

[133] *Id.*

largest cost-of-service elements are significantly overstated, there are no assurances that the consuming public will be protected from excessive rates.[134]

63.     We disagree with the North Carolina Commission's assertion that the Commission's reliance on the *CATCO* decision is in error. The existence of negotiated rates does not negate the Commission's discretion to approve initial rates in this proceeding under the public convenience and necessity standard, pending the adjudication of just and reasonable rates in Mountain Valley's next general NGA section 4 rate case. In *CATCO*, the Court compared the less rigorous public convenience and necessity standard of review employed under section 7 to assess initial rates for new service or facilities with the just and reasonable standard of review for rate changes under sections 4 and 5.[135] The less exacting standard used in a section 7 certificate proceeding is intended to mitigate the delay associated with a full evidentiary rate proceeding, and, as here, the Commission has discretion to approve initial rates that will "hold the line" while awaiting the adjudication of just and reasonable rates.[136]

64.     As explained above, we are requiring Mountain Valley to revise its proposed recourse rates to reflect a reduction to its depreciation rate as requested by the North Carolina Commission. Subject to Mountain Valley making that change addressed above, we will approve Mountain Valley's rates for the Southgate Project.

## 2.     **Fuel**

65.     Mountain Valley states that it will implement a retainage factor to track and recover actual experienced fuel and lost and unaccounted for gas on the Southgate System. The company states that the initial retainage factor for the Southgate System will be 1.66%, based on the submitted fuel study, and that it will adjust the Retainage Factor quarterly to reflect actual fuel and lost and unaccounted for gas. We approve Mountain Valley's proposed initial fuel retainage percentage of 1.66% for the Southgate Project.

## 3.     **Reporting Incremental Costs**

66.     We will require Mountain Valley to keep separate books and accounting of costs and revenues attributable to the proposed services and capacity created by the Southgate

---

[134] *Id.* at 16.

[135] *See CATCO*, 360 U.S. at 390-91.

[136] *Transcon. Gas Pipe Line Co., LLC*, 169 FERC ¶ 61,051, at P 35 (2019) (citing *Transcon. Gas Pipe Line Co., LLC*, 161 FERC ¶ 61,212, at P 6 (2017)).

Project, as required by section 154.309 of the Commission's regulations.[137]  The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[138]

### 4.  **Negotiated Rate Agreements**

67.     Mountain Valley proposes to provide service to the project shipper under a negotiated rate agreement.  Mountain Valley must file either its negotiated rate agreement or tariff records, setting forth the essential terms of the agreement associated with the Project, in accordance with the Alternative Rate Policy Statement[139] and the Commission's negotiated rate policies.[140]  Mountain Valley must file the negotiated rate agreement or tariff record no earlier than 60 days and no later than 30 days prior to the proposed effective date for such rates.[141]

### 5.  *Pro Forma* **Tariff Records**

68.     Mountain Valley included in Exhibit P *pro forma* tariff records reflecting the addition of the separate Southgate System rate zone.  We approve the *pro forma* tariff records included in Exhibit P, except as detailed above, and direct Mountain Valley to file the tariff records no earlier than 60 days and no later than 30 days prior to the in-service date of the facilities.

---

[137] 18 C.F.R. § 154.309 (2019).

[138] *See Revisions to Forms, Statements, and Reporting Requirements for Natural Gas Pipelines,* Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).

[139] Alternative Rate Policy Statement, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194.

[140] *Natural Gas Pipeline Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

[141] Pipelines are required to file any service agreement containing non-conforming provisions and to disclose and identify any transportation term or agreement in a precedent agreement that survives the execution of the service agreement.  *See* 18 C.F.R. § 154.112(b) (2019); *see also, e.g., Texas Eastern Transmission, LP*, 149 FERC ¶ 61,198, at P 33 (2014).

### C.   Environmental Analysis

#### 1.   Pre-filing Review

69.    On May 18, 2018, Commission staff granted Mountain Valley's request to use the pre-filing process in Docket No. PF18-4-000.  As part of the pre-filing review, on August 9, 2018, the Commission issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned MVP Southgate Project, and Request for Comments on Environmental Issues, and Notice of Public Scoping Sessions* (NOI).  The NOI was published in the *Federal Register* on August 15, 2018[142] and sent to more than 1,100 interested parties, including representatives of federal, state, and local agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners; concerned citizens; and local libraries and newspapers.  The NOI announced the date, time, and location of three public scoping sessions, and established September 10, 2018, as the deadline for public comments on the project.

70.    A total of 68 people provided oral comments at the public scoping sessions.[143]  In addition, we received 69 written or electronically-filed comment letters and 65 form letters during the public scoping period.[144]

#### 2.   Application Review

71.    On November 6, 2018, following the pre-filing process, Mountain Valley filed an application for authorization to construct and operate the Southgate Project.

72.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[145] Commission staff evaluated the proposed project's potential environmental impacts in an EIS, with respect to which the Army Corps and the FWS's Virginia and North Carolina Field Offices participated as cooperating agencies.

---

[142] 83 Fed. Reg. 40,509 (Aug. 15, 2018).

[143] Between August 20-23, 2018, Commission staff held public scoping sessions in Reidsville, North Carolina; Chatham, Virginia; and Haw River, North Carolina.  Transcripts for the public comment sessions were placed in the public record for the proceeding.

[144] Table 1.3-1 of the final EIS provides a detailed and comprehensive list of issues raised during scoping.

[145] 42 U.S.C. §§ 4321 *et seq.* (2018).  *See also* the Commission's NEPA-implementing regulations at Title 18 of the Code of Federal Regulations, Part 380.

73.    On July 26, 2019, Commission staff issued a draft EIS addressing the issues raised during the scoping period and including staff's independent analysis of the project's environmental impacts.  Notice of the draft EIS was published in the *Federal Register* on August 2, 2019, establishing a 45-day public comment period that ended on September 16, 2019.[146]  Commission staff held three public comment sessions between August 19-22, 2019, to receive comments on the draft EIS.[147]  Approximately 65 people provided oral and written comments at the public comment sessions.  Transcripts of the public comment sessions were placed in the Commission's public record for this proceeding.  In addition, we received 77 written or electronically-filed comments.[148]

74.    In October 2019, after issuance of the draft EIS, Mountain Valley filed a number of minor route modifications to reduce environmental and cultural resources impacts, to accommodate landowner requests, or for constructability reasons.  On November 15, 2019, Commission staff mailed letters to 24 landowners affected by the route modifications (including 14 newly affected landowners), requesting comments on the route modifications during a supplemental comment period that ended December 15, 2019.  None of the landowners affected by these route modifications filed comments.

75.    On February 14, 2020,[149] Commission staff issued the final EIS for the project, addressing all of the substantive environmental comments received on the draft EIS.[150]  The final EIS addresses geology; soils; water resources; wetlands; vegetation; wildlife and fisheries; threatened, endangered, and other special status species; land use, recreation and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; cumulative impacts; and alternatives.  In addition to the environmental comments, several commenters raised concerns about the scope of the analysis in the EIS and the NEPA process generally.

76.    The final EIS concludes that if the Southgate Project is constructed and operated in accordance with applicable laws and regulations, the project will result in limited adverse environmental impacts; however, these impacts would be reduced to less-than-significant

---

[146] 84 Fed. Reg. 37,859 (Sept. 16, 2019).

[147] Commission staff held public comment meetings on the draft EIS in Wentworth and Haw River, North Carolina and Chatham, Virginia.

[148] The Commission received additional comments on the draft EIS after the close of the comment period, which were addressed in the final EIS to the extent possible.

[149] Notice of the final EIS was issued in the *Federal Register* on February 26, 2020.  85 Fed. Reg. 11,064 (Feb. 26, 2020).

[150] Final EIS at Appendices I.1, I.2, and I.3.

levels with the implementation of Mountain Valley's proposed and Commission staff's recommended avoidance, minimization, and mitigation measures, which are included as conditions in the appendix to this order.

77.     Between issuance of the final EIS and May 31, 2020, the Commission received comments on the final EIS from the applicant, the U.S. Environmental Protection Agency (EPA), Transco, the Monacan Indian Nation and the Sappony Tribe, Roger Sisson, Katie Whitehead, and the Blue Ridge Environmental Defense League.  To the extent they raise substantive issues, these comments are discussed below.

### 3.     Comments on the Scope of Analysis in the EIS

#### a.     Completeness of Draft EIS and Requests for Revised or Supplemental Draft EIS

78.     Some entities requested an extension of the draft EIS comment period.[151]  The Commission's standard draft EIS comment period is 45 days, which is consistent with the Council for Environmental Quality's (CEQ) regulations implementing NEPA.[152]  Moreover, in preparing the final EIS, Commission staff considered late-filed comments on the draft EIS to the extent practicable.[153]  In addition, due to route modifications submitted by Mountain Valley in October 2019, Commission staff initiated a supplemental 30-day comment period to allow landowners affected by the route modifications (including 14 newly affected landowners) the opportunity to comment and to file motions to intervene in the proceeding.  This supplemental comment period closed on December 15, 2019, nearly 90 days following Commission staff's issuance of the draft EIS.  Any substantive comments filed during this time, regardless of whether the commenter was a newly affected landowner, were considered and addressed in the final EIS.

79.     Some commenters allege that the draft EIS contained "substantial deficiencies"[154] that precluded meaningful public participation in the NEPA process, including a failure to evaluate the need for the Southgate Project, insufficient information about the project's

---

[151] *See, e.g.*, Defense League's September 16, 2019 Comments at 3; Katie Whitehead's August 8, 2019 Comments.

[152] 40 C.F.R. § 1506.10(c) (2019).

[153] *See supra* note 148.

[154] Sierra Club's January 28, 2020 Request for Revised or Supplemental Draft EIS (Sierra Club's January 28, 2020 Comments).

environmental impacts, and incomplete or draft plans regarding mitigation.[155]  In addition, Sierra Club argues that Commission staff issued the draft EIS prematurely, pointing to environmental information requests issued by Commission staff following issuance of the draft EIS and additional information submitted by Mountain Valley providing information responsive to these information requests.[156]  For these reasons, Sierra Club and others argue that a revised or supplemental draft EIS should have been issued for comment.[157]

80.     We find that a revised or supplemental draft EIS was not warranted because the draft EIS was adequate and allowed for meaningful analysis.  The draft EIS is a draft of the agency's proposed final EIS and, as such, its purpose is to elicit suggestions for change.  A draft is adequate when it allows for "meaningful analysis" and "make[s] every effort to disclose and discuss" major points of view on the environmental impacts.[158]  NEPA does not require a complete mitigation plan be actually formulated at the onset, but only that the proper procedures be followed for ensuring that the environmental consequences have been fairly evaluated.[159]  In addition, NEPA does not require every study or aspect of an analysis to be completed before an agency can issue a final EIS, and

---

[155] *See, e.g.*, *id.* at 5.

[156] *See id.* at 6-7.  In particular, Sierra Club takes issue with staff's November 15, 2019 additional information request that accompanied a revised notice of schedule for completion of the environmental review for the Southgate Project.  This additional information request, and the revised schedule, were appropriate and timely responses to Mountain Valley's October 2019 submittal of minor route modifications.  These minor route modifications, and any related environmental impacts, were fully disclosed and analyzed in the final EIS.

[157] *See, e.g.*, Sierra Club's January 28, 2020 Comments; SELC's September 16, 2019 Comments at 6, 13.

[158] 40 C.F.R. § 1502.9(a) (2019); *see also Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1328 (D.C. Cir. 2004) (*Nat'l Comm. for the New River*) (holding that FERC's draft EIS was adequate even though it did not have a site-specific crossing plan for a major waterway where the proposed crossing method was identified and thus provided "a springboard for public comment") (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (*Methow Valley Citizens Council*)).

[159] *See Methow Valley Citizens Council*, 490 U.S. at 352-53.

the courts have held that agencies do not need perfect information before taking any action.[160]

81.    The draft EIS identified baseline conditions for all relevant resources.  To ensure that the final EIS included the most up to date information, the draft EIS recommended the filing of supplemental information prior to the end of the draft EIS comment period.  However, as stated in section 5.2 of the draft EIS, Commission staff did not expect that the updated information and documents would materially change any of the conclusions in the draft EIS.  Final mitigation plans will not present new environmentally significant information nor pose substantial changes to the proposed action that would otherwise require a supplemental EIS.

82.    We also disagree that there was a need to issue a revised draft EIS.  CEQ regulations require agencies to prepare a supplement to either a draft or final EIS if: (i) the agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact.[161]  Here, the final EIS, which incorporates comments filed on the draft EIS, contains ample information for the Commission to fully consider and address the environmental impacts associated with the Southgate Project.  As discussed further below, the final EIS recommends, and we require in this order, that Mountain Valley not

---

[160] *U.S. Dep't of the Interior v. FERC*, 952 F.2d 538, 546 (D.C. Cir. 1992); *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978), *vacated in part sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978) ("NEPA cannot be 'read as a requirement that [c]omplete information concerning the environmental impact of a project must be obtained before action may be taken.'") (quoting *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973)).

[161] 40 C.F.R. § 1502.9(c).

commence construction of the Southgate Project until it provides specified information[162] and confirms it has received all applicable authorizations required under federal law.[163]

## b.    Project Purpose and Need, and Range of Alternatives

83.    Several commenters contend that the EIS defined the purpose and need of the project too narrowly, which led to an insufficient analysis of the project alternatives.[164] An agency's environmental document must include a brief statement of the purpose and need to which the proposed action is responding.[165]  An agency uses the purpose and need statement to define the objectives of a proposed action and then to identify and consider legitimate alternatives.[166]  CEQ has explained that "[r]easonable alternatives include those

---

[162] *See, e.g.*, Environmental Conditions 13-16.  Environmental Condition 14, for example, requires Mountain Valley to file with the Commission the locations of all private water wells and springs identified within 150 feet of the project work areas.  This submittal must identify the status, use, distance from construction workspace, and any proposed measures to minimize or avoid impacts for each private water well or spring identified.  Environmental Condition 16 requires Mountain Valley to file for Commission approval a final list of water sources to be used for project purposes (e.g., dust control, hydrostatic testing, and horizontal directional drill operations), which identifies intake location, waterbody name, withdrawal rate and method, and measures to minimize aquatic species entrainment.

[163] *See* Environmental Condition 10.  Further, as stated above, we are directing the Office of Energy Projects to not issue any notice to proceed with construction of the Southgate Project until Mountain Valley receives the necessary federal permits for the Mainline System, and the Director of the Office of Energy Projects lifts the stop-work order and authorizes Mountain Valley to continue construction on the Mainline System. *See supra* P 9.

[164] *See, e.g.*, Sierra Club's January 28, 2020 Comments at 3-5; EPA's September 23, 2019 Comments at 3; North Carolina DEQ's September 16, 2019 Comments at 2-4; AMA's September 16, 2019 Comments at 1-7; Defense League's September 16, 2019 Comments at 5-8; SELC's September 16, 2019 Comments at 2-3.

[165] *See* 40 C.F.R. § 1508.9 (2019) (for an Environmental Assessment); 40 C.F.R. § 1502.13 (2019) (for an EIS).

[166] *See Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999).

that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant."[167]

84.     Courts have upheld federal agencies' use of applicants' project purpose and need as the basis for evaluating alternatives.[168]  When an agency is asked to consider a specific plan, the needs and goals of the parties involved in the application should be taken into account.[169]  We recognize that a project's purpose and need should not be so narrowly defined as to preclude consideration of what may actually be reasonable alternatives.[170]  Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays in the decisional process."[171]

85.     For the Southgate Project, the EIS appropriately relied on the applicant's stated purpose and need.  We find that doing so did not predetermine from the outset the results of the alternatives analysis for the Southgate Project.[172]  In fact, Commission staff identified numerous reasonable alternatives to the project, which were evaluated in the EIS.[173]  Staff concluded that none of the alternatives analyzed would meet the project's purpose and need, be technically feasible, and offer a significant environmental advantage.[174]

---

[167] *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026-27 (Mar. 23, 1981).

[168] *E.g., City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994).

[169] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

[170] *Id.* at 196.

[171] *Id.* at 199; *see also Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582 (finding the statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives).

[172] *See* North Carolina DEQ's September 16, 2019 Comments at 4.

[173] *See* final EIS at 3-1 to 3-45.

[174] *See id.* at 3-45.

86.     We also reject the Southern Environmental Law Center's (SELC) argument that because the EIS "only considered alternatives that transport natural gas, the [Commission] has not taken a hard look at the No Action Alternative—or the possibility that the project is not constructed, as required by NEPA."[175]  Contrary to SELC's contention, the EIS states that under the no-action alternative the Southgate Project would not be constructed, and that the environmental impacts associated with the project would not occur.[176]  Moreover, the resource-by-resource discussion in section 4 of the final EIS first details the existing state of each resource and then describes the environmental impacts of the preferred alternative.[177]  Section 5 of the final EIS summarizes staff's conclusions about those impacts.[178]  By providing a description of the existing state of each resource and a description of the environmental impacts of the preferred alternative, the EIS provides the Commission with a meaningful comparison of the harm to be avoided under a no-action alternative.

87.     Some commenters state that the EIS failed to evaluate the public benefit or market need for the project.  These commenters conflate the balancing of economic benefits (market need) and effects under the Certificate Policy Statement with the description of the purpose and need in the EIS.[179]  The purpose and need statement in the final EIS complied with CEQ's regulations, which provide that this statement "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed actions" for purposes of its environmental analysis.[180] The public interest determination, including market need, for the pipeline lies with the Commission.  Neither NEPA nor the NGA requires the Commission to make its determination of whether a project is required by the public convenience and necessity before its final order.  The final EIS appropriately explained that the determination of

---

[175] See SELC's September 16, 2019 Comments at 2-3.

[176] Final EIS at 3-2.

[177] Id. at 4-1 to 4-264.

[178] Id. at 5-1 to 5-14.

[179] See, e.g., Sierra Club's January 28, 2020 Comments at 3-5; North Carolina DEQ's September 16, 2019 Comments at 2; SELC'S September 16, 2019 Comments at 2-3.

[180] 40 C.F.R. § 1502.13 (2019).

whether the Southgate Project satisfied a showing of market need according to the Certificate Policy Statement was beyond the scope of the environmental document.[181]

### c.   Segmentation

88.     Some commenters argue that the Commission impermissibly segmented its NEPA review of the Southgate Project by failing to consider Mountain Valley's Mainline System and Southgate Project in a single EIS.[182]  Appalachian Mountain Advocates assert that the Southgate Project and the Mainline System are "connected actions," and argues that the Commission's failure to evaluate the two projects in a single EIS renders the Commission's significance findings incomplete.[183]

89.     CEQ regulations require the Commission to include "connected actions," "cumulative actions," and "similar actions" in its NEPA analyses.  An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration.[184]  "Connected actions" include actions that:  (a) automatically trigger other actions, which may require an EIS; (b) cannot or will not proceed without previous or simultaneous actions; or (c) are interdependent parts of a larger action and depend on the larger action for their justification.[185]

90.     Assertions that we segmented our environmental review by not re-examining the Mainline System's impacts alongside the Southgate Project's impacts in a single EIS are misplaced.  The Commission's consideration of Mountain Valley's two projects did not overlap.  The Commission completed a comprehensive analysis of the environmental impacts of Mountain Valley's Mainline System between 2016 and 2017, culminating in the issuance of a final EIS in June 2017 and certificate authorization in October 2017. Commission staff's review of the environmental impacts of the Southgate Project began during the pre-filing process in mid-2018, continuing with Mountain Valley's filing of an

---

[181] *See* final EIS at ES-2, 1-2, I.2-1 (Appendix I.2), and I.3-37 (Appendix I.3).

[182] *See, e.g.*, AMA's September 16, 2019 Comments at 8-10; Defense League's September 16, 2019 Comments at 3-5.

[183] AMA's September 16, 2019 Comments at 10.

[184] *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

[185] 40 C.F.R. § 1508.25(a)(1) (2019).

application for the Southgate Project in November 2018, and culminating in staff's issuance of the final EIS in February 2020.

91.    The final EIS for the Mainline System fully analyzed the environmental impacts of Mountain Valley's mainline pipeline as originally proposed.  Issued over two and a half years later, the final EIS for the Southgate Project fully analyzed the environmental impacts of Mountain Valley's proposed expansion of its mainline system.  Moreover, the Southgate Project's EIS thoroughly examined whether the Southgate Project's impacts would result in a cumulative impact on the environment when combined with the impacts of other past, present, and reasonably foreseeable future projects, including Mountain Valley's Mainline System.[186]

92.    CEQ defines cumulative impacts as "the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[187]  A cumulative environmental impact results from the effect of the current project along with any other actions "*in the same geographic area* as the project under review."[188]

93.    The EIS disclosed impacts associated with the Southgate Project and identified the geographic scope of the cumulative impacts analysis based on the resources affected by project construction and operation.  Specifically, Commission staff defined resource-specific geographic scopes for its cumulative impacts analysis to include projects or actions within 0.25 mile of construction activities for impacts to air quality and noise; within the same HUC-12 watershed area[189] for impacts to groundwater, wetlands, vegetation, and wildlife; and within the same HUC-10 watershed for impacts to surface water, fisheries and aquatic resources.[190]  The EIS explained that only a small portion of the Mainline System's southern terminus falls within the Southgate Project's resource-specific geographic scopes.[191]  Accordingly, the EIS evaluated the cumulative impacts of

---

[186] *See* final EIS at 4-225 to 4-264.

[187] 40 C.F.R. § 1508.7 (2019).

[188] *Freeport LNG*, 827 F.3d at 47 (citations omitted); *see also* 40 C.F.R. § 1508.7.

[189] A HUC is the acronym for Hydrologic Unit Code, designated by the U.S. Geological survey, which identifies hydrological features, such as a drainage basin or watershed.  HUC-10 refers to a watershed typically 40,000-250,000 acres in area, while HUC-12 refers to more local sub-watershed, typically ranging from 10,000 to 40,000 acres.

[190] Final EIS at 4-227 to 4-229 (Table 4.13-1).

[191] *Id*. at 4-236.

Mountain Valley's Southgate Project and Mainline System across all resource areas. The final EIS concluded that – when added to the impacts of other past, present, and reasonably foreseeable future actions, including Mountain Valley's Mainline System – the Southgate Project's impacts would not result in any significant cumulative impacts on environmental resources within the geographic scopes affected by the Southgate Project.[192]

94.     For these reasons, the concerns central to a segmented NEPA review, namely the dividing of one project into several in order to reduce the true scope of a project's environmental impacts, are not present here. Thus, the Commission appropriately did not consider the impacts of the Mainline System and Southgate Project in a single NEPA document.

### d. Greenhouse Gas Emissions and Climate Change Impacts

95.     Appalachian Mountain Advocates and others argue that we did not take a hard look at the Southgate Project's greenhouse gas (GHG) emissions and climate impacts. In support of this claim, Appalachian Mountain Advocates points to the EIS's failure to provide estimates of the project's upstream[193] and downstream[194] GHG emissions. Appalachian Mountain Advocates argues that the EIS's failure to assess the project's indirect GHG emissions "is contrary to NEPA's goals of informed decisionmaking and informed public comment" and undermines the Commission's environmental analysis.[195] Last, Appalachian Mountain Advocates asserts that the EIS fails to assess the significance of the Southgate Project's GHG emissions on climate change, in violation of the NEPA requirements.[196]

96.     NEPA requires agencies to consider indirect effects or impacts that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[197] With respect to causation, "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause"[198] in order "to

---

[192] *Id*. at 5-13 to 5-14.

[193] AMA's September 16, 2019 Comments at 11-13.

[194] *Id*. at 13-15.

[195] *Id*. at 23.

[196] *Id*. at 15-24.

[197] 40 C.F.R. § 1508.8(b) (2019).

[198] *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (*Pub. Citizen*)

make an agency responsible for a particular effect under NEPA."[199]  As the Supreme
Court has explained, "a 'but for' causal relationship is insufficient [to establish cause for
purposes of NEPA]."[200]  Thus, "[s]ome effects that are 'caused by' a change in the
physical environment in the sense of 'but for' causation," will not fall within NEPA if
"the causal chain is too attenuated."[201]  Further, the Court has stated that "where an
agency has no ability to prevent a certain effect due to its limited statutory authority over
the relevant actions, the agency cannot be considered a legally relevant 'cause' of the
effect."[202]  Regarding reasonable foreseeability, courts have found that an impact is
reasonably foreseeable if it is "sufficiently likely to occur that a person of ordinary
prudence would take it into account in reaching a decision."[203]  Although courts have
held that NEPA requires "reasonable forecasting,"[204] an agency "is not required to
engage in speculative analysis"[205] or "to do the impractical, if not enough information is
available to permit meaningful consideration."[206]

97.     As we have previously concluded in other natural gas infrastructure proceedings
and affirm with respect to the Southgate Project, the environmental effects resulting from
natural gas production are generally neither caused by a proposed pipeline project nor are
they reasonably foreseeable consequences of our approval of an infrastructure project, as

---

(quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)
(*Metro. Edison Co.*)).

[199] *Pub. Citizen*, 541 U.S. at 767.

[200] *Id.*

[201] *Metro. Edison Co.*, 460 U.S. at 774.

[202] *Pub. Citizen*, 541 U.S. at 770.  *See generally Transcontinental Gas Pipe Line
Co., LLC*, 171 FERC ¶ 61,032 (2020) (*Transco*) (McNamee, Comm'r, concurrence).

[203] *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (citations
omitted); *see also Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).

[204] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079
(9th Cir. 2011) (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 962
(9th Cir. 2003)).

[205] *Id.* at 1078.

[206] *Id.* (quoting *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014
(9th Cir. 2006)).

contemplated by CEQ regulations, where the supply source is unknown.[207]  Because the Southgate Project will receive natural gas from other interstate pipelines (Mountain Valley's Mainline System and East Tennessee's system), the specific source of natural gas to be transported via the project is currently unknown and will likely change throughout the project's operation.  Moreover, there is no evidence in the record that would help the Commission determine the origin of the natural gas that will be transported on the Southgate Project, let alone predict the number and location of any additional wells that would be drilled as a result of any production demand associated with the project.  Nor is there evidence that, absent approval of the Southgate Project, this gas would not be brought to the market by other means.  Therefore, we conclude that the environmental impacts of upstream natural gas production are not an indirect effect of the project.[208]  Last, where there is not even an identified general supply area for the gas that will be transported on the project, any analysis of production impacts would be so generalized it would be meaningless.[209]

98.    As to downstream emissions from gas consumption, the U.S. Court of Appeals for the D.C. Circuit in *Sierra Club v. FERC* held that where it is known that the natural gas transported by a project will be used for a specific end-use combustion, the Commission should "estimate[] the amount of power-plant carbon emissions that the pipelines will

---

[207] *See, e.g., Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); *see also Adelphia Gateway, LLC*, 169 FERC ¶ 61,220, at P 243 (2019), *order on reh'g*, 171 FERC ¶ 61,049, at P 89 (2020).

[208] *Birckhead v. FERC*, 925 F.3d 510, 518 (D.C. Cir. 2019) (holding the Commission did not violate NEPA in not considering upstream impacts where there was no evidence to predict the number and location of additional wells that would be drilled as a result of a project).  *See generally Transco,* 171 FERC ¶ 61,032 (2020) (McNamee Comm'r concurrence) (elaborating on the purpose of the NGA and that one of its purposes is to facilitate the development of and access to natural gas; as well as an analysis of consideration of indirect effects under NEPA).

[209] *See Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198-99 (D.C. Cir. 2017) (accepting Department of Energy's "reasoned explanation" as to why the indirect effects pertaining to induced natural gas production were not reasonably foreseeable where the Department noted the difficulty of predicting both the incremental quantity of natural gas that might be produced and where at the local level such production might occur, and that an economic model estimating localized impacts would be far too speculative to be useful).

make possible."[210]  However, in *Birckhead v. FERC* (*Birckhead*), a case that did not involve a known specific end use, the D.C. Circuit stated that "emissions from downstream gas combustions are [not], as a categorical matter, always a reasonably foreseeable indirect effect of a pipeline project."[211]  The court in *Birckhead* also noted that "NEPA . . . requires the Commission to at least attempt to obtain the information necessary to fulfill its statutory responsibilities," but, citing to *Delaware Riverkeeper Network*, the court acknowledged that NEPA does not "demand forecasting that is not meaningfully possible."[212]

99.    In this case, because the end-use of the contracted for volumes is unknown, any potential GHG emissions associated with the ultimate combustion of the transported gas are not reasonably foreseeable, and therefore, not an indirect impact of the Southgate Project.  The Commission requested information from Mountain Valley about the ultimate end use of the gas to be transported by the Southgate Project.[213]  However, as discussed in the final EIS, most of the gas will serve North Carolina end-users, primarily by residential and small and medium-sized commercial customers, and that some volumes will go to North Carolina and Virginia, but that the end-use of the gas is unknown.[214]  Beyond serving North Carolina end-users, we do not know how Dominion will be utilizing the gas, and there remains a range of possible uses for the gas to be delivered by the project.  Accordingly, we find this generalized information insufficient to render the emissions associated with any consumption of the gas to be transported a reasonably foreseeable indirect effect of the project.

100.    In any event, since the Southgate Project will receive gas from the Mainline System and East Tennessee's system, Mountain Valley contends it is not necessary to provide an estimate of the GHG emissions associated with the end use combustion of the gas to be transported on the project.[215]  Mountain Valley points out that the Commission previously quantified the GHG emissions that could result from the end use consumption of the volumes transported on Mountain Valley's Mainline System, and previously

---

[210] *Sabal Trail*, 867 F.3d at 1371.

[211] 925 F.3d at 519 (citing *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971)).

[212] *Id.* at 520 (quoting *Del. Riverkeeper Network*, 753 F.3d at 1310).

[213] *See* Commission staff's March 5, 2019 Data Request.

[214] Final EIS at 4-263; *see also* Mountain Valley's March 15, 2019 Data Request Response.

[215] Mountain Valley's March 31, 2020 Comments at 1-2.

evaluated the environmental impacts associated with the volumes transported on East Tennessee's system.[216]  Thus, Mountain Valley asserts, quantifying the downstream GHG emissions associated with the Southgate Project would lead to "double counting" of emissions.[217]  We note that the final EIS for the Mountain Valley Mainline System, which is expected to source approximately 80% of the gas transported on the Southgate Project facilities, conservatively estimated the GHG emissions associated with the full combustion of the volume of natural gas transported on its mainline system.[218]  This underscores the point that, given the connected nature of the interstate pipeline system, the transportation capacity associated with a new pipeline does not necessarily represent, on a national level, incremental capacity.  It further underscores our determination that providing upper bound estimates of downstream GHG emissions on individual pipelines may be misleading and does not provide meaningful information regarding a pipeline project's impact on GHG emissions and climate change.

101.    Some commenters assert that the Commission's NEPA analysis is flawed because the EIS does not use the Social Cost of Carbon, or a similar tool, to evaluate climate change impacts.[219]  Appalachian Mountain Advocates, the Institute for Policy Integrity at New York University School of Law, and others assert that the Commission erroneously claims there is no reliable method for evaluating climate impacts.[220]  Commenters further argue that the Commission's failure to use the Social Cost of Carbon or a similar methodology renders NEPA's "hard look" requirement unmet.[221]

---

[216] *Id.* at 2.

[217] *Id.*

[218] *Mountain Valley*, 161 FERC ¶ 61,043 at P 293.  The Commission noted that this estimate represents an upper bound for the amount of end-use combustion that could result from the gas transported by these projects and we reiterate that providing upper bound estimates of downstream effects using worst-case scenarios of peak use does not meaningfully inform its decision.  *See Columbia Gas Transmission*, 170 FERC ¶ 61,246, at P 47 (2020).

[219] *See, e.g.*, AMA's September 16, 2019 Comments at 11-24; Institute for Policy Integrity at New York University School of Law's September 16, 2019 Comments (Institute for Policy Integrity's September 16, 2019 Comments).

[220] AMA's September 16, 2019 Comments at 18-22; Institute for Policy Integrity's September 16, 2019 Comments at 1.

[221] *See, e.g.*, AMA's September 16, 2019 Comments at 11.

102.    The Social Cost of Carbon has been described as an estimate of the monetized climate change damage associated with an incremental increase in carbon dioxide ($CO_2$) emissions in a given year.[222]  The Commission has provided extensive discussion on why the Social Cost of Carbon is not appropriate in project-level NEPA review, and cannot meaningfully inform the Commission's decisions on natural gas infrastructure projects under the NGA.[223]  We adopt that reasoning here.  As the Commission has previously explained, the Social Cost of Carbon is not appropriate for use in any project-level NEPA review for the following reasons:

(1)    the EPA states that "no consensus exists on the appropriate [discount] rate to use for analyses spanning multiple generations"[224] and consequently, significant variation in output can result;[225]

(2)    the tool does not measure the actual incremental impacts of a project on the environment; and

---

[222] Interagency Working Group on the Social Cost of Greenhouse Gases, *Technical Support Document – Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866* at 3 (Aug. 2016), https://www.epa.gov/sites/production/files/2016-12/documents/sc_co2_tsd_august_2016.pdf

[223] *Mountain Valley*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297, *aff'd sub nom., Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at *2 ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes.").

[224] *See* EPA, Fact Sheet:  *Social Cost of Carbon* (November 2013), https://19january2017snapshot.epa.gov/climatechange/social-cost-carbon_.html.

[225] Depending on the selected discount rate, the tool can project widely different present-day cost to avoid future climate change impacts.  *See generally Transco,* 171 FERC ¶ 61,032 (2020) (McNamee, Comm'r, concurring at n.142) ("The Social Cost of Carbon produces wide-ranging dollar values based upon a chose discount rate, and the assumptions made.  The Interagency Working Group on Social Cost of Greenhouse Gases estimated in 2016 that the Social Cost of one ton of carbon dioxide for the year 2020 ranged from $12 to $123.").

(3)      there are no established criteria identifying the monetized values that are to be considered significant for NEPA reviews.[226]

Moreover, the Commission has explained it does not use monetized cost-benefit analyses as part of its NEPA review.[227]  In any event, there is no universally accepted methodology for evaluating the Southgate Project's impacts on climate change.  As the Commission has previously concluded, it cannot determine a project's incremental physical impacts on the environment caused by GHG emissions.[228]  We have also previously concluded the Commission cannot determine whether an individual project's contribution to climate change would be significant.[229]  That situation has not changed.

### 4.      Comments Received After Issuance of Final EIS

103.    As noted above, between issuance of the final EIS and May 31, 2020, the Commission received substantive comments on the final EIS from the applicant, the EPA, Transco, the Monacan Indian Nation and the Sappony Tribe, Roger Sisson, Katie Whitehead, and the Blue Ridge Environmental Defense League.[230]  We address the issues raised in these comments below.

---

[226] *See generally Transco*, 171 FERC ¶ 61,032 (2020) (McNamee, Comm'r, concurring at P 66) ("When the Social Cost of Carbon estimates that one metric ton of $CO_2$ costs $12 (the 2020 cost for a discount rate of five percent), agency decision-makers and the public have no objective basis or benchmark to determine whether the cost is significant. Bare numbers standing alone simply *cannot* ascribe significance.") (emphasis in original) (footnote omitted).

[227] *See Florida Southeast Connection, LLC*, 162 FERC ¶ 61,233, at PP 39-44 (2018).

[228] *Dominion Transmission, Inc.,* 163 FERC ¶ 61,128, at PP 67-70 (2018) (LaFleur, Comm'r, *dissenting in part*; Glick, Comm'r, *dissenting in part*); *see generally Transco* 171 FERC ¶ 61,032 (2020) (McNamee, Comm'r, concurring at PP 63-74) (explaining that the Commission has no standard for determining whether GHG emissions significantly affect the environment, elaborating on why the Social Cost of Carbon is not a useful tool for determining whether GHG emissions are significant, and explaining that the Commission has no authority or reasoned basis to establish its own framework).

[229] *Id.*

[230] We received a few comments raising general concerns about the Novel Coronavirus Disease (COVID-19) pandemic.  Because the comments do not raise project-specific concerns we do not address them herein.  However, the Commission

### a.   Applicant's Final EIS Clarifications and Supplemental Filing

104.    In its comments on the final EIS, Mountain Valley provided some minor clarifications responding to information contained in the final EIS.  Mountain Valley's clarifications addressed its proposed construction schedule and work hours, and its proposed construction corridor for certain wetland crossings.[231]

105.    Mountain Valley states that in section 2.5 of the final EIS, *Construction Schedule and Workforce*, the construction schedule description should be clarified to note that Mountain Valley anticipates conducting construction work seven days per week.[232] Mountain Valley's application and residential construction plans both contemplated construction occurring six days per week.  This was the schedule reviewed and recommended in the final EIS and this is the schedule approved herein.  Although we have, on a case-by-case basis, approved construction schedules where an applicant has demonstrated a need to perform limited construction activities seven days per week,[233] Mountain Valley has not provided a sufficient demonstration here.  Therefore, we are not revising the authorized construction schedule.

106.    Referencing section 2.4 of the final EIS, *Construction Procedures*, Mountain Valley clarifies that its *Wetland and Waterbody Construction and Mitigation Procedures*[234] requested a greater than 75-foot-wide construction corridor at five wetland locations, rather than four.[235]  Although the final EIS stated that "[t]here are four locations where Mountain Valley is requesting a greater than 75-foot-wide construction corridor in wetlands," the final EIS analyzed all five individual wetlands where Mountain

---

continues to closely monitor the situation and is committed to ensuring the health and safety of the public and the continued reliability of the nation's energy sector.

[231] Mountain Valley's March 31, 2020 Comments at 2-3.

[232] *See* final EIS at 2-29.

[233] *See, e.g.*, *Algonquin Gas Transmission, LLC*, 158 FERC ¶ 61,061, at P 217 (2017) (explaining, in the context of the noise analysis for horizontal directional drill (HDD) construction, that "[w]hile we encourage applicants make reasonable efforts to comply with state and local noise regulations, to the extent practicable, HDD construction is primarily a 24-hour per day activity.").

[234] Mountain Valley's October 23, 2019 Supplemental Filing.

[235] Final EIS at 2-13 (stating that Mountain Valley requested a greater than 75-foot-wide construction corridor at four wetland locations).

Valley requested a greater than 75-foot-wide construction corridor.[236]  The final EIS evaluated four locations, one of which included two individual wetland crossings that were considered to be at the same general location due to their proximity, site conditions, and justification provided by Mountain Valley.  Accordingly, we grant the requested clarification.  Neither of the foregoing clarifications changes the conclusions in the final EIS.

107.    On April 21, 2020, Mountain Valley filed changes to the Southgate Project, including slight realignments of the pipeline route at waterbody crossings and minor changes in workspace locations.[237]  Because this route modification request was received at such a late stage in the proceeding and because it is not clear that Mountain Valley has obtained landowner approval for the modifications requested, we are not approving the April 21 realignments as part of the pipeline route certificated herein.  Should Mountain Valley choose to resubmit these route realignments as part of its Implementation Plan required by Environmental Condition 6 or as part of a variance request in accordance with Environmental Condition 5, which requires landowner approval, Commission staff will review the requested modifications at that time.

### b.    Agency and Tribal Consultation

108.    EPA recommends incorporating in the record of decision the results of the Commission's consultation or coordination efforts related to aquatic resources, endangered species, historic preservation, and tribes.[238]  EPA also states that every effort should be made to minimize impacts on tribal interests within the vicinity of the proposed project.  On April 27, 2020, Cultural Heritage Partners filed comments on behalf of the Monacan Indian Nation and the Sappony Tribe concerning the Commission's consultation with the tribes.  These comments are addressed below.

109.    The final EIS, prepared in coordination with cooperating agencies Army Corps and FWS, contains a comprehensive evaluation of the various resource areas identified by EPA and discusses the Commission's consultation efforts through publication of the

---

[236] *Id.* at 4-57.

[237] Mountain Valley's April 21, 2010 Supplemental Filing.

[238] EPA's March 23, 2020 Comments at 1.

final EIS.[239]  Below, we summarize the results of our efforts to consult under the ESA, under the National Historic Preservation Act, and with tribes.

### i.      Endangered Species Act

110.   With respect to consultation under the ESA, the final EIS identifies six species that are federally listed as threatened or endangered (or are identified as proposed for federal listing) and may occur in or near the project area.[240]  No critical habitat has been designated in the project area for any of these species.[241]  Commission staff determined that the project is *not likely to adversely affect* any proposed or listed species.[242]  The final EIS also identifies two federally designated species of concern[243] that could occur in the project area and concludes that the project would not likely impact these species.[244] On March 19, 2020, the FWS's Raleigh Ecological Services Field Office filed a letter concurring with the final EIS's determinations of effect on five of the six federally listed or proposed species that potentially occur in the project area.[245]  The final EIS considers the sixth species, the northern long-eared bat, and concludes that there are no known hibernacula or maternity roosts in the survey area and, with the application of FWS's final 4(d) rule,[246] the project *may affect but is not likely to adversely affect* the northern long-eared bat.

---

[239] *See* final EIS at sections 4.3 (water resources); 4.7.1 – 4.7.6 (federally listed threatened, endangered, and other species of concern); 4.9.8 (environmental justice); and 4.10.1 (cultural resources and tribal consultations).

[240] *Id*. at 4-97 (Table 4.7-1).

[241] *Id*. at 4-96.

[242] *Id*. at 4-96.

[243] "Species of concern" is an informal term used by FWS to refer to species that have been identified as important to monitor, but do not have endangered, threatened or candidate status and thus receive no legal protection.

[244] *Id*. at 4-97 (Table 4.7-1).

[245] FWS's March 19, 2020 Letter.

[246] In January 2016, the FWS finalized a rule under authority of section 4(d) of the ESA that provides measures that are necessary and advisable to provide for the conservation of the northern long-eared bat.  *See* final EIS at 4-98.

111.   ESA consultation with the FWS is not yet complete.  FWS has not yet responded to staff's request for concurrence with staff's ESA determination that the project is not likely to adversely affect the northern long-eared bat.  Further, because access was denied on some properties, a limited number of areas may require surveys following issuance of the certificate.  Last, Mountain Valley has indicated that water required for construction and hydrostatic test would be primarily obtained from the Dan River (which contains federally listed species).[247]  Environmental Condition 16 requires Mountain Valley to provide written concurrence from the FWS for any water withdrawals from the Dan River.  As required by Environmental Condition 19, Mountain Valley may not commence construction activities until it files with the Secretary the results of all outstanding biological surveys, the staff completes ESA consultation with the FWS, and Mountain Valley has received written notification from the Director of OEP, or the Director's designee, that construction or mitigation activity may begin.

### ii.    National Historic Preservation Act and Tribal Consultation

112.   The Commission's consultation efforts in compliance with section 106 of the National Historic Preservation Act (NHPA)[248] and its implementing regulations[249] are documented in the final EIS.  As described in section 4.10.3 of the final EIS, Commission staff consulted with the State Historic Preservation Officers (SHPO) of Virginia and North Carolina, interested Indian tribes, and other consulting parties prior to making determinations regarding National Register of Historic Places (NRHP) eligibility and project effects.[250]  The final EIS recommends, and we require in Environmental Condition 20, that Mountain Valley not begin construction of facilities or use of any staging, storage, temporary work areas, or new or to-be-improved access roads until: (1) Mountain Valley files with the Commission all remaining cultural resources survey reports, site evaluations, and avoidance or treatment plans for NRHP-listed or eligible sites, as necessary, and comments on those reports and plans from the SHPOs, interested

---

[247] FWS's March 19, 2020 Letter indicates that additional ESA surveys and consultation may be needed as the result of certain project modifications, such as "changing from municipal water supplies to surface water intakes."  FWS's March 19, 2020 Letter at 1.  The final EIS explains that Mountain Valley has not yet finalized its water sources to be used for project purposes (e.g., dust control, hydrostatic testing, and horizontal directional drilling) nor has Mountain Valley obtained permission from the FWS for any water withdrawals from the Dan River.  *See* final EIS at 4-48.

[248] 54 U.S.C. § 306108 (2018).

[249] 36 C.F.R. pt. 800 (2019).

[250] *See* final EIS at 4-154 to 4-173.

Indian tribes, and other consulting parties; and (2) Commission staff reviews and approves all cultural resources reports, studies, and plans, and notifies Mountain Valley in writing that treatment plans and mitigation measures may be implemented and/or construction may proceed.

113.    The final EIS concludes that although construction and operation of the Southgate Project would have adverse effects on historic properties, an agreement document would be developed with the goal of resolving those impacts.[251]  On November 14, 2019, Commission staff notified the Advisory Council on Historic Preservation (Advisory Council) that the Southgate Project may have adverse effects on historic properties, and invited the Advisory Council to participate in the resolution of adverse effects through the development of an agreement document.  By letter filed December 11, 2019, the Advisory Council declined to participate in the consultation to resolve adverse effects.[252] Commission staff then prepared a draft programmatic agreement that was sent to the SHPOs and other consulting parties on January 8, 2020.  After addressing the Virginia and North Carolina SHPOs' comments on the draft agreement, Commission staff sent a final programmatic agreement to the SHPOs and other consulting parties on March 10, 2020.  The North Carolina SHPO signed the agreement on March 24, 2020.

114.    By letter dated April 1, 2020,[253] the Virginia SHPO requested that the Commission consider comments on the final agreement that the Virginia SHPO stated it received on March 25, 2020, from Cultural Heritage Partners on behalf of the Monacan Indian Nation and the Sappony Tribe.[254]  Commission staff responded to these comments in an April 10, 2020 letter to the Virginia SHPO and requested the SHPO's signature on the final agreement.  The Virginia SHPO signed the agreement on May 17, 2020.  Execution of the programmatic agreement by the Commission, the North Carolina SHPO, and the Virginia SHPO[255] concludes the NHPA section 106 process.  The programmatic agreement provides a mechanism for the review of future cultural resources investigations to cover the entire area of potential effect for the undertaking, avoidance or treatment for historic properties, and future consultations among the

---

[251] *Id*. at 5-11.

[252] Advisory Council's December 11, 2019 Response to Notice of Adverse Effect.

[253] The Virginia SHPO's letter was filed in the public docket on April 9, 2020.

[254] Neither tribe submitted substantive comments on the text of the draft agreement document directly to the Commission.

[255] The executed programmatic agreement was placed into the public record for this proceeding on May 19, 2020.

consulting parties. Environmental Condition 20 requires Mountain Valley to implement the stipulations of the programmatic agreement.

115.   On April 24, 2020, Cultural Heritage Partners filed comments on behalf of the Monacan Indian Nation and the Sappony Tribe (collectively, Tribes).[256]  The Tribes argue that the Commission process for developing the programmatic agreement "failed to comply with the letter and spirit of Section 106 of the [NHPA] . . . ."[257]  The Tribes believe that since they have obligations under the programmatic agreement, they should be recognized as invited signatories to the agreement.

116.   Pursuant to the section 106 implementing regulations, the agency must consult with the SHPO and other consulting parties (including interested Indian tribes) to seek ways to avoid, minimize, or mitigate the undertaking's adverse effects.[258]  If they agree on how to resolve the adverse effects, the agency and the SHPO must execute an agreement document.[259]  By developing and executing an agreement document with the North Carolina and Virginia SHPOs, in order to resolve adverse effects on historic properties affected by the Southgate Project, the Commission has complied with both the letter and spirit of section 106 of the NHPA.

117.   The required signatories to a section 106 agreement document include the agency official, the appropriate SHPO, and, if participating in the consultation, the Advisory Council.[260]  Generally, if the project were to occur on or affect historic properties on tribal lands, the tribe would also be a signatory to the agreement.[261]  That is not the case here. Section 800.6(c)(2) of the section 106 implementing regulations allows, but does not require, the Commission to invite additional consulting parties to be signatories to a

---

[256] Cultural Heritage Partners also filed comments on the Tribes' behalf commenting on the Commission's development of the programmatic agreement on January 16, and February 7, 2020.

[257] Monacan Indian Nation's and Sappony Tribe's April 27, 2020 Letters at 1.

[258] 36 C.F.R. § 800.6(b)(1)(i) (2019).

[259] *Id.* § 800.6(b)(1)(iv).

[260] *Id.* § 800.6(c)(1).  As noted above, the Advisory Council declined to participate in the consultation for the Southgate Project by letter filed December 11, 2019.

[261] *See* 36 C.F.R. §§ 800.6(c)(1) and 800.2(c)(2)(i) (2019).

section 106 agreement document (i.e., "invited signatories").[262]  Citing Advisory Council guidance, the Tribes argue that they should be invited signatories because they have obligations under the programmatic agreement.[263]  However, the Advisory Council's guidance further underscores that it is within the Commission's discretion to determine whether to invite additional parties to sign an agreement document, explaining that "[f]ederal agencies . . . should weigh the decision carefully, since an invited signatory who actually signs an agreement has the same ability to amend or terminate the agreement as other signatories."[264]  Accordingly, the Commission acted within its discretion, and in accord with the NHPA and its implementing regulations, by limiting the signatories to the programmatic agreement to those required under section 800.6(c)(1).[265]  Nevertheless, because the Monacan Indian Nation and the Sappony Tribe are considered to be consulting parties, the Commission invited the tribes to sign the agreement as concurring parties.  To date, neither tribe has done so.

118.    The Tribes also take issue with Commission staff's development of the programmatic agreement, stating that the programmatic agreement was presented as a "done deal" and "appears to be nothing more than a standard FERC template."[266]

119.    As described above, a draft programmatic agreement was circulated among consulting parties on January 8, 2020.  The purpose of distributing the draft agreement was to elicit substantive comments and edits from the consulting parties.  Commission staff made substantial changes to the final programmatic agreement based on comments received from the Virginia and North Carolina SHPOs.  Moreover, the use of a common

---

[262] *Id.* § 800.6(c)(2)(i) ("The agency official *may* invite additional parties to be signatories to a memorandum of agreement.") (emphasis added).

[263] Cultural Heritage Partner's April 27, 2020 Comment at 1 (citing Advisory Council, *Guidance on Agreement Documents: Executing Agreement Documents*, https://www.achp.gov/executing_agreement_documents).

[264] Advisory Council, *Guidance on Agreement Documents: Executing Agreement Documents*, https://www.achp.gov/executing_agreement_documents.

[265] 36 C.F.R. § 800.6(c)(1).

[266] Monacan Indian Nation's and Sappony Tribe's April 27, 2020 Letters at 1.

template for the same type of program or undertaking, such as for natural gas projects, is contemplated by the section 106 implementing regulations.[267]

120.    The Tribes assert that the Commission has not engaged in meaningful government to government consultation.[268]  They also take issue with certain aspects of Mountain Valley's *Plan for Unanticipated Discoveries of Historic Properties and Human Remains* (Unanticipated Discovery Plan).[269]

121.    Commission staff initiated consultation on August 8, 2018, by mailing the NOI for the Southgate Project to a wide variety of stakeholders, including the Virginia and North Carolina SHPOs and potentially interested Indian tribes.  On October 16, 2018, staff supplemented the information contained in the NOI by sending individual letters to 25 federally recognized tribes, including the Monacan Indian Nation.[270]  In response, staff received comments from five tribes.  Commission staff held meetings, in person or via teleconference, with three federally recognized Indian tribes, including a January 17, 2019 meeting with representatives of the Monacan Indian Nation in Richmond, Virginia.  On February 21, 2019, Mountain Valley provided the Monacan Indian Nation and the Sappony Tribe copies of the cultural resources investigations reports prepared for the project.[271]  Both Tribes commented on the cultural resources reports in July 2019.[272]  Both Tribes also commented on the draft EIS.  Staff addressed the Tribes' comments in the final EIS.[273]

---

[267] *See* 36 C.F.R. § 800.14(b)(4) (2019) (describing the use of a "prototype programmatic agreement" for the "same type of program or undertaking in more than one case or area").

[268] Monacan Indian Nation's and Sappony Tribe's April 27, 2020 Letters at 2.

[269] *Id.*

[270] The Sappony Tribe is a North Carolina state-recognized tribe.

[271] *Id.* at 4-159; *see also* Mountain Valley's March 5, 2019 Information Request Response at 127.

[272] *See* Monacan Indian Nation's July 1, 2019 Comments on Cultural Resources Reports (filed as privileged); Sappony Tribe's July 1, 2019 Comments on Cultural Resources Reports (filed as privileged).

[273] *See* final EIS, Appendix I.3 at I.3-62 to I.3-67 (addressing Sappony Tribe's September 16, 2019 Comments on the draft EIS); I.3-68 to I.3-74 (addressing Monacan Indian Nation's September 16, 2019 Comments on the draft EIS); I.3-75 to I.3-77

122.    Section 800.2(a)(4) of the regulations implementing section 106 of the NHPA states that "[t]he [Advisory] Council encourages the agency official to use to the extent possible existing agency procedures and mechanisms to fulfill the consultation requirements of this part."[274]  By using our existing procedures, including notices, letters to and from tribes, and meetings between staff and tribal representatives, Commission staff has conducted consultation with Indian tribes.  Section 4.10.1.2 of the final EIS provides a detailed account of the Commission's efforts to consult on a government-to-government basis with Indian tribes that may attach religious or cultural significance to sites in the region or may be interested in potential impacts from the Southgate Project on cultural resources.[275]

123.    Mountain Valley developed its Unanticipated Discovery Plan[276] in consultation with the Virginia and North Carolina SHPOs.  The plan notes that Mountain Valley "is contacting federally-recognized Native American Tribes to solicit their concerns and input regarding potential Project effects to historic properties, tribal resources, and human remains."[277]  In addition, the plan sets forth the procedures to which Mountain Valley would adhere if archaeological resources or human remains are discovered during project construction.  The plan includes two distinct protocols, the use of which is dependent upon whether or not the discovered cultural resources may involve human remains or funerary objects.[278]  Both protocols require Mountain Valley to notify and consult with "Interested Tribes," which Mountain Valley has defined as "tribes that have asked to be

─────────────

(addressing Monacan Indian Nation's November 11, 2019 Comments); and I.3-78 to I.3-80 (addressing Sappony Tribe's December 12, 2019 Comments).

[274] 36 C.F.R. § 800.2(a)(4) (2019).

[275] *See also* final EIS, Appendix E-3 (Table 4.10-2).

[276] Mountain Valley's original Unanticipated Discovery Plan was filed as part of its November 8, 2018 Application.  *See* Application, Resource Report 4, Appendix 4-C. The Unanticipated Discovery Plan was revised in May 2019.  *See* Mountain Valley's May 22, 2019 Supplemental Filing, attachment 5.  In its comments on the final EIS, Mountain Valley clarified that the Unanticipated Discovery Plan has not been revised since the May 2019 version filed with the Commission.  Mountain Valley's March 31, 2020 Comments at 3.

[277] Unanticipated Discovery Plan, section 3.0.

[278] *Compare* Mountain Valley's Unanticipated Discovery Plan, section 4.2 (Notification and Assessment Procedures – Not Involving Human Remains or Funerary Objects) *and* section 4.3 (Notification and Treatment Procedures – Human Remains or Funerary Objects).

consulted in the event of a discovery"[279] and "tribes that have requested consultation during the FERC review process."[280] Mountain Valley filed a revised Unanticipated Discovery Plan on May 22, 2019, which was subsequently approved by the North Carolina SHPO on August 19, 2019, and the Virginia SHPO on October 18, 2019.[281] We are satisfied that Mountain Valley has developed appropriate protocols for addressing unanticipated discoveries during project construction, and that Mountain Valley will seek input from the Tribes regarding any discoveries, as appropriate.[282] In the event of the unanticipated discovery of human remains, funerary object, sacred objects, or objects of cultural patrimony, Mountain Valley would follow the protocols set forth in the Unanticipated Discovery Plan and the executed programmatic agreement,[283] and has committed to treating any such discovery in a manner guided by the Advisory Council's *Policy Statement Regarding Treatment of Burial Sites, Human Remains, and Funerary Objects* (2007) and any relevant state laws and guidelines.[284]

124.    As detailed above, the Commission engaged in meaningful consultation pursuant to our obligations under NHPA section 106 and pursuant to our government-to-government

---

[279] Unanticipated Discovery Plan, section 3.0.

[280] Mountain Valley's October 18, 2019 Response to Environmental Information Request at 29.

[281] We note that, by letter filed May 19, 2020, the Virginia SHPO requested that Mountain Valley re-open consultation on the Unanticipated Discovery Plan to explore ways in which the Tribes may be more involved in determinations of significance of any discoveries.

[282] If the discovery is determined to be a newly identified and potentially significant archaeological site (i.e., exhibiting archaeological features, intact contacts, or patterned artifact distributions that could provide substantive information concerning prehistory or history), or if it represents information that would alter the understanding of a previously known and cleared archaeological resource, Mountain Valley must notify the Commission, the relevant SHPO, and Interested Tribes within 24 hours of the determination. *See* Unanticipated Discovery Plan, section 4.2.

[283] The programmatic agreement includes Stipulation VI.B, which states in part: "Human remains, funerary objects, sacred objects, and objects of cultural patrimony shall be treated in accordance with the [Unanticipated Discover Plan]; and repatriated to appropriate consulting Indian tribes or reburied after analysis, as determined by consultations among the signatories to this [programmatic agreement]."

[284] *See* Mountain Valley's October 18, 2019 Response to Environmental Information Request at 29.

responsibility to Indian tribes.  Execution of the programmatic agreement, and implementation thereof, evidences the Commission's compliance with the section 106 review process.

###    c.    **Environmental Justice**

125.    EPA states that every effort should be made to minimize impacts to environmental justice communities within the vicinity of the project facilities.[285]  The final EIS identified potential environmental justice communities (i.e., minority or low-income populations) in the project area consistent with EPA guidance.[286]  The project pipeline would cross 35 census block groups, 15 of which contain environmental justice populations.[287]  Two environmental justice populations are located within one mile of the proposed Lambert Compressor Station.[288]  The EPA does not identify specific impacts to environmental justice communities that the Commission should minimize; however, the final EIS discusses factors that could affect such communities and determined that potentially adverse environmental effects would be minimized and/or mitigated.[289]  Based on an evaluation of the project's potential environmental impacts on the identified environmental justice communities and finding that those impacts would be minimized or mitigated, the final EIS concludes that the project would not have a disproportionately high and adverse environmental or human health impact on minority or low-income populations.[290]

---

[285] EPA's March 23, 2020 Comments at 1.

[286] *See* final EIS at 4-144 to 4-149 (Table 4.9-7).  Potential environmental justice communities include:  (1) census block groups that have a minority population of more than 50% or a population that is 10 percentage points higher than their respective county; and (2) census block groups that have a household poverty rate of more than 20% or a household poverty rate that is 10 percentage points higher than their respective county. *Id.* at 4-142.

[287] *Id*. at 4-142.

[288] *Id.*

[289] *Id.*  Factors that could affect environmental justice communities include air and noise impacts from construction and operation (section 4.11), visual impacts (section 4.8), and socioeconomic impacts such as traffic, loss of tourism, and crop loss (section 4.9).

[290] *See id*. at 4-153 and 5-11.

#### d.    <u>Hydrostatic Testing</u>

126.   EPA reiterates an earlier request for a hydrostatic testing report and recommends that Mountain Valley consider recycling the water used for hydrostatic testing.[291] The final EIS provides a description of Mountain Valley's proposed hydrostatic testing plans, including source and volume of water and discharge procedures.[292] The final EIS also notes that Mountain Valley would test the pipeline in segments, and that the water may be moved through each sequential segment along the route, or the water would be discharged.[293] If the hydrostatic test water is discharged, it would be discharged through sediment filters in vegetated uplands away from waterbodies and wetlands.[294] Prior to construction, Mountain Valley must apply for any applicable permits to discharge hydrostatic test water.

#### e.    <u>Collocation with Transco Pipeline</u>

127.   The Southgate Project's proposed pipeline route is adjacent to, or collocated with, Transco's existing system of three and four parallel, natural gas pipelines for approximately 33 miles. Transco and a landowner, Katie Whitehead, filed comments on the final EIS regarding the Southgate Project's proposed collocation.

#### i.    <u>Transco Comments</u>

128.   On March 27, 2020, Transco filed comments on the final EIS identifying several issues with collocating portions of the proposed Southgate Project with Transco's pipeline system.[295] Specifically, Transco is concerned with possible interference with Transco's cathodic protection system, the use of Transco's right-of-way for Southgate Project construction purposes (e.g., spoil storage, grading, heavy equipment, timber

---

[291] EPA's March 23, 2020 Comments at 1.

[292] Final EIS at 4-46 and 4-47.

[293] *Id*. at 2-20.

[294] *Id*.

[295] On January 31, 2020, Transco raised, for the first time, concerns that construction and operation of the Southgate Project would encroach on Transco's existing right-of-way and could potentially adversely affect the safety, integrity, operations, and expandability of Transco's pipeline system. Transco's January 31, 2020 Motion to Intervene Out of Time. The filing noted that Transco and Mountain Valley had executed an agreement on July 1, 2019, that set forth terms for Mountain Valley to cross Transco's right-of-way. *Id.* at 5.

storage, burning of brush, blasting impacts), and Transco's ability to access its right-of-way throughout the Southgate Project construction and restoration phase while erosion and sediment control devices remain on site.

129.    On April 6, 2020, in response to staff's data request seeking detailed locations of the Transco pipeline systems, Mountain Valley filed revised alignment sheets showing that, for the majority of the proposed Southgate Project pipeline route, Mountain Valley proposes to place the Southgate Project pipeline at least 50 feet away from Transco facilities, with the exception of seven locations where the Southgate Project pipeline route would cross the Transco right-of-way and one location where the pipe would be horizontally directionally drilled under the Dan River.  Mountain Valley states that it continues to coordinate with Transco at these locations.  On May 8, 2020, Mountain Valley filed a response to Transco's March 27, 2020 comments.

130.    We encourage collocated pipelines to minimize the space between existing and new pipelines in order to reduce the impact on natural resources and to minimize the amount of land that would need to be acquired from landowners.  We note that collocated pipelines often use workspace associated with existing pipelines' permanent rights-of-way.  Here, Mountain Valley has proposed placing its new pipeline at least 50 feet away from Transco facilities, with a few exceptions.  Regarding Transco's safety concerns about the appropriate distances between pipelines, we note that maintaining a 50-foot separation between pipelines is not uncommon and that there are numerous examples of pipelines located less than 50 feet apart, including along Transco's own pipeline system.[296]  Mountain Valley has also confirmed that the Southgate Project's proposed construction workspaces do not overlap a Transco pipeline in any location other than where the Southgate Project route would cross Transco's right-of-way.  We note that the Interstate Natural Gas Association of America (INGAA) has adopted standard guidance

---

[296] Mountain Valley points out that Transco has collocated its own pipelines in the same right-of-way, with as little as a 25-foot separation.  *See* Mountain Valley's May 8, 2020 Comments (quoting a February 4, 2019 comment filed by Transco in Docket No. CP18-186-000 for Transco's Southeastern Trail Expansion Project, in which Transco stated that "[c]urrent industry best practice is to maintain 25 feet of separation between large diameter, high-pressure natural gas transmission pipeline. This is designed to give the operating company clear access to safely excavate the pipeline for future maintenance activities (if necessary). The proposed 25-foot separation also allows construction to take place without regularly operating heavy equipment over the existing, in-service pipelines.").

calling for a 50-foot separation between pipelines.[297]  The Southgate Project alignment along Transco's pipeline system is consistent with this guidance.

131.    Regarding Transco's concerns about possible interference with its cathodic protection system, Mountain Valley must design, construct, operate, and maintain the Southgate Project pipeline in accordance with the U.S. Department of Transportation's (DOT) minimum federal safety standards.[298]  In compliance with 49 CFR Part 192, subpart I, gas pipelines must be properly coated and have cathodic protection to prevent corrosion.  The performance of cathodic protection systems must be monitored regularly with tests performed at least once per year.  Records must be maintained for the life of the pipeline.  Pipelines that are found to have deficient cathodic protection must be remediated in a timely manner (usually within 12 to 18 months after discovery).

132.    We expect Mountain Valley's adherence to these requirements (as well as Transco's) will ensure that the location of Mountain Valley's new pipeline in proximity to Transco's existing pipelines will not result in detrimental impacts to any of the pipelines' cathodic protection systems.  If any such impact occurred, the monitoring required by 49 CFR Part 192 would identify it and require remediation.  Mountain Valley states that it continues to coordinate with Transco to ensure that the potential for interference and stray current between their cathodic protection systems is eliminated, and that it agrees with Transco that it would be advantageous to develop a plan to mitigate any potential risks to Transco's existing cathodic protection system.[299]

133.    Mountain Valley has committed to working with Transco during construction and operation of the Southgate Project to coordinate access to the right-of-way in the event that unplanned issues arise.  In response to Transco's concern that Mountain Valley's installation of erosion and sediment control devices would "unduly inhibit Transco's ability to access its right-of-way for operational and safety purposes,"[300] Mountain Valley responds that any controls within Transco's right-of-way can be temporarily removed to allow access.[301]  We expect Mountain Valley to continue to coordinate with Transco to

---

[297] *See, e.g.,* INGAA Foundation, *Building Interstate Natural Gas Transmission Pipelines: A Primer* 87 (Jan. 2013), https://www.ingaa.org/constructionprimer.aspx.

[298] 49 C.F.R. pt. 192 (2019).

[299] *See* Mountain Valley's May 8, 2020 Comments at 2.

[300] Transco's March 27, 2020 Comments at 2.

[301] Mountain Valley's May 8, 2020 Comments at 2.

resolve Transco's collocation and safety concerns.  Based on the foregoing, we conclude that the Southgate Project, as proposed, could be constructed and operated safely.

## ii.    Katie Whitehead Comments

134.    On April 8, 2020, landowner Katie Whitehead filed a comment in response to Mountain Valley's April 6 filing.  Ms. Whitehead asserts that on the revised alignment sheets the location of Transco's existing pipelines on her property is not correct.  Ms. Whitehead claims that the alignment sheets incorrectly depict the location of the Transco pipelines within Transco's right-of-way.  Specifically, Ms. Whitehead believes that the Transco pipeline is located at least 40 feet from the edge of its right-of-way; therefore, based on Mountain Valley's pipeline alignment, there would be, at a minimum, a 65-foot separation between the existing Transco pipeline and the proposed Southgate Project pipeline.  Ms. Whitehead states that she is unable to negotiate an appropriate easement without accurately knowing the temporary and permanent easement boundaries.[302]

135.    On April 28, 2020, Mountain Valley responded that the alignment sheets are correct, based on data obtained from Transco as well as use of pipe locating equipment to determine the location of the Transco pipeline.  In its filing, Mountain Valley included additional images of Ms. Whitehead's property to clarify the Transco pipeline locations with respect to the right-of-way and the proposed Southgate pipeline.  In response to Ms. Whitehead, Mountain Valley stated that it has offered to make changes to the proposed route to reduce the impact on Ms. Whitehead's property and has stated that it will file the revised alignment sheets reflecting the changes as part of the project's Implementation Plan.[303]

136.    On May 11, 2020, Ms. Whitehead responded, raising questions about the easement agreement process.  Specifically, Ms. Whitehead's filing requests information related to agreements between Transco and Mountain Valley regarding the joint use of the right-of-way, including Mountain Valley's proposed crossing of a spillway leading from a small lake on her property[304] and Mountain Valley's plan for felled trees.

---

[302] Ms. Whitehead is specifically concerned about the excessive removal of trees and the impact on silviculture to accommodate the temporary workspace on her property.  *See* Katie Whitehead's September 16, 2019 and November 17, 2019 Comments on the draft EIS.

[303] Final EIS at 3-26, Table 3.4-10 (Mountain Valley would reduce temporary workspace from 100 feet to 75 feet the entire distance on the Whitehead property).

[304] Mountain Valley identified the spillway as a surface water feature with intermittent flow.  Final EIS Appendix I.3 at I.3-220.  Mountain Valley will treat this

137.    Mountain Valley proposes to treat the spillway on Ms. Whitehead's property as a waterbody crossing.[305]  Pursuant to Mountain Valley's *Wetland and Waterbody Construction and Mitigation Procedures*, Mountain Valley will be required to restore the spillway after construction.  Regarding tree felling, Environmental Condition 17 requires Mountain Valley to remove and dispose of timber and debris from the right-of-way. Mountain Valley must ensure that any timber that is not removed and remains on or adjacent to the right-of-way, as agreed to by the landowner, is located at access points where the landowner can reasonably retrieve the timber without any inadvertent impacts on the restored right-of-way, in accordance with the section III.E of the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan*.

138.    The landowner easement agreement process provides an opportunity for Ms. Whitehead to express her concerns to Mountain Valley and to negotiate site-specific plans to meet her needs.[306]  Environmental Condition 5 allows Mountain Valley to make minor adjustments to the route per landowner request so long as the route adjustments do not affect other landowners or sensitive environmental areas.  Should Mountain Valley seek to revise its proposal based on easement negotiations with landowners, Environmental Condition 4 of this order requires Mountain Valley to file revised detailed survey alignment maps/sheets prior to the start of construction.  Any changes to the approved route would be reflected on these alignment sheets.

## f.    <u>Sandy Creek Crossing</u>

139.    Roger Sisson notes concerns about the Southgate Project's impacts on a spring-fed well on his property.  Mr. Sisson is also concerned about the pipeline's crossing of the Sandy Creek riverbed, noting the potential for pipeline shifting and corrosion, due to the wet and sandy nature of the soil, and the possibility of flood damage.

140.    Mountain Valley is required to identify all private wells and springs that are used for potable water in the project area.  Accordingly, the final EIS recommends, and we

---

feature as a surface water crossing during construction, which will include a dry open-cut crossing consisting of either dam and pump or a flume.  Final EIS Appendix B.5 at B.5-1.

[305]  *See* Final EIS Appendix I.3 at I.3-220 and Appendix B.5 at B.5-1 (waterbody S-E18-4 at milepost 4.8).

[306]  We note that NGA section 7(h) provides that a holder of a certificate of convenience and necessity, which this order issues to Mountain Valley, may acquire the needed property rights by exercise of the right of eminent domain.  *See generally, Mountain Valley*, 161 FERC ¶ 61,043, at PP 59-62, *order on reh'g*, 163 FERC ¶ 61,197, at PP 48-51, *aff'd sub nom.*, *Appalachian Voices v. FERC*, No., 17-1271, 2019 WL 847199.

require in Environmental Condition 14, that Mountain Valley, prior to construction, file the locations of all private water wells and springs identified within 150 feet of the project work areas – including each water source's status, use, direction, and distance from construction workspace – and any proposed mitigation measures that would minimize or avoid impacts on the private water wells or springs.[307]  To address potential impacts on groundwater wells, Mountain Valley will offer to conduct pre- and post-construction water quality testing for all water supply wells located within 150 feet of project workspaces, as described in Mountain Valley's *Water Resources Identification and Testing Plan*.[308]

141.    The Southgate Project will cross Sandy Creek at milepost 12.8 in Pittsylvania County, Virginia.[309]  To cross Sandy Creek, Mountain Valley will use dry-ditch methods (i.e., dam-and-pump or flume)[310] to minimize in-stream construction and surface water impacts.[311]  Regarding Mr. Sisson's concerns about flood damage and risk to the pipeline from shifting in the stream bed, the final EIS explains that, although flooding itself does not generally present a risk to pipeline facilities, bank erosion and/or scour could expose the pipeline or cause sections of pipe to become unsupported.  The final EIS states that the pipeline will be installed below scour depth for each waterbody crossed, and that at least four feet of cover would be maintained at waterbody crossings, except in consolidated rock, where there would be a minimum of two feet of cover.[312]  The final EIS further states that flooding can also affect the pipeline by increasing buoyancy, causing the pipe to rise toward the land surface where it may become exposed.[313]  To minimize and prevent impacts, Mountain Valley would implement mitigation measures such as use of concrete coating, gravel-filled blankets, or concrete weights on the pipeline to maintain negative buoyancy.[314]  These measures are included in Mountain Valley's

---

[307] Final EIS at 5-3.

[308] *Id.*

[309] *Id.* Appendix B.5 at B.5-3.

[310] The dam-and-pump and flume methods are types of dry-ditch crossings that involve diverting the flow of water across construction work areas using one or more flume pipes, or a series of pumps and hoses, placed in the waterbody.  *Id.* at 2-22 to 2-23.

[311] *Id.*

[312] *Id.* at 2-22.

[313] *Id.* at 4-13.

[314] *Id.* at 4-14.

*Wetland and Waterbody Construction and Mitigation Procedures* and project-specific *Erosion and Sediment Control Plan*, which Mountain Valley is required to follow at all waterbody crossings.

142.    Cathodic protection would be installed along the entire length of the pipeline to prevent corrosion.[315]  In addition, as described above, Mountain Valley will complete periodic corrosion and leak surveys.[316]  Finally, Mountain Valley must design, construct, operate, and maintain the Southgate Project pipeline in accordance with DOT's minimum federal safety standards,[317] including requirements for internal, external, and atmospheric corrosion control.[318]

### g.    Natural Resources Conservation Service Riparian Area

143.    On April 17, 2020, the Blue Ridge Environmental Defense League filed a comment on behalf of landowner Douglas Bryant, who is concerned about a riparian area on his property that would be crossed by the proposed pipeline at milepost 21.5 and that was part of a Natural Resources Conservation Service conservation program.  Mr. Bryant requested that the Southgate Project pipeline route avoid this area on his property. Commission staff confirmed, through information provided by the Natural Resources Conservation Service, that this riparian area is no longer under a conservation program and does not warrant special protection.  Therefore, there is no need to consider a reroute in the area.  In general, to minimize impacts and restore riparian areas affected by the project, Mountain Valley would implement its *Upland Erosion Control, Revegetation and Maintenance Plan*, *Wetland and Waterbody Construction and Mitigation Procedures* and its project-specific *Erosion and Sediment Control Plan*.  In addition, Environmental Condition 5 allows for Mountain Valley to make minor adjustments to the route per landowner request so long as the route adjustments do not affect other landowners or sensitive environmental areas.

### 5.    Environmental Analysis Conclusion

144.    We have reviewed the information and analysis contained in the final EIS regarding the potential environmental effects of the Southgate Project, as supplemented herein.  We agree with the conclusions presented in the final EIS and find that the environmental impacts associated with the project, if constructed and operated as

---

[315] *Id.* at 4-218.

[316] *See supra* P 131.

[317] 49 C.F.R. pt. 192.

[318] *Id.* §§ 192.451-192.493 (subpart I); *see also* final EIS at 2-12.

described in the final EIS, are acceptable considering the public benefits that the project will provide.  We accept the final EIS's environmental recommendations, as revised herein, and include them as conditions in the appendix to this order.

145.    Based on our Certificate Policy Statement determination and our environmental analysis, we find under section 7 of the NGA that the public convenience and necessity requires approval of Mountain Valley's Southgate Project, subject to the conditions in this order.

146.    Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Commission staff carefully reviews all information submitted and will only issue a notice to proceed with construction when satisfied that the applicant has complied with all applicable conditions.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

147.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[319]

148.    At a hearing held on June 18, 2020, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record,

---

[319] *See* 15 U.S.C. § 717r(d) (2018) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

The Commission orders:

(A)     A certificate of public convenience and necessity is issued to Mountain Valley, authorizing it to construct and operate the proposed facilities, as described and conditioned herein, and as more fully described in the application, and subsequent filings by the applicant, including any commitments made therein.

(B)     The construction of the Southgate Project facilities will not commence until Mountain Valley receives the appropriate federal permits for the Mainline System, and the Director of the Office of Energy Projects, or the Director's designee, lifts the stop-work order and authorizes Mountain Valley to continue constructing the remaining portions of the Mainline System.

(C)     The certificate authority issued in Ordering Paragraph (A) is conditioned on:

(1)     Mountain Valley's completion of construction of the proposed facilities and making them available for service within three years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)     Mountain Valley's compliance with all applicable Commission regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

(3)     Mountain Valley's compliance with the environmental conditions listed in the appendix to this order; and

(4)     Mountain Valley's filing a written statement affirming that it has executed firm service agreements for volumes and service terms equivalent to those in its precedent agreements, prior to commencing construction.

(D)     Mountain Valley's proposed rates for service on the Southgate System are approved, as modified above.

(E)     Mountain Valley's proposal to charge an initial retainage factor to recover fuel costs associated with the Southgate System is approved.

(F)     Mountain Valley is required to file actual tariff records setting forth rates and the separately-stated fuel rate for the project and other proposed changes to its tariff implementing the project no more than 60 days and no less than 30 days prior to placing the project in service.

(G)     Mountain Valley shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Mountain Valley. Mountain Valley shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

(H)     The North Carolina Utilities Commission's and the Appalachian Mountain Advocates' requests for a full evidentiary, trial-type hearing are denied.

(I)     Transcontinental Gas Pipe Line Company, LLC's request for a technical conference is denied.

By the Commission.  Commissioner Glick is dissenting in part with a separate statement attached.
                             Commissioner McNamee is concurring with a separate statement attached.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

## Appendix

## Environmental Conditions

As recommended in the final Environmental Impact Statement (EIS) for the Southgate Project (Project) and modified herein, this authorization includes the following conditions:

1.      Mountain Valley shall follow the construction procedures and mitigation measures described in its application, supplemental filings (including responses to staff data requests), and as identified in the EIS, unless modified by the Order.  Mountain Valley must:

   a.      request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

   b.      justify each modification relative to site-specific conditions;

   c.      explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   d.      receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.      The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project.  This authority shall allow:

   a.      the modification of conditions of the Order;

   b.      stop-work authority; and

   c.      the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation.

3.      **Prior to any construction,** Mountain Valley shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EIs' authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4. The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of construction**, Mountain Valley shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Mountain Valley's exercise of eminent domain authority granted under Natural Gas Act Section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations. Mountain Valley's right of eminent domain granted under Natural Gas Act Section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5. Mountain Valley shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, construction support areas, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. All areas must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, & Maintenance Plan* and/or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all facility location changes resulting from:

a. implementation of cultural resources mitigation measures;

b. implementation of endangered, threatened, or special concern species mitigation measures;

c. recommendations by state regulatory authorities; and

    d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **Within 60 days of the acceptance of the Certificate and before construction begins**, Mountain Valley shall file its Implementation Plan with the Secretary, for review and written approval by the Director of OEP, or the Director's designee. Mountain Valley must file revisions to its plans as schedules change. The plans shall identify:

    a.    how Mountain Valley will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

    b.    how Mountain Valley will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

    c.    the number of EIs assigned per spread and/or facility, and how Mountain Valley will ensure that sufficient personnel are available to implement the environmental mitigation;

    d.    company personnel, including EIs and contractors, who will receive copies of the appropriate materials;

    e.    the location and dates of the environmental compliance training and instructions Mountain Valley will give to all personnel involved with construction and restoration (initial and refresher training as the Project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

    f.    the company personnel (if known) and specific portion of Mountain Valley's organization having responsibility for compliance;

    g.    the procedures (including use of contract penalties) Mountain Valley will follow if noncompliance occurs; and

    h.    for each discrete facility, a Gantt or Program Evaluation Review Technique (PERT) chart (or similar Project scheduling diagram), and dates for:

        1.  the completion of all required surveys and reports;
        2.  the environmental compliance training of on-site personnel;
        3.  the start of construction; and
        4.  the start and completion of restoration.

7.  Mountain Valley shall employ a team of EIs (i.e., two or more or as may be established by the Director of OEP or the Director's designee) per construction spread.  The EIs shall be:

    a.  responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or authorizing documents;

    b.  responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.  empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

    d.  a full-time position separate from all other activity inspectors;

    e.  responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.  responsible for maintaining status reports.

8.  Beginning with the filing of its Implementation Plan, Mountain Valley shall file updated status reports with the Secretary on a **weekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities.  Status reports shall include the following:

    a.  an update on Mountain Valley's efforts to obtain the necessary federal authorizations;

    b.  the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

    c.  a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.  a description of the corrective actions implemented in response to all instances of noncompliance;

    e.  the effectiveness of all corrective and remedial actions implemented;

    f.  a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

      g.     copies of any correspondence received by Mountain Valley from other federal, state, or local permitting agencies concerning instances of noncompliance, and Mountain Valley's response.

9.     Mountain Valley shall implement its environmental complaint resolution procedure. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the Project and restoration of the right-of-way. **Prior to construction**, Mountain Valley shall mail the complaint procedures to each landowner whose property will be crossed by the Project.

      a.     In its letter to affected landowners, Mountain Valley shall:

           i.     provide a local contact that the landowners should call first with their concerns; the letter shall indicate how soon a landowner should expect a response;

           ii.     instruct the landowners that if they are not satisfied with the response, they should call Mountain Valley's Hotline; the letter shall indicate how soon to expect a response; and

           iii.     instruct the landowners that if they are still not satisfied with the response from Mountain Valley's Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

      b.     In addition, Mountain Valley shall include in its **weekly** status report a copy of a table that contains the following information for each problem/concern:

           i.     the identity of the caller and date of the call;

           ii.     the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

           iii.     a description of the problem/concern; and

           iv.     an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.    Mountain Valley must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Project facilities**. To obtain such authorization, Mountain Valley must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    Mountain Valley must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project facilities into service**. Such

authorization would only be granted following a determination that rehabilitation and restoration of the areas affected by the Project are proceeding satisfactorily.

12. **Within 30 days of placing the authorized facilities in-service**, Mountain Valley shall file an affirmative statement with the Secretary, certified by a senior company official:

   a.   that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

   b.   identifying which of the conditions of the Order Mountain Valley has complied with or will comply with.  This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, a revised *General Blasting Plan* that clarifies it will not bury excess rock fragments generated during trenching or blasting in any location other than where the rock originated.  Excess rock fragments not suitable for reburial at the point of origin should be considered construction debris and should be disposed of consistent with our *Upland Erosion Control, Revegetation, & Maintenance Plan* at sections III.E and V.A.3.

14. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, the locations of all private water wells and springs identified within 150 feet of the Project work areas, including the well's or springs' status, use, distance from construction workspace, and any proposed measures to minimize or avoid impacts on the private water wells or springs.

15. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, site-specific plans detailing the enhanced erosion control measures and maintenance requirements for each location where the Project will parallel and remove vegetation within 15 feet of a waterbody.

16. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, its final list of water sources to be used for the Project (dust control, hydrostatic testing, and horizontal directional drill operations), including intake location, waterbody name, withdrawal rate and method, and measures to minimize entrainment of aquatic species.  Mountain Valley shall also provide written concurrence from the

U.S. Fish and Wildlife Service (FWS) for any water withdrawals from the Dan River.

17. **During construction and prior to any Project in-service approval,** Mountain Valley shall remove and dispose of timber and debris from the right-of-way. Mountain Valley must ensure that any beneficial reuse of timber that is not removed or remains on or adjacent to the right-of-way, as agreed to by the landowner, is located at access points where the landowner can reasonably retrieve timber without any inadvertent impacts on the restored right-of-way, in accordance with the FERC *Upland Erosion Control, Revegetation, and Maintenance Plan,* section III.E.

18. In order to identify locations where additional protection measures will be needed, and to inform compliance monitoring, Mountain Valley shall file with the Secretary, the results of the pre-construction bald eagle nest and colonial rookery surveys **prior to construction.**

19. Mountain Valley shall **not begin** construction activities **until**:

   a.   Mountain Valley files with the Secretary the results of all outstanding biological surveys;

   b.   the staff completes Endangered Species Act consultation with the FWS; and

   c.   Mountain Valley has received written notification from the Director of OEP, or the Director's designee, that construction or use of mitigation may begin.

20. Mountain Valley shall **not begin** construction of facilities and/or use of all staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

   a.   Mountain Valley files with the Secretary:

      i.    remaining cultural resources survey reports;

      ii.   site evaluation reports and avoidance or treatment plans, as required; and

      iii.  comments on the cultural resources reports and plans from the Virginia and North Carolina State Historic Preservation Officers and interested Indian tribes.

   b.   Mountain Valley implements the stipulations of the May 17, 2020 executed programmatic agreement for the Southgate Project; and

c.    The Commission staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies Mountain Valley in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

All materials filed with the Commission containing location, character, and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: "**CUI//PRIV-DO NOT RELEASE**."

21.   **Prior to construction**, Mountain Valley shall file its *Nighttime Construction Noise Management Plan* with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, that demonstrates noise levels will be reduced below 48.6 decibels on the A-weighted scale (dBA) at night and 55 dBA day-night sound level ($L_{dn}$) overall at the nearest noise sensitive area (NSA), or not exceed 10 dBA over the ambient at the nearest NSA where ambient noise levels are already above 55 dBA.  This plan shall indicate site-specific mitigation measures and indicate resulting noise impacts on NSAs.

22.   **No later than 60 days after placing the Lambert Compressor Station (including the Interconnect) into service**, Mountain Valley shall file a noise survey with the Secretary.  If a full load condition noise survey is not possible, Mountain Valley shall provide an interim survey at the maximum possible load **within 60 days** of placing the station into service and provide the full load survey **within 6 months**.  If the noise attributable to the operation of the equipment at the station under interim or full load conditions exceeds an $L_{dn}$ of 55 dBA at the nearest NSA, Mountain Valley shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  Mountain Valley shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Mountain Valley Pipeline, LLC | Docket No. | CP19-14-000 |

(Issued June 18, 2020)

GLICK, Commissioner, *dissenting in part*:

1.     I dissent in part from today's order because I believe that the Commission's action violates both the Natural Gas Act[1] (NGA) and the National Environmental Policy Act[2] (NEPA).  The Commission once again refuses to consider the consequences its actions have for climate change.  Although neither the NGA nor NEPA permit the Commission to assume away the climate change implications of constructing and operating this project, that is exactly what the Commission is doing here.

2.     In today's order authorizing Mountain Valley Pipeline, LLC's (Mountain Valley) proposed Southgate Project (Project),[3] the Commission continues to treat greenhouse gas (GHG) emissions and climate change differently than all other environmental impacts. The Commission again refuses to consider whether the Project's contribution to climate change from GHG emissions would be significant,[4] even though it quantifies the direct GHG emissions from the Project's construction and operation.[5]  That failure forms an integral part of the Commission's decisionmaking:  The refusal to assess the significance of the Project's contribution to the harm caused by climate change is what allows the Commission to determine that the environmental impacts associated with the Project are "acceptable"[6]  and, as a result, conclude that the Project is required by the public

---

[1] 15 U.S.C. § 717f (2018).

[2] National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*

[3] *Mountain Valley Pipeline, L.L.C.*, 171 FERC ¶ 61,232 (2020) (Certificate Order).

[4] *Id.* PP 97–99.

[5] Southgate Project Final Environmental Impact Statement at 4-184–4-185 & Tables 4.11-4, 4.11-5 (EIS).

[6] Certificate Order, 171 FERC ¶ 61,232 at P 144; EIS at 5-1 ("If the Project is constructed and operated in accordance with the mitigating measures discussed in this EIS, and our recommendations, adverse environmental impacts would be reduced to less than significant levels").

convenience and necessity.[7]  Claiming that a project has no significant environmental impacts while at the same time refusing to assess the significance of the project's impact on the most important environmental issue of our time is not reasoned decisionmaking.[8]

3.     Making matters worse, the Commission again refuses to make a serious effort to assess the indirect effects of the Project—despite the fact that the record plainly provides that the Project will be used to transport natural gas to residential and commercial end-users in North Carolina and Virginia.[9]  The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has repeatedly criticized the Commission for its stubborn refusal to identify and consider the reasonably foreseeable GHG emissions caused by the downstream combustion of natural gas transported through an interstate pipeline.  But even so, today's order doubles down on approaches that the D.C. Circuit has already rejected.  So long as the Commission refuses to heed the court's unambiguous directives, I have no choice but to dissent.

4.     Finally, I disagree with the Commission's decision to grant Mountain Valley a 14 percent return on equity (ROE) for the Project's initial rates.[10]  The majority's decision not only represents an unwarranted departure from recent precedent,[11] but it also does

---

[7] Certificate Order, 171 FERC ¶ 61,232 at P 145.

[8] Commissioner McNamee argues that the Commission can consider a project's direct GHG emissions under NEPA and in its public convenience and necessity determination without actually assessing whether the GHG emissions are significant.  Certificate Order, 171 FERC ¶ 61,232 (McNamee, Comm'r, concurring at P 2).  No matter how many times he says so, this does not constitute consideration of the impact of the Project's GHG emissions.  If you refuse to consider how the project's GHG emissions will impact the environment you aren't actually examining those emissions for purposes of NEPA and the NGA.

[9] Certificate Order, 171 FERC ¶ 61,232 at n.60 ("Mountain Valley states that the natural gas transported by the Southgate Project will be used to make bundled gas sales primarily to residential and small- and medium-sized commercial customers for heating, cooking, and other end-uses typical of natural gas local distribution company customers.") (citing Mountain Valley's March 15, 2019 Data Request Response at 3); *see id.* P 43 ("The project shipper is a local distribution company, which will locally distribute gas to residential, commercial, and industrial end-use customers."); *id.* P 99 ("[A]s discussed in the final EIS, most of the gas will serve North Carolina end-users, primarily by residential and small and medium-sized commercial customers.").

[10] *Id.* P 57.

[11] In developing incremental rates for pipeline expansion projects, the Commission's general policy is to use the rate of return components approved in the

nothing but lend credence to the North Carolina Commission's concern that we offer "no assurances that the consuming public will be protected from excessive rates."[12]

## I.   The Commission's Public Interest Determination Is Not the Product of Reasoned Decisionmaking

5.      We know with certainty what causes climate change:  It is the result of GHG emissions, including carbon dioxide and methane, released in large quantities through the production, transportation, and consumption of fossil fuels, including natural gas.  The Commission recognizes this relationship, finding, as it must, that "anthropogenic sources of GHGs are the primary cause of warming of the global climate system"[13] and that GHG emissions from the Project's construction and operation "would increase the atmospheric concentration of GHGs, in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."[14] In light of this undisputed relationship between anthropogenic GHG emissions and climate change, the Commission must carefully consider the Project's contribution to climate change, both in order to fulfill NEPA's requirements and to determine whether the Project is in the public interest.[15]

---

pipeline's last NGA section 4 rate proceeding, or in the absence of a litigated ROE on file, the most recent ROE approved in a litigated NGA section 4 rate case.  *Gulfstream Natural Gas Sys., L.L.C.*, 170 FERC ¶ 61,199, at PP 18-19 (2020); *Cheyenne Connector, LLC,* 168 FERC ¶ 61,180, at PP 51-52 (2019); *Cheniere Corpus Christi Pipeline, LP,* 169 FERC ¶ 61,135, at PP 34-35.

   [12] *See* Certificate Order, 171 FERC ¶ 61,232 at 62; North Carolina Commission Protest at 16.

   [13] EIS at 4-176.

   [14] *Id.* at 4-262.

   [15] Section 7 of the NGA requires that, before issuing a certificate for new pipeline construction, the Commission must find both a need for the pipeline and that, on balance, the pipeline's benefits outweigh its harms.  15 U.S.C. § 717f.  Furthermore, NEPA requires the Commission to take a "hard look" at the environmental impacts of its decisions.  *See* 42 U.S.C. § 4332(2)(C)(iii); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  This means that the Commission must consider and discuss the significance of the harm from a pipeline's contribution to climate change by actually evaluating the magnitude of the pipeline's environmental impact.  Doing so enables the Commission to compare the environment before and after the proposed federal action and factor the changes into its decisionmaking process.  *See Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (*Sabal Trail*) ("The [FEIS] needed to

6.      Today's order on rehearing falls short of that standard.  As part of its public interest determination, the Commission must examine the Project's impact on the environment and public safety, which includes the facility's impact on climate change.[16] That is now clearly established D.C. Circuit precedent.[17]  The Commission, however, insists that it need not consider whether the Project's contribution to climate change is significant because—for want of a better explanation—it "cannot."[18]  However, the most troubling part of the Commission's rationale is what comes next.  Based on this alleged inability to assess the significance of the Project's impact on climate change, the Commission still summarily concludes that all of the Project's environmental impacts would be "acceptable."[19]  Think about that.  The Commission is simultaneously stating that it cannot assess the significance of the Project's impact on climate change[20] while concluding that all environmental impacts are acceptable to the public interest.[21]  That is

---

include a discussion of the 'significance' of this indirect effect."); 40 C.F.R. § 1502.16 (a)–(b) (An agency's environmental review must "include the environmental impacts of the alternatives including the proposed action," as well as a discussion of direct and indirect effects *and their significance*. (emphasis added)).

[16] *See Sabal Trail*, 867 F.3d at 1373 (explaining that the Commission must consider a pipeline's direct and indirect GHG emissions because the Commission may "deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); *see also Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (holding that the NGA requires the Commission to consider "all factors bearing on the public interest").

[17] *See Allegheny Def. Project v. FERC*, 932 F.3d 940, 945-46 (D.C. Cir. 2019), *reh'g en banc granted, judgment vacated*, 2019 WL 6605464 (D.C. Cir. Dec. 5, 2019); *Birckhead v. FERC*, 925 F.3d 510, 518-19 (D.C. Cir. 2019); *Sabal Trail*, 867 F.3d at 1371-72.  The history of these cases is discussed further below.  *See infra* P 9.

[18] *See* Certificate Order, 171 FERC ¶ 61,232 at P 102 ("[T]he Commission cannot determine whether an individual project's contribution to climate change would be significant."); EIS at 4-263 ("Currently, there is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment to the Southgate Project's incremental contribution to GHGs.").

[19] Certificate Order, 171 FERC ¶ 61,232 at P 144; EIS at 5-1.

[20] Certificate Order, 171 FERC ¶ 61,232 at P 102; EIS at 4-263–4-264 ("[W]e are unable to determine the significance of the Southgate Project's contribution to climate change.").

[21] Certificate Order, 171 FERC ¶ 61,232 at P 144.

unreasoned and an abdication of our responsibility to give climate change the "hard look" that the law demands.[22]

7.      It also means that the volume of emissions caused by the Project does not play a meaningful role in the Commission's public interest determination, no matter how many times the Commission assures us otherwise. Using the approach in today's order, the Commission will always be able to conclude that a project will not have any significant environmental impact irrespective of the project's actual GHG emissions or those emissions' impact on climate change. So long as that is the case, a project's impact on climate change cannot, as a logical matter, play a meaningful role in the Commission's public interest determination. A public interest determination that systematically excludes the most important environmental consideration of our time is contrary to law, arbitrary and capricious, and not the product of reasoned decisionmaking.

8.      Commissioner McNamee notes that he believes the D.C. Circuit cases cited above[23] were wrongly decided.[24] Although that is his prerogative, it is irrelevant to the task before us. As he has explained, we are called on to apply the law and the facts, not our personal policy preferences. But surely, implicit in that statement, is a recognition that we must apply the law as it is, not as we wish it were. The D.C. Circuit has unambiguously interpreted the "public convenience and necessity" standard in section 7 of the NGA to encompass the authority to consider and, if appropriate, act upon "the direct and indirect environmental effects" of a proposed pipeline.[25] As Commissioners,

---

[22] *See, e.g.*, *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (explaining that agencies cannot overlook a single environmental consequence if it is even "arguably significant"); *see also Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (internal quotation marks omitted)); *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency").

[23] *Supra* notes 16-17.

[24] *See* Certificate Order, 171 FERC ¶ 61,232 (McNamee, Comm'r, concurring at PP 12-13).

[25] *E.g., Sabal Trail*, 867 F.3d at 1373.

our job is to apply that law, not to attack binding judicial precedent in favor of an interpretation that was, in fact, expressly rejected by the court.[26]

## II.     The Commission's NEPA Analysis of the Project's Contribution to Climate Change Is Deficient

9.      The Commission's NEPA analysis is similarly flawed.  In order to evaluate the environmental consequences of the Project under NEPA, the Commission must consider the harm caused by its GHG emissions[27] and "evaluate the 'incremental impact' that [those emissions] will have on climate change or the environment more generally."[28] The D.C. Circuit has repeatedly instructed the Commission that the GHG emissions caused by the reasonably foreseeable combustion of natural gas transported through a pipeline are an indirect effect and must, therefore, be included within the Commission's NEPA analysis.[29]  While the Commission quantifies the Project's direct GHG emissions from construction and operation,[30] it refuses to even disclose the Project's indirect GHG emissions from downstream combustion.  Once again the Commission takes the position that if it does not know the exact volume and end-use of the natural gas, any associated GHG emissions are categorically not reasonably foreseeable.[31]  What's more, the

---

[26] *Id.*; *see Birckhead*, 925 F.3d at 519 (explaining that in "the pipeline certification context the Commission does have statutory authority to act" on the reasonably foreseeable GHG emissions caused by the pipeline (citing *Sabal Trail*, 867 F.3d at 1373)).

[27] When conducting a NEPA review, an agency must consider both the direct and the indirect effects of the project under consideration.  40 C.F.R. §§ 1502.16(b), 1508.8(b); *Sabal Trail*, 867 F.3d at 1371.

[28] *See Ctr. for Biological Diversity,* 538 F.3d at 1216 ("While the [environmental document] quantifies the expected amount of CO2 emitted . . . , it does not evaluate the 'incremental impact' that these emissions will have on climate change or on the environment more generally . . . ."); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is a necessary component . . . , but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres.").

[29] *See Allegheny Def. Project*, 932 F.3d at 945-46; *Birckhead*, 925 F.3d at 518-19; *Sabal Trail*, 867 F.3d at 1371-72.

[30] EIS at 4-184–4-185 & Tables 4.11-4, 4.11-5.

[31] Certificate Order, 171 FERC ¶ 61,232 at P 99 (stating that "because the end-use of the contracted for volumes is unknown, any potential GHG emissions associated with

Commission even goes so far as to suggest that, because constructing any new pipeline *may* not increase the interstate transportation system's overall capacity, estimating the pipeline's downstream GHG emissions is not just needless, but "misleading."[32]  This is nothing more than another version of the Commission's argument that *Sabal Trail* "is narrowly limited to the facts of that case"—an argument that the D.C. Circuit rejected emphatically in *Birckhead*.[33]  Indeed, *Birckhead* rejected as a "total non-sequitur" the argument that the potential for increased natural gas transportation capacity to reduce GHG emissions by displacing existing natural gas supplies or more GHG-intensive forms of electricity generation somehow renders the downstream GHG indirect emissions from a natural gas pipeline not reasonably foreseeable.[34]  Even in the face of some uncertainty, the courts have required the Commission to use its "best efforts" to identify and consider the full scope of a project's environmental impact, an exercise which may require using educated assumptions.[35]

10.     Instead, the Commission's overly narrow and circular definition of indirect effects[36] disregards the Project's central purpose—to facilitate additional natural gas

---

the ultimate combustion of the transported gas are not reasonably foreseeable, and therefore, not an indirect impact of the Southgate Project").

[32] *Id.* P 100.

[33] *Birckhead*, 925 F.3d at 518-19.

[34] *Id.*

[35] *Sabal Trail*, 867 F.3d at 1374 ("We understand that emission estimates would be largely influenced by assumptions rather than direct parameters about the project, but some educated assumptions are inevitable in the NEPA process. And the effects of assumptions on estimates can be checked by disclosing those assumptions so that readers can take the resulting estimates with the appropriate amount of salt." (internal citations and quotation marks omitted)).

[36] *See San Juan Citizens All. et al. v. U.S. Bureau of Land Mgmt.*, No. 16-CV-376-MCA-JHR, 2018 WL 2994406, at *10 (D.N.M. June 14, 2018) (holding that it was arbitrary for the Bureau of Land Management to conclude "that consumption is not 'an indirect effect of oil and gas production because production is not a proximate cause of GHG emissions resulting from consumption'" as "this statement is circular and worded as though it is a legal conclusion").  The Commission must use its "best efforts" to identify and quantify the full scope of the environmental impacts and, as the U.S. Court of Appeals for the District of Columbia found in *Sierra Club v. FERC*, educated assumptions are inevitable in the process of emission quantification.  *See* 867 F.3d 1357, 1374 (D.C. Cir. 2017) (*Sabal Trail*).

consumption.[37]  The Commission cannot ignore the fact that adding firm transportation capacity is likely to "spur demand" for natural gas[38]—a fact that Mountain Valley certainly recognizes[39]—and, for that reason, the Commission must at least examine the effects that an expansion of pipeline capacity might have on consumption and production.[40]  Indeed, if a proposed pipeline neither increases the supply of natural gas available to consumers nor decreases the price that those consumers would pay, it is hard to imagine why that pipeline would be "needed" in the first place.

11.     Recognizing this fact, Mountain Valley instead claims that it would be "double counting" to consider the Project's downstream GHG emissions here, because the Commission "previously quantified" these emissions when it authorized the Mountain Valley mainline system.[41]  But, as I argued in that proceeding, while the Commission may have quantified the GHG emissions, at no point did the Commission consider them

---

[37] *See supra* note 9; *see also* Certificate Order, 171 FERC ¶ 61,232 at P 38 (Mountain Valley argues that the Project "will . . . provide North Carolina and southern Virginia access to new natural gas supplies" and "provide the opportunity to serve commercial and industrial load in Virginia and North Carolina not currently served by natural gas.").

[38] *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138 (9th Cir. 2011) (holding that it "is completely inadequate" for an agency to ignore a project's "growth inducing effects" where the project has a unique potential to spur demand); *id.* at 1139 (distinguishing *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997), which the majority relies on in today's order) ("[O]ur cases have consistently noted that a new runway has a unique potential to spur demand, which sets it apart from other airport improvements, like changing flight patterns, improving a terminal, or adding a taxiway, which increase demand only marginally, if at all."); *id.* at 1139 ("[E]ven if the stated purpose of [a new airport runway project] is to increase safety and efficiency, the agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects.").

[39] *See* Certificate Order, 171 FERC ¶ 61,232 at P 38.

[40] As the United States Court of Appeals for the Eighth Circuit explained in *Mid States Coal. for Progress v. Surface Transp. Bd.*—a case that also involved the downstream emissions from new infrastructure for transporting fossil fuels—when the "nature of the effect" (end-use emissions) is reasonably foreseeable, but "its extent is not" (specific consumption activity producing emissions), an agency may not simply ignore the effect.  345 F.3d 520, 549 (8th Cir. 2003).

[41] Certificate Order, 171 FERC ¶ 61,232 at P 100.

in making its public interest determination.[42]  Simply asserting that a project is in the public interest without any discussion why is not reasoned decisionmaking.  The Commission's utter failure to actually consider these emissions as part of its public interest determination renders Mountain Valley's argument empty and unconvincing.

12.      I remain baffled by the Commission's continued refusal to take any step towards considering indirect downstream emissions and their impact on climate change unless specifically and expressly directed to do so by the courts (and even that does not always seem to be the case[43]).  Here there are plenty of steps that the Commission could take to consider the GHGs associated with the Project's incremental capacity if the Commission were actually inclined to take a 'hard look' at climate change.  At a minimum, we know that the vast majority, 97 percent, of all natural gas consumed in the United States is combusted[44]—a fact that, on its own might be sufficient to make downstream emissions reasonably foreseeable, at least absent contrary evidence.  After all, the D.C. Circuit has recognized that NEPA does not require absolute certainty and that "some educated assumptions are inevitable in the NEPA process."[45]  Moreover, the record here makes this a relatively easy case:  Mountain Valley states that the natural gas transported by the Project will be sold "primarily to residential and small- and medium-sized commercial customers for heating, cooking, and other end-uses typical of natural gas local distribution company customers."[46]  That would seem to be more-than-sufficient to confirm that the gas is highly likely to be combusted, making the resulting GHG emissions reasonably foreseeable.

_____

[42] *See Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197 (2018) (Glick, Comm'r, dissenting).

[43] *El Paso Natural Gas Co., L.L.C.*, 169 FERC ¶ 61,133 (2019) (Glick, Comm'r, dissenting in part at PP 10-11) (criticizing the Commission for failing to follow the D.C.'s guidance in *Birckhead* and consider GHG emissions associated with natural gas transportation capacity that it was told would be used to serve electricity generation).

[44] U.S. Energy Info. Admin., *September 2019 Monthly Energy Review* 22, 97 (2019) (reporting that, in 2018, 778 Bcf of natural gas had a non-combustion use compared to 29,956 Bcf of total consumption), *https://www.eia.gov/totalenergy/data/monthly/archive/00351908.pdf*.

[45] *Sabal Trail*, 867 F.3d at 1374; *see id.* (stating that "the effects of assumptions on estimates can be checked by disclosing those assumptions so that readers can take the resulting estimates with the appropriate amount of salt").

[46] Certificate Order, 171 FERC ¶ 61,232 at n.60; Mountain Valley March 15, 2019 Data Request Response at 3.

13.     In any case, even where the Commission quantifies the Project's construction and operational GHG emissions, it still fails to "evaluate the 'incremental impact' that [those emissions] will have on climate change or the environment more generally."[47]  In *Sabal Trail*, the court explained that the Commission was required "to include a discussion of the 'significance' of" the indirect effects of the project, including its GHG emissions.[48] That makes sense.  Identifying and evaluating the consequences that a project's GHG emissions may have for climate change is essential if NEPA is to play the disclosure and good government roles for which it was designed.[49]  But neither the Commission's orders in this proceeding nor the accompanying EIS provide that discussion or even attempt to assess the significance of the Project's GHG emissions.

14.     Instead, the Commission insists that it need not assess the significance of the Project's GHG emissions because it lacks a "universally accepted methodology" for evaluating the project's impact on climate change.[50]  But that does not excuse the Commission's failure to evaluate these emissions let alone to determine the significance of the Project's environmental impact from these emissions.  As an initial matter, the lack of a single methodology does not prevent the Commission from adopting *a* methodology, even if that methodology is not universally accepted.  One possible methodology endorsed by the courts is comparing a project's GHG emissions against a known benchmark, such as a state emission reduction requirement, an approach the Commission

---

[47] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008); *see also WildEarth Guardians v. Zinke*, No. CV 16-1724 (RC), 2019 WL 1273181, at *1 (D.D.C. Mar. 19, 2019) (explaining that the agency was required to "provide the information necessary for the public and agency decisionmakers to understand the degree to which [its] decisions at issue would contribute" to the "impacts of climate change in the state, the region, and across the country").

[48] *Sabal Trail*, 867 F.3d at 1374.

[49] *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (explaining that one of NEPA's purposes is to ensure that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision"); *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) ("The idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed.").

[50] Certificate Order, 171 FERC ¶ 61,232 at P 102; EIS at 4-263 ("[T]here is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment to the Southgate Project's incremental contribution to GHGs.").

has relied on in the past[51] but inexplicably fails to undertake here, even though the Commission recognizes that both North Carolina and Virginia have GHG emissions reduction targets.[52]  Armed with a known target, the Commission has all the information necessary to "compare the emissions from this project to emissions from other projects, to total emissions from the state" and make a determination about significance.[53]  As the D.C. Circuit stated in *Sabal Trail*, "[w]ithout such comparisons, it is difficult to see how [the Commission] could engage in 'informed decision making' with respect to the greenhouse-gas effects of this project, or how 'informed public comment' could be possible."[54]  Instead of doing so here, the Commission disregards its prior position and asserts that "[w]ithout the ability to determine discrete resource impacts, we are unable to determine the significance of the Southgate Project's contribution to climate change."[55]  This defies logic.  The Commission cannot simultaneously argue an established benchmark is necessary to determine significance and, then, when a benchmark is provided, argue the relevant comparison is not useful.  Moreover, the Commission often relies on percentage comparisons when it comes to other environmental impacts as the basis for determining significance.[56]  Refusing to apply the same consideration when it comes to GHG emissions and climate change is arbitrary and capricious.

---

[51] *Fl. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 19-21 (2018) (Glick, Comm'r, dissenting) (arguing that the Commission's refusal to assess the significance of a project's GHG emissions, despite having compared project emissions to state and national emission inventories, is not reasoned decisionmaking); *PennEast Pipeline Co.*, 164 FERC ¶ 61,098, at PP 118-121 (2018) (Glick, Comm'r, dissenting) (same); *Venture Global Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019) (Glick, Comm'r, dissenting) (same).  In each of the orders cited above, the Commission offered reasoning, similar to that advanced in today's order, in an attempt to justify the Commission's refusal to determine the significance of the projects' respective contributions to climate change.  And, yet, in each of these cases the Commission compared the project emissions to national, and in some cases state, emission inventories.  The Commission offers nothing in today's order to explain its refusal to similarly disclose and compare project emissions in this case.

[52] EIS at 4-263.

[53] *Sabal Trail*, 867 F.3d at 1374.

[54] *Id.*

[55] EIS at 4-263–4-264.

[56] See, for example, the Commission's environmental analysis of Columbia Gas Transmission's Buckeye XPress Project, where the Commission finds that impacts amounting to one percent of the overall prime farmland affected would be "permanent,

15.     Independent of whether there are established GHG reduction targets, the Commission has several tools to assess the harm from the Project's contribution to climate change, including, for example, the Social Cost of Carbon.  By measuring the long-term damage done by a ton of carbon dioxide, the Social Cost of Carbon links GHG emissions to actual environmental effects from climate change, thereby facilitating the necessary "hard look" at the Project's environmental impacts that NEPA requires.

16.     Especially when it comes to a global problem like climate change, a measure for translating a single project's climate change impacts into concrete and comprehensible terms plays a useful role in the NEPA process by putting the harms from climate change in terms that are readily accessible for both agency decisionmakers and the public at large.  The Commission, however, continues to ignore the tools at its disposal, relying on deeply flawed reasoning that I have previously critiqued at length.[57]

17.     Regardless of the tools, methodologies, or targets available, the Commission can use its expertise to consider all factors and determine, quantitatively or qualitatively, whether the Project's GHG emissions have a significant impact on climate change.  That is precisely what the Commission does in other aspects of its environmental review.  Consider, for example, the Commission's findings that the Project will not have a significant effect on issues as diverse as "wildlife,"[58] and "forests,"[59] and "property values,"[60] without relying on a specific federal or state benchmark.  Notwithstanding the lack of any "universally accepted methods" to assess these impacts, the Commission managed to use its judgment to conduct a qualitative review and assess the significance

---

but not significant."  Buckeye Xpress Project Environmental Assessment, Docket No. CP18-137-000, at B-33; *see also Columbia Gas Transmission, LLC,* 170 FERC ¶ 61,045, at P 138 (2020).  Notwithstanding the fact that there are no universally accepted or objective standards or targets to compare this impact to, the Commission was able to determine that the project's environmental impact was not significant based on this proportionate effect.  It is clear that it is only when it comes to climate change that the Commission suddenly gets cold feet about using percentages to determine significance.

[57] *See, e.g., Transcontinental Gas Pipe Line Co., LLC,* 167 FERC ¶ 61,110 (2019) (Glick, Comm'r, dissenting in part at P 6 & n.11) (noting that the Social Cost of Carbon "gives both the Commission and the public a means to translate a discrete project's climate impacts into concrete and comprehensible terms"); *Fla. Se. Connection, LLC,* 164 FERC ¶ 61,099 (2018) (Glick, Comm'r, dissenting).

[58] EIS at 4-95.

[59] *Id.* at 4-62–4-71.

[60] *Id.* at 4-137–4-138. 4-153.

of the Project's effect on those considerations.[61]  The Commission's refusal to, at the very least, exercise similar qualitative judgment to assess the significance of GHG emissions here is arbitrary and capricious.[62]

18.     That refusal is even more mystifying because NEPA "does not dictate particular decisional outcomes."[63]  NEPA "'merely prohibits uninformed—rather than unwise—agency action.'"[64]  In other words, taking the matter seriously—and rigorously examining a project's impacts on climate change—does not necessarily prevent any Commissioner from ultimately concluding that a project meets the public interest standard.

19.     Even if the Commission were to determine that a project's GHG emissions are significant, that would not be the end of the inquiry nor would it mean that the project is not in the public interest or required by the public convenience and necessity.  Instead, the Commission could require mitigation—as the Commission often does with regard to other environmental impacts.  The Supreme Court has held that, when a project may cause potentially significant environmental impacts, the relevant environmental impact statement must "contain a detailed discussion of possible mitigation measures" to address adverse environmental impacts.[65]  The Court explained that, "[w]ithout such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects" of a project, making an examination of possible mitigation measures necessary to ensure that the agency has taken a "hard look" at the environmental consequences of the action at issue.[66]  The Commission not only has the obligation to discuss mitigation of adverse environmental impacts under NEPA, but also

---

[61] *See also supra* note 56 and accompanying discussion describing the Commission's use of just such a technique regarding impacts to farmland.

[62] After all, the standard the Commission typically uses for evaluating significance is whether the adverse impact would result in a substantial adverse change in the physical environment.  Surely that standard is open to some subjective interpretation by each Commissioner.  What today's order does not explain is why it is appropriate to exercise subjective interpretation and judgment when it comes to potential impacts such as those to property values and forests, but not climate change.

[63] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 37 (D.C. Cir. 2015).

[64] *Id.* (quoting *Robertson*, 490 U.S. at 351).

[65] *Robertson*, 490 U.S. at 351.

[66] *Id.* at 352; *see also* 40 C.F.R. §§ 1508.20 (defining mitigation), 1508.25 (including in the scope of an environmental impact statement mitigation measures).

the authority to condition certificates under section 7 of the NGA,[67] which could encompass measures to mitigate a project's GHG emissions.[68]

20.     My colleague, Commissioner McNamee, seems to relish in constantly reminding us that Congress has failed to enact more than 70 bills proposed to reduce GHG emissions.  Somehow that must suggest that climate change is not worthy of consideration and mitigation under the Natural Gas Act's public interest standard.  But as science tells us and, in fact the Commission's orders admit, increased GHG emissions cause climate change.[69]  And, as is the case with regard to numerous other environmental impacts for which Congress has not established regulatory regimes,[70] this Commission has the duty to ensure that impacts attributable to the Project's direct and indirect GHG emissions are sufficiently mitigated or, if they cannot be mitigated, that the Project's benefits outweigh those impacts.  Commissioner McNamee argues that the Commission

---

[67] 15 U.S.C. § 717f(e); Certificate Order, 171 FERC ¶ 61,232 at P 146 ("[T]he Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources . . . , including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.").

[68] Commissioner McNamee implies that, as part of a mitigation mechanism, I want the Commission to consider imposing a carbon tax or a cap-and-trade like system.  Certificate Order, 171 FERC ¶ 61,232 (McNamee, Comm'r, concurring at P 52).  That is a red herring.  To my knowledge, no one has suggested that the Commission can impose a carbon tax or something similar under NGA section 7.  My point is that the Commission could consider discrete measures that offset the adverse effects of the Project itself, just like it does for a host of other adverse environmental impacts.  For example, the project developer could purchase renewable energy credits or plant trees sufficient to sequester the Project's GHG emissions.  Tailored programs that offset the actual emissions from the Project are a far cry from a comprehensive emissions-trading scheme and have much in common with other forms of mitigation routinely required by the Commission, including the mitigation contained in this order.

[69] *See supra* notes 13 and 14 and accompanying text.

[70] Take, for example, the Commission's analysis of the Project's impacts on "forests," for which there is no congressionally-established regulatory regime.  Notwithstanding this fact, the Commission concludes that, "in the context" of the total number of acres of forestland in Virginia and North Carolina, impacts on forests, including the clearing of 597.5 acres of forested uplands and the permanent conversion of 18.5 acres of interior forest, would be long-term but mitigated to less than significant levels.  *See* EIS at 4-62–4-71.

cannot require mitigation for the Project's GHG emissions without a congressionally endorsed mitigation program with established limits.[71]  But the absence of such a regime has not stopped the Commission—with Commissioner McNamee's support—from requiring the mitigation it determined to be necessary in the past.[72]  After all, section 7 of the NGA gives the Commission the express "power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."[73]  That climate impacts continue to be treated differently serves only to highlight this Commission's stubborn refusal to identify any potential climate mitigation measures or discuss how such measures might affect the magnitude of the Project's impact on climate change.

21.     Furthermore, a rigorous examination and determination of significance regarding climate change impacts would bolster any finding of public interest by providing the Commission a more complete set of information necessary to weigh benefits against adverse effects.  By refusing to assess significance, however, the Commission short circuits any discussion of mitigation measures for the Project's GHG emissions, eliminating a potential pathway for us to achieve consensus on whether the Project is consistent with the public interest.

### III.    The Commission's Initial Rate Determination Is an Unwarranted Departure from Commission Precedent

22.     I disagree with the Commission's decision to authorize Mountain Valley's proposed 14 percent ROE, because I believe it is unwarranted and gratuitous and will ultimately come at the expense of end-users, such as the residential, commercial, and industrial customers this project is meant to serve.  In approving 14 percent ROEs for greenfield pipeline projects, the Commission has held that it is an appropriate rate of return because it reflects the fact that new entrants developing greenfield projects experience greater risk than existing pipeline companies.[74]  In contrast, the Commission's general policy in developing rates for incremental expansion projects is to require a pipeline to use the ROE approved in its last NGA section 4 rate proceeding, or, if the

---

[71] *See* Certificate Order, 171 FERC ¶ 61,232 (McNamee, Comm'r, concurring at PP 53, 57).

[72] *See Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202, at PP 139, 279 & envtl. condition 28 (2020) (requiring certificate applicant to mitigate adverse impacts on short-term housing by hiring a professional housing coordinator to address the Commission's housing concerns).

[73] 15 U.S.C. § 717f(e).

[74] *Cheniere Corpus Christi Pipeline, LP,* 169 FERC ¶ 61,135 at P 34.

pipeline has not filed a rate case, the ROE from the last litigated NGA section 4 rate case.[75]  The Commission departs from its general policy in today's order, by allowing Mountain Valley to use a 14 percent ROE in setting rates for the Project—an incremental expansion of Mountain Valley's mainline system—when Mountain Valley already received the right to charge this higher rate for service on its mainline system.[76]  What is more, the company has since executed binding service contracts with shippers for the mainline system's full design capacity, providing a level of revenue certainty that applicants for greenfield projects do not typically have.

23.    Mountain Valley has more in common with an existing pipeline company proposing an expansion project than a new market entrant proposing to construct a greenfield pipeline.  For this reason, I would have applied the Commission's current policy and required Mountain Valley to use the 10.55 percent ROE approved in *El Paso Natural Gas Co.*[77]—the most recent NGA section 4 rate case litigated before the Commission—to design the initial rates for the Project.[78]  Mountain Valley has not provided any evidence justifying a departure from the Commission's current policy, which it has recently applied to multiple similar incremental pipeline expansion

---

[75] *See Cheyenne Connector, LLC*, 168 FERC ¶ 61,180 at PP 51-52 (rejecting Rockies Express's proposal to use a 13 percent ROE approved as part of its greenfield certificate authorization to an incremental pipeline expansion project, and instead requiring Rockies Express to revise its incremental recourse rates to reflect a 10.55 percent ROE from the last litigated rate case); *see also Gulfstream Natural Gas Sys., L.L.C.*, 170 FERC ¶ 61,199 at P 19 (rejecting Gulfstream Natural's proposal to use a 14 percent ROE, found to be appropriate for its greenfield project, to an incremental pipeline expansion project, and instead requiring use of use the most recent ROE approved by the Commission in a litigated NGA section 4 rate case, 10.55 percent); *Cheniere Corpus Christi Pipeline, LP*, 169 FERC ¶ 61,135 at PP 34-35 ("It is not appropriate to use the 14 percent ROE approved in Cheniere Pipeline's initial certificate authorizations in determining the cost of service for [an incremental expansion project] because it would not adequately reflect the lower risks associated with expanding an existing pipeline system.").

[76] Certificate Order, 171 FERC ¶ 61,232 at P 57.

[77] 145 FERC ¶ 61,040, at P 642 (2013), *reh'g denied,* 154 FERC ¶ 61,120 (2016).

[78] *Gulfstream Natural Gas Sys., L.L.C.*, 170 FERC ¶ 61,199 at PP 18-19; *Cheyenne Connector,* 168 FERC ¶ 61,180 at PP 51-52; *Corpus Christi,* 169 FERC ¶ 61,135 at PP 34-35*; Alliance Pipeline L.P.,* 140 FERC ¶ 61,212, at PP 18-20 (2012).

projects.[79]  The Commission's decision today serves only to further erode confidence in its promise to "'hold the line' while awaiting the adjudication of just and reasonable rates."[80]

For these reasons, I respectfully dissent in part.

_____

Richard Glick
Commissioner

_____

[79] *See e.g., Gulfstream Natural Gas Sys., L.L.C.*, 170 FERC ¶ 61,199 at P 19, decided less than a month ago.

[80] *See* Certificate Order, 171 FERC ¶ 61,232 at P 62.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Mountain Valley Pipeline, LLC                    Docket No.        CP19-14-000

(Issued June 18, 2020)

McNAMEE, Commissioner, *concurring*:

1.      Today's order issues Mountain Valley Pipeline, LLC (Mountain Valley) a certificate to construct and operate its proposed Southgate Project.[1]  The Southgate Project is designed to provide up to 375,000 dekatherms (Dth) per day of firm transportation service.[2]  Additionally, this order directs the Office of Energy Projects (OEP) to not issue any notice to proceed with construction of the Southgate Project until Mountain Valley receives necessary federal permits for the Mainline System[3], and the Director of OEP, or the Director's designee, lifts the stop-work order and authorizes Mountain Valley to continue constructing the Mainline System.[4]  I agree that the order complies with the Commission's statutory responsibilities under the Natural Gas Act (NGA) and the National Environmental Policy Act (NEPA).  The order determines that the Project is in the public convenience and necessity, finding that the project will not adversely affect Mountain Valley's existing customers or competitor pipelines and their captive customers, and the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.[5]  The order also finds that the environmental impacts associated with the project, if constructed and operated as described in the Environmental Impact Statement (EIS), are acceptable considering the public benefits that the project will provide.[6]  Consistent with the holding in *Sierra Club v. FERC* (*Sabal Trail*),[7] the Commission quantified and considered the greenhouse gas

---

[1] *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232 (2020) (Certificate Order).

[2] *Id.* P 11.

[3] *Id.* P 3.  (The Mainline System consists of a 303.5-mile-long, 42-inch-diameter interstate pipeline system to provide up to 2,000,000 Dth per day of firm natural gas transportation service from Wetzel County, West Virginia, to an interconnection with Transcontinental Gas Pipe Line, LLC's Compressor Station 165 in Pittsylvania County, Virginia.)

[4] *Id.* P 9.

[5] *Id.* P 52.

[6] *Id.* P 144.

[7] 867 F.3d 1357 (D.C. Cir. 2017).  This case is commonly referred to as "Sabal

(GHG) emissions associated with the construction and operation of the Project and found that because the end-use of the contracted volumes is unknown, any potential GHG emissions are not reasonably foreseeable.[8]  The Commission also found that the Social Cost of Carbon is not a suitable methodology to determine whether the Project would have a significant impact on climate change.[9]

2.      Although I fully support this order, I write separately to address what I perceive to be a misinterpretation of the Commission's authority under the NGA and NEPA.  There have been contentions that the NGA authorizes the Commission to deny a certificate application based on the environmental effects that result from the upstream production and downstream use of natural gas, that the NGA authorizes the Commission to establish measures to mitigate GHG emissions, and that the Commission violates the NGA and NEPA by not determining whether GHG emissions significantly affect the environment. I disagree.

3.      A close examination of the statutory text and foundation of the NGA demonstrates that the Commission does not have the authority under the NGA or NEPA to deny a pipeline certificate application based on the environmental effects of the upstream production or downstream use of natural gas nor does the Commission have the authority to unilaterally establish measures to mitigate GHG emissions.  Further, the Commission has no objective basis to determine whether GHG emissions will have a significant effect on climate change nor the authority to establish its own basis for making such a determination.

4.      It is my intention that my discussion of the statutory text and foundation will assist the Commission, the courts, and other parties in their arguments regarding the meaning of the "public convenience and necessity" and the Commission's consideration of a project's effect on climate change.  Further, my review of appellate briefs filed with the court and the Commission's orders suggests that the court may not have been presented with the arguments I make here.  Before I offer my arguments, it is important that I further expound on the current debate.

## I.      Current debate

5.      When acting on a certificate application, the Commission has two primary statutory obligations:  (1) to determine whether the project is required by the "public

---

Trail" because the Sabal Trail Pipeline is one of the three pipelines making up the Southeast Market Pipelines Project.

[8] Certificate Order, 171 FERC ¶ 61,232 at P 99; Final Environmental Impact Statement at 4-263.

[9] *Id.* P 102.

convenience and necessity" as required by the NGA;[10] and (2) to take a "hard look" at the direct,[11] indirect,[12] and cumulative effects[13] of the proposed action as required by NEPA and the Council on Environmental Quality's (CEQ) implementing regulations. Recently, there has been much debate concerning what factors the Commission can consider in determining whether a proposed project is in the "public convenience and necessity," and whether the effects of upstream production and downstream use of natural gas are indirect effects of a certificate application as defined by NEPA.

6.      Equating NGA section 7's "public convenience and necessity" standard with a "public interest" standard, my colleague has argued that NGA section 7 requires the Commission to weigh GHGs emitted from project facilities and related to the upstream production or downstream use of natural gas.[14] In support of his contention, my colleague has cited the holding in *Sabal Trail* and dicta in *Atlantic Refining Co. v. Public Service Commission of State of New York* (*CATCO*).[15] My colleague has argued that the NGA requires the Commission to determine whether GHG emissions have a significant impact on climate change in order for climate change to "play a meaningful role in the Commission's public interest determination."[16] And he argues that by not determining the significance of those emissions, the "public interest determination [] systematically

---

[10] 15 U.S.C. § 717f(e) (2018).

[11] Direct effects are those "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a) (2019).

[12] Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b) (2019). The U.S. Supreme Court held that NEPA requires an indirect effect to have "a reasonably close causal relationship" with the alleged cause; "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

[13] Cumulative effects are those "which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (2019).

[14] *See, e.g.*, *Adelphia Gateway, LLC*, 169 FERC ¶ 61,220 (2019) (Glick, Comm'r, dissenting at P 3) (Adelphia Dissent); *Cheyenne Connector, LLC*, 168 FERC ¶ 61,180 (2019) (Glick, Comm'r, dissenting at P 4) (Cheyenne Connector Dissent).

[15] Adelphia Dissent P 4 n.7 (citing *CATCO*, 360 U.S. 378, 391 (1959)). The case *Atlantic Refining Co. v. Public Service Commission of State of New York* is commonly known as "*CATCO*" because the petitioners were sometimes identified by that name.

[16] Adelphia Dissent P 5.

excludes the most important environmental consideration of our time" and "is contrary to law, arbitrary and capricious" and is not "the product of reasoned decision making."[17]

7.      My colleague has also argued that the emissions from all downstream use of natural gas are indirect effects of a project and must be considered in the Commission's NEPA environmental documents.[18]  In other proceedings, he has argued that the Commission must also consider as indirect effects GHG emissions from upstream natural gas production.[19]  He has asserted that NEPA requires the Commission to determine whether GHG emissions will have a significant effect on climate change and that the Commission could make that determination using the Social Cost of Carbon or its own expertise.[20]  Further, he has contended that the Commission could mitigate any GHG emissions in the event that it made a finding that the GHG emissions had a significant impact on climate change.[21]

8.      Several recent cases before the United States Court of Appeals for the D.C. Circuit have also considered the Commission's obligations under NGA section 7 and NEPA as they apply to what environmental effects the Commission is required to consider under NEPA.[22]  In *Sabal Trail*, the D.C. Circuit vacated and remanded the Commission's order issuing a certificate for the Southeast Market Pipelines Project, finding that the Commission inadequately assessed GHGs emitted from downstream power plants in its EIS for the project. [23]  The court held that the downstream GHG emissions resulting from burning the natural gas at the power plants were a reasonably foreseeable indirect effect

--------

[17] *Id.*

[18] *Id.* P 6.

[19] Cheyenne Connector Dissent P 10.

[20] Adelphia Dissent PP 8-10.

[21] *Id.* P 12.

[22] The courts have not explicitly opined on whether the Commission is required to determine whether GHG emissions will have a significant impact on climate change or whether the Commission must mitigate GHG emissions.  The D.C. Circuit, however, has suggested that the Commission is not required to determine whether GHG emissions are significant.  *Appalachian Voices v. FERC*, 2019 WL 847199, *2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("FERC provided an estimate of the upper bound of emissions resulting from end-use combustion, and it gave several reasons why it believed petitioner's preferred metric, the Social Cost of Carbon, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes.").

[23] *Sabal Trail*, 867 F.3d 1357.

of authorizing the project and, at a minimum, the Commission should have estimated those emissions.

9.     Further, the *Sabal Trail* court found the Commission's authorization of the project was the legally relevant cause of the GHGs emitted from the downstream power plants "because FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment."[24]   The court stated the Commission could do so because, when considering whether pipeline applications are in the public convenience and necessity, "FERC will balance 'the public benefits against the adverse effects of the project,' *see Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 101-02 (D.C. Cir. 2014) (internal quotation marks omitted), including adverse environmental effects, *see Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015)."[25]   Relying on its finding that the Commission could deny a pipeline on environmental grounds, the court distinguished *Sabal Trail* from the Supreme Court's holding in *Public Citizen,* where the Court held "when the agency has no *legal* power to prevent a certain environmental effect, there is no decision to inform, and the agency need not analyze the effect in its NEPA review"[26] and the D.C. Circuit's decision in *Sierra Club v. FERC* (*Freeport*), where it held "that FERC had *no legal authority to prevent* the adverse environmental effects of natural gas exports."[27]

10.     Based on these findings, the court concluded that "greenhouse-gas emissions are an indirect effect of authorizing this project, which FERC could reasonably foresee, and which the agency has legal authority to mitigate."[28]   The court also held "the EIS for the Southeast Market Pipelines Project should have either given a quantitative estimate of the downstream greenhouse emissions . . . or explained more specifically why it could not have done so."[29]   The court impressed that "[it did] not hold that quantification of greenhouse-gas emissions is required *every* time those emissions are an indirect effect of an agency action" and recognized that "in some cases quantification may not be feasible."[30]

---

[24] *Id.* at 1373.

[25] *Id.*

[26] *Id.* at 1372 (citing *Pub. Citizen*, 541 U.S. at 770) (emphasis in original).

[27] *Id.* at 1373 (citing *Freeport*, 827 F.3d 36, 47 (D.C. Cir. 2016)) (emphasis in original).

[28] *Id.* at 1374 (citing 15 U.S.C. § 717f(e)).

[29] *Id.*

[30] *Id.* (emphasis in original).

11.     More recently, in *Birckhead v. FERC*,[31] the D.C. Circuit commented in dicta on the Commission's authority to consider downstream emissions.  The court stated that because the Commission could "'deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment, the agency is the legally relevant cause of the direct and indirect environmental effects of pipelines it approves'—even where it lacks jurisdiction over the producer or distributor of the gas transported by the pipeline."[32]  The court also examined whether the Commission was required to consider environmental effects related to upstream gas production, stating it was "left with no basis for concluding that the Commission acted arbitrarily or capriciously or otherwise violated NEPA in declining to consider the environmental impacts of upstream gas production."[33]

12.     I respect the holding of the court in *Sabal Trail* and the discussion in *Birckhead*, and I recognize that the *Sabal Trail* holding is binding on the Commission.  However, I respectfully disagree with the court's finding that the Commission can, pursuant to the NGA, deny a pipeline based on environmental effects stemming from the upstream production or downstream use of natural gas, and that the Commission is therefore required to consider such environmental effects under the NGA and NEPA.[34]

13.     The U.S. Supreme Court has observed that NEPA requires an indirect effect to have "a reasonably close causal relationship" with the alleged cause.[35]  Whether there is a reasonably close causal relationship depends on "the underlying policies or legislative intent" of the agency's organic statute "to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not."[36]  Below, I review the text of the NGA and subsequent acts by Congress to demonstrate that the "public convenience and necessity" standard in the NGA is not so broad as to include

---

[31] 925 F.3d 510 (D.C. Cir. 2019).

[32] *Id.* at 519 (citing *Sabal Trail*, 867 F.3d at 1373) (internal quotations omitted).

[33] *Id.* at 518.

[34] Though the D.C. Circuit's holding in *Sabal Trail* is binding on the Commission, it is not appropriate to expand that holding through the dicta in *Birckhead* so as to establish new authorities under the NGA and NEPA.  The Commission is still bound by the NGA and NEPA as enacted by Congress, and interpreted by the U.S. Supreme Court and the D.C. Circuit.  Our obligation is to read the statutes and case law in harmony.  This concurrence articulates the legal reasoning by which to do so.

[35] *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983).

[36] *Id.* at 774 n.7.

environmental effects of the upstream production or downstream use of natural gas, and that the Commission cannot be responsible for those effects.

14.    As for GHGs emitted from pipeline facilities themselves, I believe that the Commission can consider such emissions in its public convenience and necessity determination and is required to consider them in its NEPA analysis.  As I set forth below, however, the Commission cannot unilaterally establish measures to mitigate GHG emissions, and there currently is no suitable method for the Commission to determine whether GHG emissions are significant.

## II.    **The NGA does not permit the Commission to deny a certificate application based on environmental effects related to the upstream production or downstream use of natural gas**

15.    To interpret the meaning of "public convenience and necessity," we must begin with the text of the NGA.[37]  I recognize that the Commission[38] and the courts have equated the "public convenience and necessity" standard with "all factors bearing on the public interest."[39]  However, the phrase "all factors bearing on the public interest" does not mean that the Commission has "broad license to promote the general public welfare"[40] or address greater societal concerns.  Rather, the courts have stated that the words must "take meaning from the purposes of regulatory legislation."[41]  The Court has

---

[37] 15 U.S.C. § 717f(e) (2018).  *See infra* PP 42-48.  It is noteworthy that the phrase "public interest" is not included in NGA section 7(c)(1)(A) (requiring pipelines to have a certificate) or NGA section 7(e) (requiring the Commission to issue certificates).  Rather, these provisions use the phrase "public convenience and necessity."  NGA section 7(c)(1)(B) does refer to public interest when discussing how the Commission can issue a temporary certificate in cases of emergency.  *Id.* § 717f(c)(1)(B).  Congress is "presumed to have used no superfluous words."  *Platt v. Union Pac. R.R. Co.*, 99 U.S. 48, 58 (1878); *see also U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 499 (D.C. Cir. 2004) ("It is, of course, a 'cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (citing *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, n.13 (2004))).

[38] *See, e.g.*, *North Carolina Gas Corp.*, 10 FPC 469, 475 (1950).

[39] *CATCO*, 360 U.S. at 391 ("This is not to say that rates are the only factor bearing on the public convenience and necessity, for § 7(e) requires the Commission to evaluate all factors bearing on the public interest.").  The Court never expounded further on that statement.

[40] *NAACP v. FPC*, 425 U.S. 662, 669 (1976).

[41] *Id.*; *see also Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1147 (D.C.

made clear that statutory language "cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[42]  The Court has further instructed that one must "construe statutes, not isolated provisions."[43]

16.      Indeed, that is how the Court in *CATCO* – the first U.S. Supreme Court case including the "all factors bearing on the public interest" language – interpreted the phrase "public convenience and necessity."  In that case, the Court held that the public convenience and necessity requires the Commission to closely scrutinize initial rates *based on the framework and text* of the NGA.[44]

17.      Following this precedent, the phrase "public convenience and necessity" must therefore be read within the overall statutory scheme of the NGA.  As set forth below, construing the NGA *as a statute* demonstrates that Congress determined the public

---

Cir. 1980) ("Any such authority to consider all factors bearing on the 'public interest' must take into account what the 'public interest' means in the context of the Natural Gas Act.  FERC's authority to consider all factors bearing on the public interest when issuing certificates means authority to look into those factors which reasonably relate to the purposes for which FERC was given certification authority.  It does not imply authority to issue orders regarding any circumstance in which FERC's regulatory tools might be useful.").

[42] *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).

[43] *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)).

[44] *CATCO*, 360 U.S. 378, 388-91.  The Court stated "[t]he Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."  *Id.* at 388.  The Court found that the text of NGA sections 4 and 5 supported the premise that Congress designed the Act to provide complete protection from excessive rates and charges.  *Id.* ("The heart of the Act is found in those provisions requiring . . . that all rates and charges 'made, demanded, or received' shall be 'just and reasonable.'"); *id.* at 389 ("The overriding intent of the Congress to give full protective coverage to the consumer as to price is further emphasized in § 5 of the Act . . . .").  The Court recognized that the Commission's role in setting initial rates was a critical component of providing consumers complete protection because "the delay incident to determination in § 5 proceedings through which initial certificated rates are reviewable appears nigh interminable" and "would provide a windfall for the natural gas company with a consequent squall for the consumers," which "Congress did not intend."  *Id.* at 389-90.

interest required (i) the public to have access to natural gas and (ii) economic regulation of the transportation and sale of natural gas to protect such public access.

###     A.    <u>The text of the NGA does not support denying a certificate application based on the environmental effects of the upstream production or downstream use of natural gas</u>

####         1.    <u>NGA section 1(a)—limited meaning of "public interest"</u>

18.    Section 1 of the NGA sets out the reason for its enactment.  NGA section 1(a) states, "[a]s disclosed in reports of the Federal Trade Commission [(FTC)] made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public *is affected with a public interest,* and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the *public interest*."[45]

19.    A review of the FTC Report referred to in NGA section 1 demonstrates that the NGA was enacted to counter activities that would limit the public's access to natural gas and subject the public to abusive pricing.  Specifically, the FTC Report states "[a]ll communities and industries within the capacity and reasonable distance of existing or future transmission facilities should be assured a natural-gas supply and receive it at fair, nondiscriminatory prices."[46]

20.    The FTC Report further states "[a]ny proposed Federal legislation should be premised, in part at least, on the fact that natural gas is a valuable, but limited, natural resource in Nation-wide demand, which is produced only in certain States and limited areas, and the conservation, production, transportation, and distribution of which, therefore, under proper control and regulation, are matters charged with high national public interest."[47]

21.    The text of NGA section 1(a) and its reference to the FTC Report make clear that "public interest" is directly linked to ensuring the public's access to natural gas through

---

[45] 15 U.S.C. § 717(a) (2018) (emphasis added).

[46] FEDERAL TRADE COMMISSION, UTILITY CORPORATIONS FINAL REPORT OF THE FEDERAL TRADE COMMISSION TO THE SENATE OF THE UNITED STATES PURSUANT TO SENATE RESOLUTION NO. 83, 70TH CONGRESS, 1ST SESSION ON ECONOMIC, CORPORATE, OPERATING, AND FINANCIAL PHASES OF THE NATURAL-GAS-PRODUCING, PIPE-LINE, AND UTILITY INDUSTRIES WITH CONCLUSIONS AND RECOMMENDATIONS NO. 84-A at 609 (1936) (FTC Report), https://babel.hathitrust.org/cgi/pt?id=ien.355560213 51598&view=1up&seq=718.

[47] *Id.* at 611.

regulating its transport and sale.  Moreover, the NGA is designed to promote the "public interest" primarily through economic regulation.  This is apparent in the text of the NGA and by its reference to the FTC Report that identifies the concern with monopolistic activity that would limit access to natural gas.[48]

22.    Therefore, there is no textual support in NGA section 1 for the claim that the Commission may deny a pipeline application due to potential upstream and downstream effects of GHG emissions on climate change.  But, this is not the end of the analysis.  We must also examine the Commission's specific authority under NGA section 7.

## 2.    NGA section 7—Congress grants the Commission and pipelines authority to ensure the public's access to natural gas

23.    Like NGA section 1, the text of NGA section 7 makes clear that its purpose is to ensure that the public has access to natural gas.  A review of the various provisions of NGA section 7 make this point evident:

- Section 7(a) authorizes the Commission to "direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas . . . to the public . . . ."[49]  The Commission has stated that "[s]ection 7(a) clearly established the means whereby the Commission

---

[48] 15 U.S.C. § 717(a) (2018) ("Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest").  The limited, economic regulation meaning of "public interest" was clear at the time the NGA was adopted.  The NGA's use of the phrase "affected with the public interest" is consistent with the States' use of this phrase when enacting laws regulating public utilities.  Historically, state legislatures used the phrase "affected with the public interest" as the basis of their authority to regulate rates charged for the sale of commodities, rendered services, or use of private property.  *Munn v. Illinois*, 94 U.S. 113, 125-26 (1876).  The Court found that businesses affected with a public interest or "said to be clothed with a public interest justifying some public regulation" include "[b]usinesses, which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation."  *Charles Wolff Packing Co. v. Court of Indus. Relations*, 262 U.S. 522, 535 (1923).  In essence, these businesses became quasi-public enterprises and were determined to have an "indispensable nature."  *Id.* at 538.  Such a conclusion also meant that if these businesses were not restrained by the government, the public could be subject to "the exorbitant charges and arbitrary control to which the public might be subjected without regulation."  *Id.*

[49] 15 U.S.C. § 717f(a) (2018).

could secure *the benefits* of gas service for certain communities, markets and territories adjacent to those originally established by the gas industry, where in the public interest."[50]

- Section 7(b) requires Commission approval for a natural gas pipeline company to "abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities."[51]  That is, Congress considered access to natural gas to be so important that it even prohibited natural gas pipeline companies from abandoning service without Commission approval.

- Section 7(c)(1)(B) authorizes the Commission to "issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate."[52]  The underlying presumption of this section is that the need for natural gas can be so important that the Commission can issue a certificate without notice and hearing.

- Section 7(e) states "a certificate *shall* be issued" when a project is in the public convenience and necessity,[53] leaving the Commission no discretion after determining a project meets the public convenience and necessity standard.

- Section 7(h) grants the pipeline certificate holder the powers of the sovereign to "exercise of the right of eminent domain in the district court of the United States."[54]  By granting the power of eminent domain, Congress made clear the importance of ensuring that natural gas could be delivered from its source to the public by not allowing traditional property rights to stand in the way of pipeline construction.  Furthermore, the sovereign's

---

[50] *Arcadian Corp. v. Southern Nat. Gas Co.*, 61 FERC ¶ 61,183, at 61,676 (1992) (emphasis added).  The Commission's analysis in this regard was unaffected by the opinion in *Atlanta Gas Light Co. v. FERC*, 140 F.3d 1392 (11th Cir. 1998) (vacating the Commission's 1991 and 1992 orders on other grounds).

[51] 15 U.S.C. § 717f(b) (2018).

[52] *Id.* § 717f(c)(1)(B).

[53] *Id.* § 717f(e) (emphasis added).

[54] *Id.* § 717f(h).

power of eminent domain must be for a public use[55] and Congress considered natural gas pipelines a public use.

24.     Each of these textual provisions illuminate the ultimate purpose of the NGA:  to ensure that the public has access to natural gas because Congress considered such access to be in the public interest.[56]  To now interpret "public convenience and necessity" to mean that the Commission has the authority to deny a certificate for a pipeline due to upstream or downstream emissions because the pipeline may result in access to, and the use of, natural gas would radically rewrite the NGA and undermine its stated purpose.

### 3.      NGA section 1(b) and section 201 of the Federal Power Act (FPA)—authority over environmental effects related to the upstream production and downstream use of transported natural gas reserved to States

25.     Statutory text also confirms that control over the physical environmental effects related to the upstream production and downstream use of natural gas are squarely reserved for the States.  NGA section 1(b) provides that "[t]he provisions of this chapter . . . shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities for such distribution or to the production or gathering of natural gas."[57]  The Ninth Circuit and the D.C. Circuit have interpreted the reference to distribution as meaning that States have exclusive authority over the gas

---

[55] *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 406 (1878) ("The right of eminent domain, that is, the right to take private property for public uses, appertains to every independent government.").

[56] This interpretation is also supported by the Commission's 1999 Certificate Policy Statement.  *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,743 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement) ("[I]t should be designed to foster competitive markets, protect captive customers, and avoid unnecessary environmental and community impacts *while serving increasing demands for natural gas*.") (emphasis added); *id.* at 61,751 ("[T]he Commission is urged to authorize new pipeline capacity to meet an anticipated increase in demand for natural gas . . . .").

[57] 15 U.S.C. § 717(b) (2018); *see Pennzoil v. FERC*, 645 F.2d 360, 380-82 (5th Cir. 1981) (holding that FERC lacks the power to even interpret gas purchase agreements between producers and pipelines for the sale of gas that has been removed from NGA jurisdiction).

once the gas moves beyond high-pressure mainlines.[58]  Likewise, FPA section 201 specifically reserves the authority to make generation decisions to the States.[59]

26.      U.S. Supreme Court precedent and legislative history confirm that the regulation of the physical upstream production and downstream use of gas is reserved for the States.[60]  The Court has observed that Congress enacted the NGA to address "specific evils" related to non-transparent rates for the interstate transportation and sale of natural gas and the monopoly power of holding companies that owned natural gas pipeline company stock.[61]  The Court has also found that Congress enacted the NGA to

---

[58] *See S. Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1092 (9th Cir. 2010) ("In sum, the history and judicial construction of the Natural Gas Act suggest that all aspects related to the direct consumption of gas . . . remain within the exclusive purview of the states."); *Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 277 (D.C. Cir. 1990) ("[T]he state . . . has authority over the gas once it moves beyond the high-pressure mains into the hands of an end user.").  I note that the court in *Sabal Trail* did not discuss or distinguish *Public Utilities Commission of State of Cal v. FERC*.

[59] 16 U.S.C. § 824(b)(1) (2018) ("The Commission . . . shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy . . . .").  Despite Congress explicitly denying the Commission jurisdiction over generation decisions in the FPA, some argue that the Commission has the authority to prevent natural gas generation through general language in the NGA regarding public convenience and necessity.  Such an approach violates the principle that explicit language trumps general provisions.  *See, e.g.*, *Passamaquoddy Tribe v. State of Me.*, 897 F. Supp. 632, 635 ("In this case, the unequivocal language in the Maine Settlement Act clearly trumps the Gaming Act's general provisions that are silent as to Maine.").

[60] Some will argue that the Court's dicta in *FPC v. Hope Natural Gas Co.* (*Hope*)—"[t]he Commission is required to take account of the ultimate use of the gas," 320 U.S. 591, 639 (1944)—means that the Commission can consider environmental effects related to the downstream use of natural gas.  However, such argument takes the Court's statement out of context.  In fact, that Court makes that statement in support of its argument that while the 1942 amendments to the NGA eliminated the language, "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest," "there is nothing to indicate that it was not and is still not an accurate statement of purpose of the Act."  *Id.* at 638.  Such argument further supports that Congress enacted the NGA to provide access to natural gas and to protect consumers from monopoly power.

[61] *Id.* at 610 ("state commissions found it difficult or impossible to discover what

fill the regulatory void created by the Court's earlier decisions prohibiting States from regulating interstate transportation and sales for resale of natural gas, while at the same time leaving undisturbed the recognized power of the States to regulate all in-state gas sales directly to consumers. Thus, the NGA "was drawn with meticulous regard for the continued exercise of state power, not to handicap it any way."[62]

27.     In *Transco*,[63] the Court also recognized that "Congress did not desire that an important aspect of this field be left unregulated."[64]  Thus, the Court held that where

---

it cost interstate pipe-line companies to deliver gas within the consuming states"); *id.* ("[T]he investigations of the Federal Trade Commission had disclosed the majority of the pipe-line mileage in the country used to transport natural gas, together with an increasing percentage of the natural gas supply for pipe-line transportation, had been acquired by a handful of holding companies.").  Senate Resolution 83, which directed the FTC to develop the report that the NGA is founded on, also demonstrates that Congress was only concerned with consumer protection and monopoly power.  The resolution directed the FTC to investigate capital assets and liabilities of natural gas companies, issuance of securities by the natural gas companies, the relationship between company stockholders and holding companies, other services provided by the holding companies, adverse impacts of holding companies controlling natural gas companies, and potential legislation to correct any abuses by holding companies.  FTC Report at 1.

[62] *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 292 (1997) (internal citations omitted) (quoting *Panhandle E. Pipeline Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 516-22 (1947) (*Panhandle*)); *see also Nw. Cent. Pipeline v. State Corp. Comm'n*, 489 U.S. 493, 512 (1989) ("The NGA 'was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry.  Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other.'" (quoting *Panhandle*, 332 U.S. at 513)); *Panhandle*, 332 U.S. at 520 (In recognizing that the NGA articulated a legislative program recognizing the respective responsibilities of federal and state regulatory agencies, the Court noted that the NGA does not "contemplate ineffective regulation at either level as Congress meant to create a comprehensive and effective regulatory scheme, complementary in its operation to those of the states and in no manner usurping their authority.").  Congress continued to draw the NGA with meticulous regard to State power when it amended the NGA in 1954 to add the Hinshaw pipeline exemption so as "to preserve state control over local distributors who purchase gas from interstate pipelines."  *Louisiana Power & Light Co. v. Fed. Power Comm'n*, 483 F.2d 623, 633 (5th Cir. 1973).

[63] *Transco*, 365 U.S. 1 (1961).

[64] *Id.* at 19.

congressional authority is not explicit and States cannot practicably regulate a given area, the Commission can consider the issue in its public convenience and necessity determination.[65]

28.    Based on this rule, and legislative history,[66] the *Transco* Court found that in its public convenience and necessity determination, the Commission appropriately considered whether the end-use of the gas in a non-producing state was economically wasteful as there was a regulatory gap and no State could be expected to control how gas is used in another State.[67]  The Court also impressed that

> The Commission ha[d] not attempted to exert its influence over such "*physically*" wasteful practices as improper well spacing and the flaring of unused gas which result in the entire loss of gas and are properly of concern to the producing State; nor has the Commission attempted to regulate the "economic" aspects of gas used within the producing State.[68]

29.    In contrast, there is no legislative history to support the Commission considering environmental effects related to the upstream production or downstream use of gas. Furthermore, the field of environmental regulation of such activities is not one that has been left unregulated.[69]  Unlike in *Transco*, States can reasonably be expected to regulate

---

[65] *Id.* at 19-20.

[66] *Id.* at 10-19.

[67] *Id.* at 20-21.

[68] *Id.* at 20 (emphasis added).

[69] I note that the Federal Power Commission, the Commission's predecessor, at times previously considered environmental impacts in its need analysis when weighing the beneficial use of natural gas between competing uses.  The Federal Power Commission did not consider negative environmental impacts of downstream end use as a reason to deny the use of natural gas.  *See, e.g.*, *El Paso Natural Gas Co.*, 50 FPC 1264 (1973) (denying a certificate because the proposed project would impact existing customers dependent on natural gas and use of gas was not needed to keep sulfur emissions within the national ambient air quality standards); *Transwestern Pipeline Co.*, 36 FPC 176 (1966) (discussing use of gas instead of oil or coal and noting potential air pollution benefits); *El Paso Nat. Gas Co.*, 22 FPC 900, 950 (1959) ("[T]he use of natural gas as boiler fuel in the Los Angeles area should be considered as being in a different category than gas being used for such a purpose in some other community where the smog problem does not exist and that the use of gas for boiler fuel in this area should not be considered an inferior use."); *see also* FPC ANNUAL REP. at 2 (1966) ("Any showing that additional gas for boiler fuel use would substantially reduce air

air emissions from the upstream production or downstream use of natural gas: "air pollution control at its source is the primary responsibility of States and local governments."[70]  The Clean Air Act vests States with authority to issue permits to regulate stationary sources related to upstream and downstream activities.[71]  In addition, pursuant to their police powers, States have the ability to regulate environmental effects related to the upstream production and downstream use of natural gas within their jurisdictions.[72]  The FTC Report referenced in NGA section 1(a) recognizes States' ability to regulate the use of natural gas.[73]  And, various States have exercised this ability. For example, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont participate in the Regional Greenhouse Gas

---

pollution merits serious consideration.  Important as this factor may be, however, it cannot be considered in isolation.").  Often these orders discussed sulfur and smog air pollution that occurred in the area where the natural gas would be transported when determining need as compared to the need or use of natural gas somewhere else.  All of this was premised on the Commission's NGA authority to use its public convenience and necessity authority to provide access to natural gas and to conserve gas by preventing economic waste.  The Commission appears to have stopped this analysis in the late-1970s.  It is noteworthy that the U.S. Environmental Protection Agency (EPA) was established in 1970, Congress established more comprehensive air emissions regulation by amending the Clean Air Act in 1970 and 1977 (Pub. L. 91-604, 84 Stat. 1676 (1970); Pub. L. 95-95, 91 Stat. 685 (1977)), and Congress enacted the Department of Energy Organization Act, which replaced the Federal Power Commission with the Federal Energy Regulatory Commission, 42 U.S.C. §§ 7101 *et seq*.

[70] 42 U.S.C. § 7401 (2018).

[71] *Id.* § 7661e ("Nothing in this subchapter shall prevent a State, or interstate permitting authority, from establishing additional permitting requirements not inconsistent with this chapter.").  The Act defines "permitting authority" as "the Administrator or the air pollution control agency authorized by the Administrator to carry out a permit program under this subchapter." *Id.* § 7661.

[72] *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the more traditional concept of what is compendiously known as the police power.").

[73] FTC Report at 716 (describing Louisiana) ("The department of conservation be, and it is hereby, given supervision over the production and use of natural gas in connection with the manufacture of carbon black in other manufacturing enterprises and for domestic consumption.").

Initiative (RGGI), which requires power plants with a capacity over 25 megawatts to hold allowances equal to their $CO_2$ emissions over a three-year control period.[74]

30.     Some may make the argument that "considering" the environmental effects related to upstream production and downstream use is hardly "regulating" such activities.  I disagree.  For the Commission to consider such effects would be an attempt to exert influence over States' regulation of physical upstream production or downstream use of natural gas, which the Court in *Transco* suggested would be encroaching upon forbidden ground.  If, for example, the Commission considered and denied a certificate based on the GHG emissions released from production activities, the Commission would be making a judgment that such production is too harmful for the environment and preempting a State's authority to decide whether and how to regulate upstream production of natural gas.  Furthermore, for the Commission to consider and deny a project based on emissions from end users, the Commission would be making a judgment that natural gas should not be used for certain activities.[75]  Such exertion of influence is impermissible:  "when the Congress explicitly reserves jurisdiction over a matter to the states, as here, the Commission has no business considering how to 'induc[e] a change [of state] policy' with respect to that matter."[76]

31.     Hence, there is no jurisdictional gap in regulating GHG emissions for the Commission to fill.  The NGA reserves authority over the upstream production and downstream use of natural gas to the States, and States can practicably regulate GHGs emitted by those activities.  And, even if there were a gap that federal regulation could fill, as discussed below, it is nonsensical for the Commission to attempt to fill a gap that

---

[74] REGIONAL GREENHOUSE GAS INITIATIVE, https://www.rggi.org/program-overview-and-design/elements (LAST ACCESSED NOV. 18, 2019).

[75] *See also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1320 (D.C. Cir. 2015) ("The Commission's power to preempt state and local regulation by approving the construction of natural gas facilities is limited by the Natural Gas Act's savings clause, which provides that the Natural Gas Act's terms must not be construed to 'affect[] the rights of States' under the Clean Air Act.  15 U.S.C. § 717b(d)(2)."); *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 243 (D.C. Cir. 2013) ("But Congress expressly saved states' [Clean Air Act] powers from preemption.").

[76] *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1248 (D.C. Cir. 1996); *see ANR Pipeline Co. v. FERC*, 876 F.2d 124, 132 (D.C. Cir. 1989) ("We think it would be a considerable stretch from there to say that, in certifying transportation that is necessary to carry out a sale, the Commission is required to reconsider the very aspects of the sale that have been assessed by an agency specifically vested by Congress with authority over the subject.").

Congress has clearly meant for the EPA to occupy.[77]  Therefore, because GHG emissions from the upstream production and downstream use of natural gas are not properly of concern to the Commission, the Commission cannot deny a certificate application based on such effects.

**B.      Denying a pipeline based on upstream or downstream environmental effects would undermine other acts of Congress**

32.      Since enactment of the NGA and NEPA, Congress has enacted additional legislation promoting the production and use of natural gas and limiting the Commission's authority over the natural gas commodity.  Each of these legislation enactments indicates that the Commission's authority over upstream production and downstream use of natural gas has been further limited by Congress.  Arguments that the Commission can rely on the NGA's public convenience and necessity standard and NEPA to deny a pipeline application so as to prevent the upstream production or downstream use of natural gas would undermine these acts of Congress.

**1.      Natural Gas Policy Act of 1978**

33.      Determining that federal regulation of natural gas limited interstate access to the commodity, resulting in shortages and high prices, Congress passed the Natural Gas Policy Act of 1978 (NGPA).  The NGPA significantly deregulated the natural gas industry.[78]  Importantly, NGPA section 601(c)(1) states, "[t]he Commission may not deny, or condition the grant of, any certificate under section 7 of the Natural Gas Act based upon the amount paid in any sale of natural gas, if such amount is deemed to be just and reasonable under subsection (b) of this section."[79]

34.      Besides using price deregulation to promote access to natural gas, Congress gave explicit powers to the President to ensure that natural gas reached consumers.  NGPA section 302(c) explicitly provides, "[t]he President may, by order, require any pipeline to transport natural gas, and to construct and operate such facilities for the transportation of

_____

[77] *See infra* PP 53-58.

[78] Generally, the NGPA limited the Commission's authority over gas that is not transported in interstate commerce, new sales of gas, sales of gas and transportation by Hinshaw pipelines, and certain sales, transportation and allocation of gas during certain gas supply emergencies.  *See, e.g.*, NGPA sections 601(a)(1)(A)-(D), 15 U.S.C. § 3431(a)(1)(A)-(D) (2018).

[79] *Id.* § 3431(c)(1) (2018).  In addition, section 121(a) provides, "the provisions of subtitle A respecting the maximum lawful price for the first sale of each of the following categories of natural gas shall, except as provided in subsections (d) and (e), cease to apply effective January 1, 1985."  15 U.S.C. § 3331(a), *repealed by* the Wellhead Decontrol Act of 1989, Pub. L. 101-60 § 2(b), 103 Stat. 157 (1989).

natural gas, as he determines necessary to carry out any contract authorized under subsection (a)."[80]  Similarly, the NGPA gave authority to the Secretary of Energy to promote access to natural gas.[81]

35.     There can be no doubt about the plain language of the NGPA:  the Court observed that Congress passed the NGPA to "promote gas transportation by interstate and intrastate pipelines."[82]  Furthermore, the NGPA was "intended to provide investors with adequate incentive to develop new sources of supply."[83]

## 2.     Powerplant and Industrial Fuel Use Act of 1978

36.     With respect to natural gas as a fuel source for electric generation, in 1987 Congress repealed sections of the Powerplant and Industrial Fuel Use Act of 1978 (Fuel Use Act),[84] which had restricted the use of natural gas in electric generation so as to conserve it for other uses.  With the repeal of the Fuel Use Act, Congress made clear that natural gas could be used for electric generation and that the regulation of the use of natural gas by power plants unnecessary.[85]

---

[80] *Id.* § 3362.

[81] *See id.* § 3391(a) ("[T]he Secretary of Energy shall prescribe and make effective a rule . . . which provides . . . no curtailment plan of an interstate pipeline may provide for curtailment of deliveries for any essential agricultural use . . . ."); *id.* § 3392(a) ("The Secretary of Energy shall prescribe and make effective a rule which provides that notwithstanding any other provisions of law (other than subsection (b)) and to the maximum extent practicable, no interstate pipeline may curtail deliveries of natural gas for any essential industrial process or feedstock use . . . ."); *id.* § 3392(a) ("The Secretary of Energy shall determine and certify to the Commission the natural gas requirements (expressed either as volumes or percentages of use) of persons (or classes thereof) for essential industrial process and feedstock uses (other than those referred to in section 3391(f)(1)(B))."); *id.* § 3393(a) ("The Secretary of Energy shall prescribe the rules under sections 3391 and 3392 of this title pursuant to his authority under the Department of Energy Organization Act to establish and review priorities for curtailments under the Natural Gas Act.").

[82] *Gen. Motors Corp. v. Tracy*, 519 U.S. at 283 (quoting 57 Fed. Reg. 13271 (Apr. 16, 1992)).

[83] *Pub. Serv. Comm'n of State of N.Y. v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 334 (1983).

[84] 42 U.S.C. § 8342, *repealed by* Pub. L. 100-42, § 1(a), 101 Stat. 310 (1987).

[85] The Commission need not look any further than the text of the statutes to determine its authority.  In the case of the repeal of the Fuel Use Act, the legislative

### 3.     Natural Gas Wellhead Decontrol Act of 1989

37.     If there were any remaining doubt that the Commission has no authority to consider the upstream production of natural gas and its environmental effects, such doubt was put to rest when Congress enacted the Wellhead Decontrol Act.[86]  In this legislation, Congress specifically removed the Commission's authority over the upstream production of natural gas.[87]

38.     But the Wellhead Decontrol Act was not merely about deregulating upstream natural gas production.  Congress explained that the reason for deregulating natural gas at the wellhead was important to ensuring that end users had access to the commodity.  The Senate Committee Report for the Wellhead Decontrol Act states "the purpose (of the legislation) is to promote competition for natural gas at the wellhead *to ensure consumers an adequate and reliable supply of natural gas at the lowest reasonable price*."[88] Similarly, the House Committee Report to the Wellhead Decontrol Act notes, "[a]ll sellers must be able to reasonably reach the highest-bidding buyer in an increasingly

---

history is informative as to Congress's reasoning.  *See* H.R. Rep. 100-78 *2 ("By amending [Fuel Use Act], H.R. 1941 will remove artificial government restrictions on the use of oil and gas; allow energy consumers to make their own fuel choices in an increasingly deregulated energy marketplace; encourage multifuel competition among oil, gas, coal, and other fuels based on their price, availability, and environmental merits; preserve the 'coal option' for new baseload electric powerplants which are long-lived and use so much fuel; and provide potential new markets for financially distressed oil and gas producers."); *id.* *6 ("Indeed, a major purpose of this bill is to allow individual choices and competition and fuels and technologies . . . ."); *see also* President Ronald Reagan's Remarks on Signing H.R. 1941 Into Law, 23 WEEKLY COMP. PRES. DOC. 568, (May 21, 1987) ("This legislation eliminates unnecessary restrictions on the use of natural gas.  It promotes efficient production and development of our energy resources by returning fuel choices to the marketplace.  I've long believed that our country's natural gas resources should be free from regulatory burdens that are costly and counterproductive.").

[86] Pub. L. 101-60, 103 Stat. 157 (1989).

[87] The Wellhead Decontrol Act amended NGPA section 601(a)(1)(A) to read, "[f]or purposes of section 1(b) of the Natural Gas Act, the provisions of the Natural Gas Act and the jurisdiction of the Commission under such Act shall not apply to any natural gas solely by reason of any first sale of such natural gas."  15 U.S.C. § 3431(a)(1)(A), *amended by*, Pub. L. 101-60 § 3(a)(7)(A), 103 Stat. 157 (1989).  *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1166 (D.C. Cir. 1996) ("That enactment contemplates a considerably changed natural gas world in which regulation plays a much reduced role and the free market operates at the wellhead.").

[88] S. Rep. No. 101-39 at 1 (emphasis added).

national market. All buyers must be free to reach the lowest-selling producer, and obtain shipment of its gas to them on even terms with other suppliers."[89] The House Committee Report also states the Commission's "current competitive 'open access' pipeline system [should be] maintained."[90] With this statement, the House Committee Report references Order No. 436 in which the Commission stated that open access transportation "is designed to remove any unnecessary regulatory obstacles and to facilitate transportation of gas to any end user that requests transportation service."[91]

### 4. <u>Energy Policy Act of 1992</u>

39.    In the Energy Policy Act of 1992 (EPAct 1992), Congress also expressed a preference for providing the public access to natural gas. EPAct section 202 states, "[i]t is the sense of the Congress that natural gas consumers and producers, and the national economy, are best served by a competitive natural gas wellhead market."[92]

40.    The NGA, NGPA, the repeal of the Fuel Use Act, the Wellhead Decontrol Act, and EPAct 1992 each reflect Congressional mandates to promote the production, transportation, and use of natural gas. None of these acts, and no other law, including NEPA, modifies the presumption in the NGA to facilitate access to natural gas. And, it is not for the Commission to substitute its judgment for that of Congress in determining energy policy.

### C.   <u>"Public convenience and necessity" does not support consideration of environmental effects related to upstream production or downstream use of natural gas</u>

41.    In addition to considering the text of the NGA as a whole and subsequent-related acts, we must interpret the phrase "public convenience and necessity" as used when enacted. As discussed below, "public convenience and necessity" has always been understood to mean "need" for the service. To the extent the environment is considered, such consideration is limited to the effects stemming from the construction and operation of the proposed facilities and is not as broad as some would believe.[93]

---

[89] H.R. Rep. No. 101-29 at 6.

[90] *Id.* at 7.

[91] *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, 50 Fed. Reg. 42,408, 42,478 (Oct. 18, 1985) (Order No. 436).

[92] Pub. L. No. 102-486, 106 Stat. 2776 (1992).

[93] Some will cite the reference to environment in footnote 6 in *NAACP v. FPC* to argue that the Commission can consider the environmental effects of upstream production and downstream use of natural gas. *NAACP v. FPC*, 425 U.S. 662, 670 n.6.

42.     When Congress enacted the NGA, the phrase "public convenience and necessity" was a term of art used in state and federal public utility regulation.[94]  In 1939, one year after the NGA's enactment, the Commission's predecessor agency, the Federal Power Commission, defined public convenience and necessity as "a public need or benefit without which the public is inconvenienced to the extent of being handicapped in the pursuit of business or comfort or both, without which the public generally in the area involved is denied to its detriment that which is enjoyed by the public of other areas similarly situated."[95]  To make such showing, the Commission required certificate applicants to demonstrate that the public needed its proposed project, the applicant could perform the proposed service, and the service would be provided at reasonable rates.[96]

43.     To the extent that public convenience and necessity included factors other than need, they were limited and directly related to the proposed facilities, not upstream or downstream effects related to the natural gas commodity.  Such considerations included the effects on pipeline competition, duplication of facilities, and social costs, such as misuse of eminent domain and environmental impacts resulting from the creation of the

---

The Court's statement does not support that argument.  The Court states that the environment could be a subsidiary purpose of the NGA and FPA by referencing FPA section 10, which states the Commission shall consider whether a hydroelectric project is best adapted to a comprehensive waterway by considering, among other things, the proposed *hydroelectric project's effect* on the adequate protection, mitigation, and enhancement of fish and wildlife.  Nothing in the Court's statement or the citation would support the consideration of upstream and downstream impacts.  *See supra* note 67 (explaining that the Federal Power Commission previously considered environmental impacts of downstream end use when weighing the beneficial use of natural gas between competing uses).

   [94] William K. Jones, *Origins of the Certificate of Public Convenience and Necessity: Developments in the States, 1870-1920*, 79 COLUM. L. REV. 426, 427-28 (1979) (Jones).

   [95] *Kan. Pipe Line & Gas Co.*, 2 FPC 29, 56 (1939).

   [96] *See* Order No. 436, at 42,474 (listing the requirements outlined in *Kan. Pipe Line & Gas Co.*: "(1) they possess a supply of natural gas adequate to meet those demands which it is reasonable to assume will be made upon them; (2) there exist in the territory proposed to be served customers who can reasonably be expected to use such natural-gas service; (3) the facilities for which they seek a certificate are adequate; (4) the costs of construction of the facilities which they propose are both adequate and reasonable; (5) the anticipated fixed charges or the amount of such fixed charges are reasonable; and (6) the rates proposed to be charged are reasonable.").

right-of-way or service.[97]  For example, the Commonwealth of Massachusetts considered environmental impacts resulting from the creation of the right-of-way and service in denying an application to build a railroad along a beach.  The Commonwealth found that "the demand for train service was held to be outweighed by the fact the beach traversed 'will cease to be attractive when it is defaced and made dangerous by a steam railroad.'"[98]

44.     The Commission's current guidance for determining whether a proposed project is in the public convenience and necessity is consistent with the historic use of the term.  As outlined in its 1999 Certificate Policy Statement, the Commission implements an economic balancing test that is focused on whether there is a need for the facilities and adverse economic effects stemming from the construction and operation of the proposed facilities themselves.  The Commission designed its balancing test "to foster competitive markets, protect captive customers, and avoid unnecessary environmental and community impacts while serving increasing demands for natural gas."[99]  The Commission also stated that its balancing test "provide[s] appropriate incentives for the optimal level of construction and efficient customer choices."[100]  To accomplish these objectives, the Commission determines whether a project is in the public convenience and necessity by balancing the public benefits of the project against the adverse economic impacts on the applicant's existing shippers, competitor pipelines and their captive customers, and landowners.[101]

45.     Although the Certificate Policy Statement also recognizes the need to consider certain environmental issues related to a project, it makes clear that the environmental impacts to be considered are related to the construction and operation of the pipeline itself and the creation of the right-of-way.[102]  As noted above, it is the Commission's objective to avoid *unnecessary* environmental impacts, meaning to route the pipeline to avoid environmental effects where possible and feasible, not to prevent or mitigate environmental effects from the upstream production or downstream use of natural gas.  This is confirmed when one considers that, if the project had unnecessary adverse

---

[97] Jones at 428.

[98] *Id.* at 436.

[99] Certificate Policy Statement, 88 FERC ¶ at 61,743.

[100] *Id.*

[101] *Id.*

[102] *See also Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1299 (11th Cir. 2019) ("Regulations cannot contradict their animating statutes or manufacture additional agency power.") (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000)).

environmental effects, the Commission would require the applicant to reroute the pipeline: "If the environmental analysis following a preliminary determination indicates a preferred route other than the one proposed by the applicant, the earlier balancing of the public benefits of the project against its adverse effects would be reopened to take into account the adverse effects on landowners who would be affected by the changed route."[103]

46.     Further, the Certificate Policy Statement provides, "[i]deally, an applicant will structure its proposed project to avoid adverse economic, competitive, environmental, or other effects on the relevant interests from the construction of the new project."[104]  And that is what occurred in this case.  Mountain Valley modified its pipeline route to reduce impacts on various landowners[105] and eliminated a compressor station that had originally been proposed in pre-filing to be located near milepost 26 in North Carolina.[106] Additionally, Mountain Valley co-located 49 percent of the proposed pipeline route with existing utility corridors and rights-of-way. [107] Further, during the pre-filing period, Mountain Valley assessed numerous route alternatives. Mountain Valley adopted 101 route alternative segments and/or minor route variations into its proposed Project design for various reasons, including landowner requests, avoidance of sensitive environmental resources (such as archaeological sites or wetlands), avoidance of areas of steep terrain or side slopes, and engineering considerations.[108]

47.     In sum, the meaning of "public convenience and necessity" does not support weighing the public need for the project against effects related to the upstream production or downstream use of natural gas.

### D.     NEPA does not authorize the Commission to deny a certificate application based on emissions from the upstream production or downstream use of transported natural gas

48.     The text of the NGA, and the related subsequent acts by Congress, cannot be revised by NEPA or CEQ regulations to authorize the Commission to deny a certificate

---

[103] Certificate Policy Statement, 88 FERC ¶ at 61,749.

[104] Id. at 61,747.

[105] Final EIS at 3-26 to 3-28.

[106] Certificate Order, 171 FERC ¶ 61,232 at P 27.

[107] Id.  P 27

[108] Final EIS at 3.

application based on effects from the upstream production and downstream use of natural gas.

49.    The courts have made clear that NEPA does not expand a federal agency's substantive or jurisdictional powers.[109]  Nor does NEPA repeal by implication any other statute.[110]  Rather, NEPA is a merely procedural statute that requires federal agencies to take a "hard look" at the environmental effects of a proposed action before acting on it.[111] NEPA also does not require a particular result.  In fact, the Supreme Court has stated, even if a NEPA analysis identifies an environmental harm, the agency can still approve the project.[112]

50.    Further, CEQ's regulations on indirect effects cannot make the GHG emissions from upstream production or downstream use part of the Commission's public convenience and necessity determination under the NGA.  As stated above, an agency's obligation under NEPA to consider indirect environmental effects is not limitless. Indirect effects must have "a reasonably close causal relationship" with the alleged cause, and that relationship is dependent on the "underlying policies or legislative intent."[113] NEPA requires such reasonably close causal relationship because "inherent in NEPA and

---

[109] *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987) ("NEPA, as a procedural device, does not work a broadening of the agency's substantive powers.  Whatever action the agency chooses to take must, of course, be within its province in the first instance.") (citations omitted); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 188 (3d Cir. 1986) ("The National Environmental Policy Act does not expand the jurisdiction of an agency beyond that set forth in its organic statute."); *Gage v. U.S. Atomic Energy Comm'n*, 479 F.2d 1214, 1220 n.19 (D.C. Cir. 1973) ("NEPA does not mandate action which goes beyond the agency's organic jurisdiction."); *see also Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 788 (1976) ("where a clear and unavoidable conflict in statutory authority exists, NEPA must give way").

[110] *U.S. v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 694 (1973).

[111] *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

[112] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.").

[113] *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 n.7 (1983).

its implementing regulations is a 'rule of reason,'"[114] which "recognizes that it is pointless to require agencies to consider information they have no power to act on, or effects they have no power to prevent."[115] Thus, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[116]

51.     The Commission has no power to deny a certificate for effects related to the upstream production or downstream use of natural gas.  As explained above, the Commission's consideration of adverse environmental effects is limited to those effects stemming from the construction and operation of the pipeline facility and the related right-of-way.  For the Commission to deny a pipeline based on GHGs emitted from the upstream production or downstream use of natural gas would be contrary to the text of the NGA and subsequent acts by Congress.  The NGA reserves such considerations for the States, and the Commission must respect the jurisdictional boundaries set by Congress.  Suggesting that the Commission can consider such effects not only risks duplicative regulation but in fact defies Congress.

### III.     The NGA does not contemplate the Commission establishing mitigation for GHG emissions from pipeline facilities

52.     My colleague has also suggested that the Commission should require the mitigation of GHG emissions from the certificated pipeline facilities and the upstream production and downstream use of natural gas transported on those facilities.[117]  I understand his suggestions as proposing a carbon emissions fee, offsets or tax (similar to the Corps' compensatory wetland mitigation program), technology requirements (such as

---

[114] *Pub. Citizen*, 541 U.S. at 767.

[115] *Ctr. for Biological Diversity*, 941 F.3d at 1297; *see also Town of Barnstable v. FAA*, 740 F.3d 681, 691 (D.C. Cir. 2014) ("NEPA's 'rule of reason' does not require the FAA to prepare an EIS when it would 'serve no purpose.'").

[116] *Pub. Citizen,* 541 U.S. at 770; *see also Town of Barnstable*, 740 F.3d at 691 ("Because the FAA 'simply lacks the power to act on whatever information might be contained in the [environmental impact statement ('EIS')],' NEPA does not apply to its no hazard determinations.") (internal citation omitted); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 196-97 (4th Cir. 2009) (finding that the U.S. Army Corps of Engineers (Corps) was not required to consider the valley fill projects because "[West Virginia Department of Environmental Protection], and not the Corps, [had] 'control and responsibility' over all aspects of the valley fill projects beyond the filling of jurisdictional waters.").

[117] *Transcontinental Gas Pipe Line Company, LLC, (Transco)* 171 FERC ¶ 61,031 (2020) (Comm'r, Glick, dissenting at P 17).

scrubbers or electric-powered compressor units),[118] or emission caps.  Some argue that the Commission can require such mitigation under NGA section 7(e), which provides "[t]he Commission shall have the power to attach to the issuance of the certificate . . . such reasonable terms and conditions as the public convenience and necessity may require."[119]

53.    I disagree.  The Commission cannot interpret NGA section 7(e) to allow the Commission to unilaterally establish measures to mitigate GHG emissions because Congress, through the Clean Air Act, assigned the EPA and the States exclusive authority to establish such measures.  Congress designated the EPA as the expert agency "best suited to serve as primary regulator of greenhouse gas emissions," [120] not the Commission.

54.    The Clean Air Act establishes an all-encompassing regulatory program, supervised by the EPA to deal comprehensively with interstate air pollution.[121]  Congress entrusted the Administrator of the EPA with significant discretion to determine appropriate emissions measures.  Congress delegated the Administrator the authority to determine whether pipelines and other stationary sources endanger public health and welfare; section 111 of the Clean Air Act directs the Administrator of the EPA "to publish (and from time to time thereafter shall revise) a list of categories of stationary sources.  He shall include a category of sources in such list if in *his judgment* it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare"[122] and to establish standards of performance for the identified stationary sources.[123]  The Clean Air Act requires the Administrator to conduct complex balancing when determining a standard of performance, taking into consideration what is technologically achievable and the cost to achieve that standard.[124]

---

[118] It is also important to consider the impact on reliability that would result from requiring electric-compressor units on a gas pipeline.  In the event of a power outage, a pipeline with electric-compressor units may be unable to compress and transport gas to end-users, including power plants and residences for heating and cooking.

[119] *Id.* § 717f(e) (2018).

[120] *American Elec. Power Co., Inc. v. Conn.*, 564 U.S. 410, 428 (2011).

[121] *See id.* at 419.

[122] 42 U.S.C. § 7411(b)(1)(A) (2018).

[123] *Id.* § 7411(b)(1)(B).

[124] *Id.* § 7411(a)(1).

55.     In addition, the Clean Air Act allows the Administrator to "distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards."[125]  The Act also permits the Administrator, with the consent of the Governor of the State in which the source is to be located, to waive its requirements "to encourage the use of an innovative technological system or systems of continuous emission reduction."[126]

56.     Congress also intended that States would have a role in establishing measures to mitigate emissions from stationary sources.  Section 111(f) notes that "[b]efore promulgating any regulations . . . or listing any category of major stationary sources . . . the Administrator shall consult with appropriate representatives of the Governors and of State air pollution control agencies."[127]

57.     Thus, the text of the Clean Air Act demonstrates it is improbable that NGA section 7(e) allows the Commission to establish GHG emission standards or mitigation measures out of whole cloth.  To argue otherwise would defeat the significant discretion and complex balancing that the Clean Air Act entrusts in the EPA Administrator, and would eliminate the role of the States.

58.     Furthermore, to argue that the Commission may use its NGA conditioning authority to establish GHG emission mitigation—a field in which the Commission has no expertise—and address climate change—an issue that has been subject to profound debate across our nation for decades—is an extraordinary leap.  The Supreme Court's "major rules" canon advises that agency rules on issues that have vast economic and political significance must be treated "with a measure of skepticism" and require Congress to provide clear authorization.[128]  The Court has articulated this canon because Congress does not "hide elephants in mouseholes"[129] and "Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration."[130]

---

[125] *Id.* § 7411(a)(2).

[126] *Id.* § 7411(j)(1)(A).

[127] *Id.* § 7411(f)(3).

[128] *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014); *Brown & Williamson,* 529 U.S. at 160 ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."); *see also Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006) (finding regulation regarding issue of profound debate suspect).

[129] *Whitman v. American Trucking Ass.,* 531 U.S. 457, 468 (2001).

[130] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 12, 159 (quoting Justice

59.     Courts would undoubtedly treat with skepticism any attempt by the Commission to establish GHG emission mitigation measures.  Congress has introduced climate change bills since at least 1977,[131] over four decades ago.  Over the last 15 years, Congress has introduced and failed to pass 70 legislative bills to reduce GHG emissions—29 of those were carbon emission fees or taxes.[132]  For the Commission to suddenly declare such climate mitigation power resides in the long-extant NGA and that Congress's efforts were superfluous strains credibility.  Establishing a carbon emissions fee or tax, or GHG mitigation out of whole cloth would be a major rule, and Congress has made no indication that the Commission has such authority.

60.     Some may make the argument that the Commission can develop mitigation measures without establishing a standard.  I disagree.  Establishing mitigation measures requires determining how much mitigation is required – i.e., setting a limit, or establishing a standard, that quantifies the amount of GHG emissions that will adversely affect the human environment.  Some may also argue that the Commission has unilaterally established mitigation in other contexts, including wetlands, soil conservation, and noise.  These examples, however, are distinguishable.  Congress did not exclusively assign the authority to establish avoidance or restoration measures for mitigating effects on wetlands or soil to a specific agency.  The Corps and the EPA developed a wetlands mitigation bank program pursuant to section 404 of the Clean Water Act.[133]  Congress endorsed such mitigation.[134]  As for noise, the Clean Air Act

---

Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 370 (1986)); *see also* Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: PART I*, 65 STAN. L. REV. 901, 1004 (2013) ("Major policy questions, major economic questions, major political questions, preemption questions are all the same.  Drafters don't intend to leave them unresolved.").

[131] National Climate Program Act, S. 1980, 95th Cong. (1977).

[132] CONGRESSIONAL RESEARCH SERVICE, MARKET-BASED GREENHOUSE GAS EMISSION REDUCTION LEGISLATION: 108TH THROUGH 116TH CONGRESSES at 3 (Oct. 23, 2019), https://fas.org/sgp/crs/misc/R45472.pdf.  Likewise, the CEQ issued guidance on the consideration of GHG emissions in 2010, 2014, 2016, and 2019.  None of those documents require, let alone recommend, that an agency establish a carbon emissions fee or tax.

[133] 33 U.S.C. § 1344 (2018).

[134] *See* Water Resources Development Act, Pub. L. 110-114, § 2036(c), 121 Stat. 1041, 1094 (2007); National Defense Authorization Act, Pub. L. 108-136, § 314, 117 Stat. 1392, 1430 (2004); Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 103 (b)(6)(M), 112 Stat. 107, 133 (1998); Water Resources Development Act of

assigns the EPA Administrator authority over determining the level of noise that amounts to a public nuisance and requires federal agencies to consult with the EPA when its actions exceed the public nuisance standard.[135]  The Commission complies with the Clean Air Act by requiring project noise levels in certain areas to not exceed 55 dBA Ldn, as required by EPA's guidelines.[136]

61.    Accordingly, there is no support that the Commission can use its NGA section 7(e) authority to establish measures to mitigate GHG emissions from proposed pipeline facilities or from the upstream production or downstream use of natural gas.[137]

### IV.    The Commission has no standard for determining whether GHG emissions significantly affect the environment

62.    My colleague has argued that the Commission violates the NGA and NEPA by not determining the significance of GHG emissions that are effects of a project.[138]  He has challenged the Commission's explanation that it cannot determine significance because there is no standard for determining the significance of GHG emissions.[139]  He has argued that the Commission can adopt the Social Cost of Carbon[140] to determine whether GHG emissions are significant or rely on its own expertise as it does for other

---

1990, Pub. L. 101-640, § (a)(18)(C), 104 Stat. 4604, 4609 (1990).

[135] 42 U.S.C. § 7641(c) ("In any case where any Federal department or agency is carrying out or sponsoring any activity resulting in noise which the Administrator determines amounts to a public nuisance or is otherwise objectionable, such department or agency shall consult with the Administrator to determine possible means of abating such noise.").

[136] *See Williams Gas Pipelines Cent., Inc.*, 93 FERC ¶ 61,159, at 61,531-52 (2000).

[137] In addition, requiring a pipeline to mitigate emissions from the upstream production or downstream use of natural gas would not be "a reasonable term or condition as the public convenience and necessity may require."  15 U.S.C. § 717f(e) (2018).  It would be unreasonable to require a pipeline to mitigate an effect it has no control over.  Further, as discussed above, emissions from the upstream production and downstream use of natural gas are not relevant to the NGA's public convenience and necessity determination.

[138] Cheyenne Connector PP 2, 7.

[139] *Id.* PP 12-13.

[140] *Id.* P 13.

environmental resources, such as soils, groundwater, and wetland resources.[141]  He has suggested that the Commission does not make a finding of significance in order to deceptively find that a project is in the public convenience and necessity.[142]

63.     I disagree.  The Social Cost of Carbon is not a suitable method for determining whether GHG emissions that are caused by a proposed project will have a significant effect on climate change, and the Commission has no authority or reasoned basis using its own expertise to make such determination.

###     A.     Social Cost of Carbon is not a suitable method to determine significance

64.     The Commission has found, and I agree, that the Social Cost of Carbon is not a suitable method for the Commission to determine significance of GHG emissions.[143] Because the courts have repeatedly upheld the Commission's reasoning,[144] I will not restate the Commission's reasoning here.

---

[141] *Dominion Energy Transmission, Inc.*, 169 FERC ¶ 61,229 (2019) (Comm'r, Glick, dissenting at P 10).

[142] *Id.* P 2.  The dissent uses the phrase "public interest"; however, as noted earlier, the Commission issues certificates when required by the public convenience and necessity.  NGA section 7(e) does not include the phrase "public interest."  To the extent that the courts and the Commission have equated the "public convenience and necessity" with "public interest," the "public convenience and necessity" is not as broad as some would argue.  *See supra* P 16.

[143] *Fla. Se. Connection, LLC*, 162 FERC ¶ 61,233, at P 48 (2018); *see also PennEast Pipeline Co., LLC*, 164 FERC ¶ 61,098, at P 123 ("Moreover, EPA recently confirmed to the Commission that the tool, which 'no longer represents government policy,' was developed to assist in rulemakings and 'was not designed for, and may not be appropriate for, analysis of project-level decision-making.'") (citing EPA's July 26, 2018 Comments in PL18-1-000).

[144] *Appalachian Voices*, 2019 WL 847199, *2; *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016); *Sierra Club v. FERC*, 672 F. App'x 38, (D.C. Cir. 2016); *see also 350 Montana v. Bernhardt*, No. CV 19-12-M-DWM, 2020 WL 1139674, *6 (D. Mont. March 9, 2020) (upholding the agency's decision to not use the Social Cost of Carbon because it is too uncertain and indeterminate to be useful); *Citizens for a Healthy Cmty. v. U.S. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223, 1239-41 (D. Colo. 2019) (upholding the agency's decision to not use the Social Cost of Carbon); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77-79 (D.D.C. 2019) (upholding the agency's decision to not use the Social Cost of Carbon); *High Country Conservation Advocates v. U.S. Forest Serv.*, 333 F. Supp. 3d 1107, 1132 (D. Colo. 2018) vacated and remanded on

65.    However, I will address the suggestion that the Social Cost of Carbon can translate a project's impact on climate change into "concrete and comprehensible terms" that will help inform agency decision-makers and the public at large.[145]  The Social Cost of Carbon, described as an estimate of "the monetized damages associated with an incremental increase in carbon emissions in a given year,"[146] may appear straightforward. On closer inspection, however, the Social Cost of Carbon and its calculated outputs are not so simple to interpret or evaluate.[147]  When the Social Cost of Carbon estimates that one metric ton of $CO_2$ costs \$12 (the 2020 cost using a discount rate of 5 percent),[148] agency decision-makers and the public have no reasoned basis or benchmark to determine whether that cost is significant.  Bare numbers standing alone simply *cannot* ascribe significance.

---

other grounds 2020 WL 994988 (10th Cir. March 2, 2020) ("[T]he *High Country* decision did not mandate that the Agencies apply the social cost of carbon protocol in their decisions; the court merely found arbitrary the Agencies' failure to do so without explanation.").

[145] Cheyenne Connector Dissent P 13 n.27.

[146] Interagency Working Group on the Social Cost of Greenhouse Gases, *Technical Support Document – Technical Update of the Social Cost of Carbon for Regulatory impact Analysis – Under Executive Order 12866* at 1 (Aug. 2016), https://www.epa.gov/sites/production/files/2016-12/documents/sc_co2_tsd_august_2016.pdf (2016 Technical Support Document).

[147] In fact, the website for the Climate Framework for Uncertainty Negotiation and Distribution (FUND) – one of the three integrated assessment models that the Social Cost of Carbon uses – states "[m]odels are often quite useless in unexperienced hands, and sometimes misleading.  No one is smart enough to master in a short period what took someone else years to develop.  Not-understood models are irrelevant, half-understood models are treacherous, and mis-understood models dangerous."  FUND-Climate Framework for Uncertainty, Negotiation and Distribution, http://www.fund-model.org/ (LAST VISITED NOV. 18, 2019).

[148] *See* 2016 Technical Support Document at 4.  The Social Cost of Carbon produces wide-ranging dollar values based upon a chosen discount rate, and the assumptions made.  The Interagency Working Group on Social Cost of Greenhouse Gases estimated in 2016 that the Social Cost of one ton of carbon dioxide for the year 2020 ranged from \$12 to \$123.  *Id.*

### B.     The Commission has no authority or reasoned basis to establish its own framework

66.     Some argue that the lack of externally established targets does not relieve the Commission from establishing a framework or targets on its own.  Some have suggested that the Commission can make up its own framework, citing the Commission's framework for determining return on equity (ROE) as an example.  However, they overlook the fact that Congress designated the EPA, not the Commission, with exclusive authority to determine the amount of emissions that are harmful to the environment.  In addition, there are no available resources or agency expertise upon which the Commission could reasonably base a framework or target.

67.     As I explain above, Congress enacted the Clean Air Act to establish an all-encompassing regulatory program, supervised by the EPA to deal comprehensively with interstate air pollution.  Section 111 of the Clean Air Act directs the Administrator of the EPA to identify stationary sources that "in his judgment cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare"[149] and to establish standards of performance for the identified stationary sources.[150]  Thus, the EPA has exclusive authority for determining whether emissions from pipeline facilities will have a significant effect on the environment.

68.     Further, the Commission is not positioned to unilaterally establish a standard for determining whether GHG emissions will significantly affect the environment when there is neither federal guidance nor an accepted scientific consensus on these matters.[151]  This inability to find an acceptable methodology is not for a lack of trying.  The Commission

---

[149] 42 U.S.C. § 7411(b)(1)(A) (2018).

[150] *Id.* § 7411(b)(1)(B).

[151] The Council on Environmental Quality's 2019 Draft Greenhouse Gas Guidance states, "[a]gencies need not undertake new research or analysis of potential climate effects and may rely on available information and relevant scientific literature."  CEQ, *Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions*, 84 Fed. Reg. 30,097, 30,098 (June 26, 2019); *see also* CEQ FINAL GUIDANCE FOR FEDERAL DEPARTMENTS AND AGENCIES ON CONSIDERATION OF GREENHOUSE GAS EMISSIONS AND THE EFFECTS OF CLIMATE CHANGE IN NATIONAL ENVIRONMENTAL POLICY ACT REVIEWS at 22  (Aug. 1, 2016) ("agencies need not undertake new research or analysis of potential climate change impacts in the proposed action area, but may instead summarize and incorporate by reference the relevant scientific literature"), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf.

reviews the climate science, state and national targets, and climate models that could inform its decision-making.[152]

69.    Moreover, assessing the significance of project effects on climate change is unlike the Commission's determination of ROE.  Establishing ROE has been one of the core functions of the Commission since its inception under the FPA as the Federal Power Commission.[153]  And, setting ROE has been an activity of state public utility commissions, even before the creation of the Federal Power Commission.[154]  The Commission's methodology is also founded in established economic theory.[155]  In contrast, assessing the significance of GHG emissions is not one of the Commission's core missions and there is no suitable methodology for making such determination.

70.    It has been argued that the Commission can establish its own methodology for determining significance, pointing out that the Commission has determined the significance of effects on soils, groundwater, and wetland resources, using its own expertise and without generally accepted significance criteria or a standard methodology.

71.    I disagree. As an initial matter, it is important to note that when the Commission states it has no suitable methodology for determining the significance of GHG emissions, the Commission means that it has no reasoned basis for making such finding.  The Commission's findings regarding significance for soils, groundwater, and wetland resources have a reasoned basis.  For example, for groundwater resources, using information provided by the U.S. Geological Service, the Commission identified major groundwater aquifers, water supply wells, and springs crossed by the project.[156]  The Commission also used information published by the EPA to identify contaminated

---

[152] *Fla. Se. Connection, LLC*, 162 FERC ¶ 61,233, at P 36; *see also WildEarth Guardians*, 738 F.3d 298, 309 (D.C. Cir. 2013) ("Because current science does not allow for the specificity demanded by the Appellants, the BLM was not required to identify specific effects on the climate in order to prepare an adequate EIS.").

[153] *Hope*, 320 U.S. 591 (1944); *FPC v. Nat. Gas Pipeline Co. of America*, 315 U.S. 575 (1942).

[154] *See, e.g., Willcox v. Consol. Gas Co.*, 212 U.S. 19, 41 (1909) (finding New York State must provide "a fair return upon the reasonable value of the property at the time it is being used for the public.").

[155] *Inquiry Regarding the Commission's Policy for Determining Return on Equity*, 166 FERC ¶ 61,207 (2019) (describing the Commission's use of the Discounted Cash Flow model that was originally developed in the 1950s as a method for investors to estimate the value of securities).

[156] Final EIS at 4-27 to 4-33.

groundwater resources within .25 miles of the Project.[157]  Based on this information, the Commission identified a location nearby the Project with an active or unresolved contamination concern.[158]  The Commission found that use of proper spill, containment, and handling procedures in Mountain Valley's Spill, Prevention, Control, and Countermeasures Plan would minimize the chance of spills and leaks.[159]  Additionally, the Commission found that temporary and minor impacts could result during trenching activities in areas with shallow groundwater but Mountain Valley would implement best management practices to protect groundwater resources and would adhere to applicable federal, state, and local requirements to protect groundwater resources.[160]  Based on this information, the Commission had a reasoned basis to find that the Project would not result in significant impacts on groundwater resources.[161]

72.     In contrast, the Commission has no reasoned basis to determine whether a project has a significant effect on climate change.  To assess a project's effect on climate change, the Commission can only quantify the amount of project emissions and compare that number to national emissions to calculate a percentage of national emissions.  That calculated number cannot inform the Commission on climate change effects caused by the project, e.g., increase of sea level rise, effect on weather patterns, or effect on ocean acidification.  Nor are there acceptable scientific models that the Commission may use to attribute every ton of GHG emissions to a physical climate change effect.

73.     Without adequate support or a reasoned target, the Commission cannot ascribe significance to particular amounts of GHG emissions.  To do so would not only exceed our agency's authority, but would risk reversal upon judicial review.  Courts require agencies to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made."[162]  Simply put, stating that an amount of GHG

---

[157] *Id*. at 4-31.

[158] *Id*.

[159] *Id*.

[160] *Id*. at 4-33.

[161] *Id*.

[162] *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C Cir. 2006) (quoting *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1235-36 (9th Cir. 2001)); *see also American Rivers v. FERC*, 895 F.3d 32, 51 (D.C. Cir. 2018) (". . . the Commission's NEPA analysis was woefully light on reliable data and reasoned analysis and heavy on unsubstantiated inferences and *non sequiturs*") (italics in original); *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1179 (9th Cir. 1982) ("The EA provides no foundation for the inference that a valid comparison may be drawn between the sheep's reaction to hikers and their reaction to large, noisy ten-wheel ore trucks.").

emissions appears significant without any support fails to meet the agency's obligations under the Administrative Procedure Act (APA).

### V.        <u>Conclusion</u>

74.     This concurrence is intended to assist the Commission, courts, and other parties in their consideration of the Commission's obligations under the NGA and NEPA.  The Commission cannot act *ultra vires* and claim more authority than the NGA provides it, regardless of the importance of the issue sought to be addressed.[163]  The NGA provides the Commission no authority to deny a certificate application based on the environmental effects from the upstream production or downstream use of natural gas.  Congress enacted the NGA, and subsequent legislation, to ensure the Commission provided public access to natural gas.  Further, Congress designed the NGA to preserve States' authority to regulate the physical effects from the upstream production and downstream use of natural gas, and did not leave that field unregulated.  Congress simply did not authorize the Commission to judge whether the upstream production or downstream use of gas will be too environmentally harmful.

75.     Nor does the Commission have the ability to establish measures to mitigate GHG emissions.  Pursuant to the Clean Air Act, Congress exclusively assigned that authority to the EPA and the States.  Finally, the Commission has no reasoned basis for determining whether GHG emissions are significant that would satisfy the Commission's APA obligations and survive judicial review.

76.     I recognize that some believe the Commission should do more to address climate change.  The Commission, an energy agency with a limited statutory authority, is not the appropriate authority to establish a new regulatory regime.

        For these reasons, I respectfully concur.

_____

_____

Bernard L. McNamee
Commissioner

---

        [163] *Office of Consumers' Counsel*, 655 F.2d at 1152 ("[A]ppropriate respect for legislative authority requires regulatory agencies to refrain from the temptation to stretch their jurisdiction to decide questions of competing public priorities whose resolution properly lies with Congress.").